**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| QUINTON HARRIS; JOHN BAKER; GEOFFREY MILLER; NORMAN MOUNT; THOMAS TAYLOR; AND SCOTT ZINN; individually and on behalf of other similarly situated, | CASE NO. 8:16cv381-JFB-TDT |
| Plaintiffs, | **DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| UNION PACIFIC RAILROAD COMPANY, | |
| Defendant. | |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND............................................................................... 2

    A.    Union Pacific Has Historically Reviewed its Safety-Sensitive Employees for Fitness-For-Duty Requirements To Ensure Safety ........................................... 2

    B.    Union Pacific's FFD Process: An Individualized Analysis of Potential Functional Work Restrictions ................................................................... 4

    C.    Union Pacific's Accommodation/Interactive Process Continues: DPM .............. 8

    D.    The NTSB Recommends That Railroads Adopt More Stringent Medical Standards For Safety-Sensitive Positions ..................................... 9

    E.    The FRA Forms the RSAC Working Group On Medical Standards................... 11

    F.    Union Pacific's 2011 Revisions to Its Medical Rules ........................................ 14

    G.    Union Pacific's Accident in Goodwell ................................................. 17

    H.    Union Pacific's 2014 Revision To Medical Rules and Adoption of FMCSA Guidance ...................................................................... 20

    I.    Union Pacific Accident In Arden ........................................................ 27

    J.    Union Pacific's FFD Evaluations and Determinations of the Named Plaintiffs ................................................................................ 30

    K.    Plaintiffs' Proposed Class List from the "eHealthSafe Datasets" ....................... 45

III.  ARGUMENT AND AUTHORITIES................................................................. 51

    A.    Standard of Review........................................................................... 51

    B.    Plaintiffs' Disparate Treatment Pattern or Practice Claim Requires Proof of Discriminatory Intent................................................. 52

    C.    Plaintiffs' ADA Disparate Treatment Claim Does Not Satisfy Rule 23(a) ........ 53

    D.    Plaintiffs' ADA Disparate Treatment Claim Does Not Satisfy Rule 23(b)(2) With Respect to Liability/Injunctive Relief........................................ 82

    E.    Plaintiffs' ADA Disparate Treatment Claim Cannot Be Certified Under Rule 23(b)(3)........................................................................... 85

    F.    Certification of Any Particular Issues Under Rule 23(c)(4) Would Be Inappropriate .................................................................... 89

    G.    Plaintiffs Have Failed to Identify an Ascertainable Class That Includes Only Class Members With Standing.................................................... 91

IV.   CONCLUSION.................................................................................................. 92

# I.
# INTRODUCTION

Plaintiffs' Motion for Class Certification (Doc. # 240) cannot be granted because Plaintiffs have failed to satisfy the indispensable requirements of Federal Rule of Civil Procedure 23. Named Plaintiffs Quinton Harris, John Baker, Geoffrey Miller, Norman Mount, Thomas Taylor, and Scott Zinn seek to certify a disparate treatment claim brought under the Americans with Disabilities Act ("ADA") on behalf of a putative class of over 7,000 current and former employees of Defendant Union Pacific Railroad Company ("Union Pacific"). Plaintiffs' claim focuses on Union Pacific's Medical Rules and Fitness-for-Duty ("FFD") policies and practices applicable to employees who hold safety-sensitive positions.

Because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Comcast Corp. v. Behrend*, 569 U.S. 27, 28 (2013), Union Pacific starts with a description of the factual background, revealed during the last year-and-a-half of discovery, on which Plaintiffs' disparate treatment class claim rests. Applying the prerequisites of Rule 23 to this factual background exposes the countless individualized inquiries that would be required to adjudicate Plaintiffs' disparate treatment claim. These individualized inquiries are essential in evaluating indispensable elements of Plaintiffs' claim on which they have the initial burden, such as whether each putative class member is a "qualified individual with a disability." Yet, such inquiries are incompatible with the requirements of Rule 23 because of the breadth of the class Plaintiffs seek to certify. The putative class is wildly diverse in the jobs they held, the reasons for their FFD evaluations, the medical and other information considered during the evaluations, the medical evidence on risk considered, and the ultimate outcome of the evaluations, including whether restrictions were imposed, and if so, what restrictions and for how long. These diversities—each relevant to the

1

Plaintiffs' assertion that intentional disability discrimination was Union Pacific's standard operating procedure in FFD evaluations resulting from reportable health events—obliterate the elements of commonality and typicality essential to certify a class.

Moreover, while Plaintiffs claim to have presented evidence of a "general policy of discrimination … that will generate common answers," (Doc. 249 at 23), in reality, they offer nothing more than reassuring generalities that are either unsupported by discovery or, even if ultimately proved, could not establish liability for all six Named Plaintiffs, let alone the entire class.  As detailed below, Plaintiffs' proposed class fails the rigors of Rule 23 because it lacks Rule 23(a)'s commonality and typicality prerequisites and cannot satisfy the requirements of either Rule 23(b)(2) or 23(b)(3).  In addition, issue certification under Rule 23(c)(4) is untenable because any issues relevant to Plaintiffs' disparate treatment claim that are capable of classwide resolution would be "artificial or merely preliminary to matters that *necessarily* must be adjudicated to resolve the heart of the matter."  *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479–80 (8th Cir. 2016).  Simply put, adjudication of any portion of Plaintiffs' disparate treatment claim cannot be accomplished on a classwide basis.

## II.
## FACTUAL BACKGROUND

**A.**    **Union Pacific Has Historically Reviewed its Safety-Sensitive Employees for Fitness-For-Duty Requirements To Ensure Safety**

1.    Because of the variety of safety concerns at play across the railroad industry, Union Pacific has conducted FFD evaluations of employees in safety-sensitive jobs for many years.  (Declaration of Debra Gengler ("Gengler Decl."), attached as Exh. D, at ¶ 2).

2.    Evaluating whether these employees can safely perform their jobs is critical to protecting the employee, other Union Pacific employees, and the public.  (Declaration of John Holland, MD, attached hereto as Exh. B ("Holland Decl.") at ¶ 3; *see also* Doc 249-34 at 6 (Dr.

Trangle, Plaintiffs' expert, agrees FFD evaluations should "keep[] in mind the safety of the individual, the coworkers and the public at large").

3.    The job functions of these employees are diverse, including, for example, operating locomotives, building and repairing railroad tracks, maintaining locomotives and train cars, building and maintaining railroad signals, transporting train crews, and controlling train traffic on specified segments of track.  (Declaration of Rod Doerr, attached as Exh. C, ("Doerr Decl. at ¶ 3).

4.    In addition, because Union Pacific operates in 23 states, the environments in which its employees work have extremely variant temperatures and weather conditions (from Eastport, ID to Laredo, TX), altitudes and terrains (across the Rocky Mountains and the Arizona desert), population densities (from urban to rural areas), and times of day (24-hour operations). (Doerr Decl. at ¶ 4).

5.    Two employees performing a job with the same title for Union Pacific in different locations may face variation in their job responsibilities, work environments, and safety risks because of this diversity of settings in which Union Pacific operates.  (Doerr Decl. at ¶ 5).

6.    According to the National Transportation Safety Board ("NTSB"), within the railroad industry, "a *safety-sensitive position* is one covered under the hours of service laws, including train and engine service employees involved in the movement of trains or engines (that is, engineers, conductors, brakemen, switchmen, locomotive hostlers/helpers); dispatching employees who issue mandatory directives (that is, train dispatchers, control operators); and signal employees who inspect, repair, or maintain signal systems."  (Exh. B3 at Dr. Holland Expert Report-Ex I-02146 n.8)(emphasis in original).  This is consistent with the FRA's

3

definition of "safety-sensitive positions."[1]  (Doerr Decl. at ¶ 6).

7.      Union Pacific considers a slightly broader group of positions to be safety-sensitive, to include, for example, intermodal clerks, who authorize access to Union Pacific property and guard against safety breaches, and non-agreement employees in the field, such as field managers who direct the work of those in safety sensitive field positions.  (Doerr Decl. at ¶ 7).

8.      Union Pacific considers these positions to be safety-sensitive for obvious reasons including, but not limited to: (1) employees are operating 200-ton locomotives that are pulling dozens of railcars; (2) trains travel through cities and over grade crossings; (3) trains transport hazardous materials; (4) employees climb on and around these huge locomotives and railcars while maintaining or moving them in railyards; (5) employees work on/in close proximity to live railroad tracks, bridges, and roads; (6) employees build and maintain signals that often require them to climb to heights over four feet; (7) employees construct or maintain railroad track and infrastructure, railcars, and mobile equipment using multiple hazardous machines and tools, including power saws, welding equipment, and cutting torches; (8) train dispatchers monitor and communicate vital information to locomotives (much like air-traffic controllers) and track maintenance crews; and (9) Union Pacific transports employees in crew vans from railyards to waiting trains in urban and rural areas.  (Doerr Decl. at ¶ 8).

**B.      Union Pacific's FFD Process: An Individualized Analysis of Potential Functional Work Restrictions**

9.      During the period relevant to Plaintiffs' claim, Union Pacific's determination of whether an employee in a safety-sensitive position is fit for duty includes an individualized

---

[1] Within the transportation industries, the terms "safety-critical positions" and "safety-sensitive positions" are used somewhat interchangeably.  (*See, e.g.,* Exh. B9 at Dr. Holland Expert Report-Ex I-02197 (using the terms "safety-critical positions" and "safety sensitive positions" within the same paragraph)).  Any distinctions between these terms are irrelevant for purposes of Plaintiffs' Motion.

assessment of the employee's health conditions and functional capabilities, which is used to determine whether the employee has functional limitations or risk for sudden incapacitation that would require functional work restrictions. If functional work restrictions are required, further individualized assessment is conducted to determine whether those restrictions can be accommodated. (Holland Decl. at ¶ 4).

10. In all FFD evaluations, Union Pacific conducts an individualized analysis of the employee's fitness for duty in multiple steps. First, HMS undertakes an assessment of the employee's health conditions and functional capabilities. (Gengler Decl. at ¶ 4).

11. The assessment of the employee's health conditions and functional capabilities is performed by either an Associate Medical Director ("AMD"), who is a physician retained by Union Pacific as an independent contractor, or, in some cases, by or in consultation with Union Pacific's CMO, Dr. Holland, when appropriate. (Gengler Decl. at ¶ 5; Holland Decl. at ¶ 5).

12. The AMDs who perform FFD evaluations are occupational medicine physicians and have extensive experience providing FFD evaluation services to other employers such as, for example, Hewlett-Packard, Agilent, State Farm, and Kodak. (Deposition of John Charbonneau, MD, attached as Exh. A75 at 17:1-13; 19:24-21:2; 27:23-28:9; 114:1-14; Deposition of Matthew Hughes, M.D., attached as Exh. A74 at 16:25-17:5).

13. After an FFD evaluation is initiated, an FFD Nurse, in collaboration with the AMD, may request the employee to provide medical records relevant to and necessary for assessing the employee's health conditions and functional capabilities. The type of records requested depends upon the employee's particular medical condition and the employee's specific job duties. (Gengler Decl. at ¶ 6).

14. The AMDs and CMO do not perform an in-person physical examination of the

5

employee, but rather review the appropriate medical records, which is an accepted method of conducting an FFD evaluation, as recognized by occupational medicine physicians, including Plaintiffs' own expert Dr. Goldstein. (Holland Decl. at ¶ 7; Deposition of Robert Goldstein, M.D., attached as Exh. A64, ("Goldstein Dep.") at 32:25-33:22).

15. In addition to reviewing the medical records, in some cases, the AMD or CMO may refer the matter to an outside physician specialist (such as a neurologist or cardiologist) for a clinical evaluation or a medical file review. (Holland Decl. at ¶ 8)

16. When the FFD evaluation is referred to an outside physician specialist, the specialist is asked to provide opinions about the employee's diagnosis, whether additional evaluation is needed, and/or whether the employee has functional limitations or risk for sudden incapacitation. (Holland Decl. at ¶ 9).

17. In some cases, primarily those involving musculoskeletal health conditions, the AMD or CMO requires the employee to undergo a Functional Capacity Evaluation (FCE) to assist in the evaluation of the employee's functional capabilities. (Holland Decl. at ¶ 10).

18. Following this assessment of the employee's health condition and functional capabilities, the AMD or CMO then uses that assessment to determine whether the employee requires functional work restrictions. (Holland Decl. at ¶ 11).

19. By "functional work restrictions," Union Pacific means restrictions that focus on particular work functions or tasks rather than whether a person is qualified or disqualified for a particular job. Some functional work restrictions that have been developed by Union Pacific focus on safety-sensitive work tasks specific to the railroad industry, such as "working on or near moving trains, freight cars, or locomotives, unless protected by barriers." Other restrictions could be applied in any work setting, such as lifting or bending restrictions, and these are

6

sometimes recommended by the employee's own treating physician. (Holland Decl. at ¶ 12).

20.     The advantages of functional work restrictions are that they can be applied to a variety of jobs, provide consistency in mitigating specific safety risks, and facilitate identification of possible accommodations by supervisors because they clearly articulate the work activities the employee will be unable to perform. (Holland Decl. at ¶ 13).

21.     If HMS determines the employee's medical condition does not warrant functional work restrictions, Union Pacific releases the employee to return to full duty work without restriction. (Gengler Decl. at ¶ 8).

22.     In some cases, though the employee is returned to work, the employee's medical condition is determined to require ongoing monitoring because some chronic medical conditions may not immediately present a need for restrictions but may progress over time so that restrictions may be needed in the future. (Gengler Decl. at ¶ 9).

23.     If HMS determines an employee requires functional work restrictions, the next step in the individualized assessment of that employee is for HMS to notify the employee and his/her supervisor of the restrictions and ask the employee's supervisor, and in some cases other higher-ranking managers, whether the employee can perform the essential functions of the job within those restrictions, either with or without reasonable accommodation. (Gengler Decl. at ¶ 10).

24.     The employee's supervisor (and/or a higher-ranking manager) evaluates the restrictions vis-a-vis the employee's job duties and makes an independent determination as to whether (a) the employee's restrictions have any effect on his/her ability to perform his/her job, and (b) if so, whether the restrictions can nonetheless be accommodated. If the employee can perform the essential functions with or without accommodation, the employee returns to the job.

(Gengler Decl. at ¶ 11).[2]

25.    If the supervisor determines that the restrictions will impede the employee's ability to perform the job, and discussions with the supervisor and the employee reveal no apparent accommodations that would allow him/her to perform the essential functions of the job within those restrictions, Union Pacific informs the employee he/she may not return to the job. (Gengler Decl. at ¶ 12).

26.    If HMS and the employee's treating medical provider disagree on the employee's current medical diagnosis that is the basis for the functional work restrictions, the employee may appeal the decision in accordance with the applicable collective bargaining agreement.  (Gengler Decl. at ¶ 13; Union Pacific's 2011 Medical Rules, attached as Exh. D3, UP 004042–43).

## C.    Union Pacific's Accommodation/Interactive Process Continues: DPM

27.    Even when an employee is unable to perform his/her job because of functional work restrictions, he/she remains employed by Union Pacific, and Union Pacific continues the interactive process through a referral to its Disability Prevention and Management Department ("DPM").  (Declaration of Kristi Deardorff, attached as Exh. E, ("Deardorff Decl.") at ¶ 3).

28.    DPM sends a letter to the employee offering him/her assistance to find alternative employment.  (*See, e.g.,* Letter from Director of DPM to Thomas Taylor, dated June 17, 2015, attached as Exh. A49, at UP 008580).

---

[2] Plaintiffs argue in their brief that Union Pacific does not conduct an individualized assessment because the evaluation does not take into account an employee's specific job duties, citing the following testimony by Dr. Holland:  "[I]t is neither practical nor necessary for Union Pacific Railroad physicians to be familiar with the detailed physical demands and safety risk for all safety-critical positions within the company, because HMS applies functional work restrictions to safety-critical workers with health-related safety risks."  (Plaintiffs' Brief at 10).  In reality, Dr. Holland's testimony is consistent with Union Pacific's FFD process, which ensures an individualized assessment.  Setting aside the fact that Dr. Holland and the AMDs have extensive knowledge of railroad jobs, more importantly, after HMS identifies functional work restrictions necessitated by the employee's medical condition, it then relies on the employee's managers, who are intimately familiar with the particulars of the employee's job, to determine whether the employee can perform the job with or without reasonable accommodation despite the restrictions.  (Holland Decl. at ¶¶ 6, 14).

8

29.     DPM assists the referred employee in a variety of ways including: (1) contacting the employee's supervisor or others in his/her department to revisit whether the employee can perform his/her job despite the functional restrictions; (2) assisting the employee in locating another job for which the employee is qualified, dependent on any applicable collective bargaining agreement and his/her seniority; (3) teaching the employee how to access information about job vacancies within Union Pacific, helping match current his/her skills/levels of function with available job openings throughout Union Pacific; and (4) assisting the employee with the application process for any Union Pacific jobs in which the employee has an interest and for which he/she is qualified, as well as providing other vocational rehabilitation assistance. (Deardorff Decl. at ¶ 4).

30.     If the employee refuses the services offered by DPM or fails to make reasonable efforts to participate in the job-seeking process, DPM closes the case and makes no further contact with the employee.  (Deardorff Decl. at ¶ 5).

**D.     <u>The NTSB Recommends That Railroads Adopt More Stringent Medical Standards For Safety-Sensitive Positions</u>**

31.     The NTSB is an independent federal agency charged with investigating and determining the probable cause of significant transportation (including rail) accidents and issuing safety recommendations to prevent future accidents.  ([www.ntsb.gov/about/Pages/default.aspx](www.ntsb.gov/about/Pages/default.aspx))

32.     On multiple occasions after significant and sometimes fatal train accidents attributable to railroad employees' medical conditions, the NTSB has advised both the Federal Railroad Administration ("FRA") (the federal agency primarily charged with regulating the railroad industry) to adopt comprehensive medical standards and enhanced fitness for duty requirements for employees in safety sensitive positions, including requiring employees to report changes in their medical conditions and railroads to evaluate employees' fitness for duty. (Exh.

B3 at Dr. Holland Expert Report-Ex I-02154–56).

33.    In 1996, two New Jersey Transit commuter trains collided nearly head-on in Secaucus, New Jersey, killing three people and injuring another.  The NTSB concluded that the locomotive engineer at fault had longstanding diabetes, which caused him to develop an acquired color vision deficiency that contributed to the accident.  The engineer was not required by FRA regulations to report his medical condition, and he did not otherwise do so.  (*Id.* at Ex I-02154).

34.    After investigating the Secaucus accident, the NTSB made the following recommendation to the Association of American Railroads ("AAR"), the Brotherhood of Locomotive Engineers, and the American Public Transit Association:

> Provide your members with information about this accident, specifically explaining acquired vision deficiency and emphasizing the importance of ensuring the color vision requirement.  Stress that railroad employees in safety sensitive positions, especially engineers, report their use of medication or any changes in their medical condition to their employer.

(*Id.* at Ex I-02155).

35.    In 2001, two Canadian National/Illinois Central Railway trains collided near Clarkston, Michigan, killing two crewmembers and seriously injuring two others.  The NTSB determined the probable cause of the accident was crewmembers' fatigue, primarily due to the engineer's untreated, and the conductor's insufficiently treated, obstructive sleep apnea.  The NTSB investigation revealed that the two crewmembers operating the locomotive that passed the stop signal had been informed by their private physicians that they had potentially incapacitating medical conditions, but neither crewmember informed their employer or received treatment to mitigate their medical condition.  (*Id.* at Ex I-02155–56).

36.    As a result of this accident, the NTSB recommended that the FRA:

> Require that any medical condition that could incapacitate, or seriously impair the performance of, an employee in a safety-sensitive position be reported to the

10

railroad in a timely manner.

> Require that, when a railroad becomes aware that an employee in a safety-sensitive position has a potentially incapacitating or performance-impairing medical condition, the railroad prohibit that employee from performing any safety-sensitive duties until the railroad's designated physician determines that the employee can continue to work safely in a safety-sensitive position.

(*Id.* at Ex I-02156).

### E.   The FRA Forms the RSAC Working Group On Medical Standards

37.   In 2005, the FRA published the Medical Standards for Railroad Workers Report ("Medical Standards Report") (Holland Decl. at ¶ 17; Exh. B1).

38.   The Medical Standards Report detailed the results of a study that examined existing programs of 3 U.S. DOT modal administrations, 5 foreign programs, and 12 railroads, representing Class 1, regional/short line, and commuter operators.  (Exh. B1, Medical Standards Report, at UP_Harris_036443).

39.   The FRA noted several accidents and injuries for which the medical condition of an employee involved was the probable or contributing cause and determined that over half of railroad employee-on-duty fatalities in 2003 were due to medical conditions.  (*Id.*).

40. The FRA also found that:

> Failure to recognize potentially incapacitating medical conditions can have serious safety consequences for railroad employees, the railroads and the public. Conditions such as seizure disorders, cardiovascular disease and sleep disorders, as well as some prescription and over-the counter medications, may put the employee at risk of being unable to perform his or her safety critical job.  Several modes of transportation in the U.S., in particular motor carrier, aviation and maritime, have regulations and a government-mandated process in place to minimize the risk of an employee performing a job in the presence of a medical condition or medication that has the risk of compromising the employee's ability to safely carry out the requirements of the job.

(Exh. B1 at UP_Harris_036451).

41.   The Medical Standards Report also noted that the "significant proportion of

11

employee-on-duty fatalities due to medical conditions indicates that there may be significant risk of an employee performing a safety-sensitive function becoming incapacitated." (*Id*. at UP_Harris_036454).

42. The FRA arrived at several conclusions, including:

- There have been several accidents and injuries due to medical conditions of the employee. A medical standards program could likely have prevented these accidents.
- Individuals and health care providers are often unable to assess the degree of impairment.
- Health care providers are often unaware of regulations and guidelines regarding medical conditions and risk of incapacitation
- The existence of a medical standards program will provide consistency across the industry and will reduce the risk of accidents due to the sudden incapacitation of an employee.

(Exh. B1 at UP_Harris_036456–57).

43. The FRA also concluded that "[c]ompatibility of a medical standards program with the Americans with Disabilities Act, the Railway Labor Act, Health Insurance Portability and Accountability Act regulations and existing labor agreements does not appear to be a problem" and that the FRA should proceed with development of medical standards. (*Id.* at UP_Harris_036443).

44. In considering how to develop medical standards, the FRA noted that the "medical standards from the DOT modal administrations and the foreign railroad oversight agencies, as well as the Railroad Retirement Board disability criteria, provide a basis for developing U.S. railroad standards." (*Id*. at UP_Harris_036455).

45. The FRA recognized that the guidelines adopted by the Federal Motor Carrier Safety Administration ("FMCSA") for commercial drivers "have been developed through consensus medical advisors" and are "periodically updated through expert consensus." (*Id*. at UP_Harris_036471–72).

46.     In or around 2006, the FRA initiated within its Railroad Safety Advisory Committee ("RSAC") a Medical Standards Working Group to establish "standards and procedures for determining the medical fitness for duty of personnel engaged in safety critical functions."  FRA Notice No. 69, 77 Fed. Reg. 24261 (April 23, 2012).  The working group consisted of representatives from the FRA, railroad employee national unions, and the AAR on behalf of railroad carriers.  (Holland Dec. at ¶ 18).

47.     In May 2007, the RSAC Medical Standards Working Group established a Physicians Taskforce.  FRA Notice No. 69, 77 Fed. Reg. 24261 (April 23, 2012).  The Physicians Taskforce was compromised of the Chief Medical Officer of the FRA, physicians representing the railroads through AAR, and a physician representing the unions.  (Holland Decl. at ¶ 19).

48.     When Dr. Holland became Union Pacific's Chief Medical Officer ("CMO") in March 2010, in that capacity, he participated on the RSAC Physician's Task Force.  (*Id.*).

49.     After over five years of consideration and deliberation, the RSAC Physician's Task Force developed a draft set of medical qualification criteria and protocols, which it presented to the RSAC Medical Standards Working Group in September 2011.  These medical criteria and protocols were intended to ensure that employees working in certain safety-sensitive railroad positions would have been required to undergo periodic fitness for duty evaluation and meet comprehensive medical standards, ensuring they did not have health conditions that posed unacceptable safety risks for work.  (Holland Decl. at ¶ 20).

50.     Under the Physician's Task Force's draft medical criteria and protocols, employees working in safety-sensitive positions would be required to disclose to their railroad-employer medical conditions that put the employees at risk of being unable to safely perform

13

their jobs, including: (1) "eye disorders," (2) "hearing loss," (3) "Use of a hearing amplification device and/or use of corrective lenses," (4) "Obstructive sleep apnea and treatment," (5) "Diabetes treated with insulin," (6) "Neurocardiogeneic syncope and Carotid Sinus Hypersensitivity (recurring fainting episodes)," (7) "Cardiovascular conditions," (8) "Transient ischemic attack (TIA) and Stroke," and (9) "Seizure Disorders." (RSAC Physician's Task Force Recommendations, attached at Exh. B2, at Dr. Holland Expert Report-Ex I-00001).

51.     The Medical Standards Working Group also prepared draft regulations, which would have required the CMO of each railroad, or his/her designee, to perform an individualized assessment of any employee who had one of these conditions to determine whether the employee was: "(i) Medically FFD without restriction - the employee can safely perform the employee's safety-critical job; (ii) Medically FFD with restriction - the employee can safely perform the employee's safety-critical job so long as the employee complies with conditions specified by the Railroad's Chief Medical Officer or his/her designee; or (iii) Not medically FFD - the employee has one or more medical conditions which prevent safe performance of the employee's safety-critical job." (Exh D2 at UP 002119).

52.     Despite the work and recommendations of RSAC's Medical Standards Working Group, the FRA failed to adopt any new regulations governing comprehensive medical standards and fitness-for-duty requirements for railroad workers in safety-sensitive positions.  (Holland Decl. at ¶ 22).

**F.     Union Pacific's 2011 Revisions to Its Medical Rules**

53.     After the FRA failed to adopt the regulations recommended by the RSAC working group, Union Pacific endeavored to restructure its fitness-for-duty program consistent with some of the NTSB's and RSAC's recommendations.  (Holland Decl. at ¶ 23).

54.     In 2011, Union Pacific revised its Medical Rules, which had last been updated in

14

1997.  (Gengler Decl. at ¶ 16).

55.    The 1997 Medical Rules had required employees to notify their supervisor "if the Employee discovers that a medical condition exists which presents significant risk of substantial harm to the Employee or others, and the medical condition has not been evaluated by HSD,[3] resulting in a 'safe work' determination."  (Exh. D1, 1997 Medical Rules, at UP 004023).

56.    The 2011 version of the Medical Rules incorporated the RSAC's Physician's Task Force's proposal to require employees working in safety-sensitive jobs to notify the Railroad if they experience one or more of an enumerated list of health events that could put the employees at risk of being unable to safely perform their jobs.  (Gengler Decl. at ¶ 17).  These are referred to by Union Pacific as Reportable Health Events ("RHEs"), and the list, contained in Appendix B of the 2011 Medical Rules, is substantially similar to the Physician's Task Force's proposal:

> New diagnosis, recent event, or change in a prior stable condition, for one of the following:
> **A.    Cardiovascular Conditions including:**
> 1.    Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
> 2.    Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
> 3.    Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
> 4.    Stroke or Transient Ischemic Attack (TIA).
> 5.    Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral).
> 6.    Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty; or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).
> **B.    Seizure of Loss of Consciousness including:**

---

[3] "HSD" referred to Union Pacific's Health Services Department, which has since changed its name to the Health and Medical Services ("HMS").  (*Compare* Exh. D1 at UP 004022 *with* Exh. D3 at UP 004063).

1.  A seizure of any kind.
2.  Diagnosis of epilepsy (a condition with risk for recurrent seizures).
3.  Treatment with anti-seizure medication to prevent seizures.
4.  Loss of consciousness (of any duration including episode caused by insulin reaction).

**C.  Significant Vision or Hearing Change including:**

1.  Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).
2.  Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).
3.  Significant hearing loss or surgery on the inner ear.
4.  New use of hearing aids.

(Exh. D3 at UP 004036; *compare with* Exh. B2 at Dr. Holland Expert Report-Ex I-00001).

57. Union Pacific's 2011 Medical Rules required that:

Dispatchers and Operating Department field employees (including all Transportation, Engineering Services, and Mechanical employees – agreement and nonagreement), must also:

- Notify HMS in a timely manner if he/she experiences any of the health events listed in Appendix B of these Medical Rules, so that HMS can carry out a Fitness-for-Duty (FFD) evaluation.  The employee should simultaneously notify his/her supervisor that he/she has experienced a health event that requires a Fitness-For-Duty evaluation by HMS prior to performing his/her job.

- If the employee experiences a health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-For-Duty clearance has been provided for such work by HMS.

 (Exh. D3 at UP 004061).

58.    The 2011 Medical Rules defined "fitness for duty" as the "[a]bility to medically and functionally (including physical, mental, and or [*sic*] cognitive function) safely perform the functions of a job, with or without reasonable accommodation and meet medical standards established by regulatory agencies in accordance with federal and/or state laws."  (Exh. D3 at UP 004035).

59.    Of course, only relatively small number of FFD evaluations are triggered by a

16

self-reported RHE, and employees' self-reporting is not the only way Union Pacific may discover employees' RHEs. (Gengler Decl. at ¶ 18). For example, an RHE may be identified during a supervisor-initiated request for FFD evaluation "based upon credible information which raises a concern about the employee's ability to safely perform his/her job duties." (Exh. D3 at UP 004045; Gengler Decl. at ¶ 18). HMS may also discover an RHE during required regulatory examination of an employee, such as an FRA examination for compliance with the medical certification requirements for Locomotive Engineers, an FMCSA examination for those employees whose job duties require commercial motor vehicle requiring licensure, or an OSHA examination for compliance with regulations on worker exposure to potential workplace hazards. (Exh. D3 at UP 004044; Gengler Decl. at ¶ 19). An employee who is seeking to transfer into a safety-sensitive job or returning to work after an absence of 12 months or longer must also submit to a FFD examination, which may reveal an RHE. (Exh. D3 at UP 004044–45; Gengler Decl. at ¶ 20).

### G.    Union Pacific's Accident in Goodwell

60.    On June 24, 2012, near Goodwell, Oklahoma, two Union Pacific freight trains collided head-on. The engineer and the conductor of the eastbound train and the engineer of the westbound train were killed. During the collision, several fuel tanks from the derailed locomotives ruptured, releasing diesel fuel that ignited and burned. Damage was estimated at $14.8 million. (Exh. B3 at Dr. Holland Expert Report-Ex I-2133).

61.    The NTSB investigation concluded that the probable cause of the accident was "the eastbound Union Pacific Railroad train crew's lack of response to wayside signals because of the engineer's inability to see and correctly interpret the signals . . . [and c]ontributing to the accident was a medical examination process that failed to decertify the engineer before his deteriorating vision adversely affected his ability to operate a train safely." (*Id.* at Ex I-02174–

17

75).

62.   The NTSB noted that while FRA regulations require locomotive engineers and conductors to undergo an evaluation of and meet medical standards for vision and hearing, the regulations have no requirements for evaluating any other health concerns or medication use. (*Id.* at Ex I-02156).

63.   The NTSB also highlighted other railroad accidents caused by undisclosed medical conditions that had occurred since the one in Clarkston, Michigan.  In one of those accidents, a BNSF coal train collided with a BNSF maintenance-of-way equipment train near Red Oak, Iowa.  The NTSB concluded that the accident was caused by the engineer and conductor falling asleep.  The engineer and conductor had been diagnosed with various conditions that are significant factors for sleep apnea, including obesity, diabetes, hypertension, restless leg syndrome, and depression.  Yet neither employee was required to disclose these conditions to BNSF to determine if he was fit for duty.  (*Id.*).

64.   The NTSB stated that the "FRA has made no changes to improve the medical certification of railroad employees in safety-sensitive position in the 11 years since the Clarkston accident."  The NTSB also noted that the "FRA has indicated that future products from the RSAC medical standards working group will be guidelines for the railroad industry, rather than information to support improved regulations."  (*Id.*).

65.   The NTSB added that the "RSAC working group on medical standards also has not made progress in the area addressed by Safety Recommendation R-02-26, which requires railroad to prohibit an employee known to have potentially incapacitating or performance-impairing medical condition from performing any safety-sensitive duties until the railroad's designated physician determines that the employee can continue to work safely in a safety-

18

sensitive position." (*Id.* at Ex I-02157).

66.     In its report of the Goodwell accident, the NTSB made the following recommendations to the FRA:

> Medical monitoring and reporting programs used in other transportation modes do not rely solely on the employee to self-report deterioration in chronic conditions. Instead, other modes have identified specific chronic conditions with the potential for deterioration and require more frequent, specified medical evaluation and certification for employees in safety-sensitive positions who have those conditions . . . Therefore, the NTSB recommends that the FRA require more frequent medical certification exams for employees in safety-sensitive positions who have chronic conditions with the potential to deteriorate sufficiently to impair safe job performance.

(*Id.* at Ex I-02159).

67.     The NTSB cited other federally-regulated transportation modes having comprehensive medical certification regulations including the Federal Aviation Administration ("FAA"), FMCSA, and the US Coast Guard and noted that "[w]ith rare exceptions … all these modes require a complete medical history, a list of medications, and a thorough physical exam for operators under their jurisdictions." (*Id.* at Ex I-02158).

68.     The NTSB also recognized that the standards for these other transportation modes could provide guidance for developing standards for railroads:

> The NTSB acknowledges that specific job requirements differ across various modes of transportation leading to different occupational health standards. However, many of the safety risks created by health problems or their treatment are similar. …

***

> [T]he FMCSA's current program change … will bring medical certification for those modes into closer alignment with the FAA system. The NTSB concludes that upgrading FRA medical certification requirements for employees in safety-sensitive positions to include comprehensive health examinations, standardized testing across the industry, and centralized oversight of certification decisions when initial testing is failed, as well as more frequent medical certification when an employee has a condition with the potential to deteriorate, would improve transportation safety.

19

(*Id.* at Ex I-02159).

69.    The NTSB reiterated its previous recommendation that the FRA require railroads to impose more frequent medical certification exams for employees in safety-sensitive positions who have chronic conditions with the potential to deteriorate sufficiently to impair safe job performance and to audit "medical records to ensure that all personnel in safety-sensitive positions have adequate documentation of appropriate medical testing." (*Id.* at Ex I-02151).

70.    One NTSB member, in concurring with the finding and recommendations in the Report, wrote:

> Sadly, as we have seen before in other rail accidents, this accident did not need to happen. There were numerous opportunities for intervention prior to the accident; and yet, with likely the best of intentions of helping out a colleague, instead three people lost their lives. From my tenure as an advocate for safety in the corporate environment, non-profit environment, and the government environment, I am troubled by this outcome. It begs the question: why is there such disparity in approaches to safety between the railroad industry and other transportation modes?

(*Id.* at Ex I-02183).

## H.    Union Pacific's 2014 Revision To Medical Rules and Adoption of FMCSA Guidance

71.    In 2014, Union Pacific again revised its Medical Rules, though the changes were minor as compared to 2011. (Gengler Decl. at ¶ 21).

72.    It revised the RHE policy to add "all Telecom employees (agreement and nonagreement) and Supply Department Filed employees (agreement and nonagreement)" to the list of employees required to report RHEs, and also added new categories of RHEs:

**Diabetes Treated with Insulin:**
1.    Including Type I and Type II Diabetes Mellitus if insulin is used.
2.    Severe hypoglycemic event (defined as a hypoglycemic event with (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).
**E.    Severe Sleep Apnea:**
1.    Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

20

(*Compare* Exh. D3 at UP 004036 *with* Doc # 248-11 at 13).

73.     Also in 2014, Union Pacific determined that it would use "a level of acceptable risk for sudden incapacitation of no greater than a 1% annual occurrence rate" to determine if functional work restrictions should be imposed on Union Pacific employees in safety-sensitive positions.  (Holland Decl. at ¶ 25; Exh. B4, Dr Holland Expert Report-Ex B-FFD_RRC-00248).

74.     In analyzing how to approach medical conditions that may present a risk of sudden incapacitation (such as RHEs)—a risk that is recognized by the NTSB and FRA as a concern in performing safety-sensitive job functions—Union Pacific started by looking at other transportation regulatory bodies.  It determined that "[t]ransportation safety regulatory bodies in the US, Canada, Europe and Australia have all either formally adopted, or implemented criteria that inferred a threshold level of acceptable risk for sudden incapacitation of no greater than 1% to 2% annual occurrence rate, for transportation industry workers in safety critical jobs (e.g., airline pilots, commercial drivers, and maritime deck officers)."  (*Id.* at Ex B-FFD_RRC-00247 ("The main differentiation between transportation regulatory agencies is whether the level of acceptable risk for sudden incapacitation is at 1% or 2% as an annual occurrence rate; and the reasons for choosing 1% versus 2% are seldom explicitly stated.")).

75.     Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation "is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook," as well as "transportation regulatory agencies in several other countries."  (*Id.*). This is what Plaintiffs refer to as the "1% Rule," but as explained below, it is simply a risk threshold Union Pacific uses as one step in some FFD evaluations and is not determinative of whether employees are ultimately removed from their job.

21

76.     Union Pacific looks to the FMCSA's guidance, particularly for cardiovascular disease and seizure disorders, in determining when an employee's level of sudden incapacitation risk is greater than 1%.  (Holland Decl. at ¶ 27).

77.     The FMCSA has developed an "ongoing process for reviewing all Federal medical standards and guidelines used to determine driver medical fitness for duty."

> First, FMCSA formulates questions relating to a specific medical condition and the associated impact on driving.  FMCSA then gathers information through a systematic review of the available scientific literature.  The findings are summarized in evidence reports that reflect current diagnostic and therapeutic medical advances.

(FMCSA Medical Examiner's Handbook, attached at Exh. B5, at Dr. Holland Expert Report-Ex I-00414).

78.     For some topics, FMCSA convenes a Medical Expert Panel ("MEP"), "comprised of an independent panel of physicians, clinicians, and scientists who are experts in their specialty fields," to review the evidence and provide "expert opinion and advice on medical standards and guidance and research on the medical certification of commercial motor vehicle (CMV) drivers." (www.fmcsa.dot.gov/regulations/medical/medical-expert-panels; Exh. B5 at Dr. Holland Expert Report-Ex I-00414).

79.     The FMCSA also established a Medical Review Board ("MRB"), composed of "five of our Nation's most distinguished and scholarly practicing physicians," who were "chosen from a field of many qualified candidates who possess a wide variety of expertise and experience" and "specialize in the areas most relevant to the bus and truck driver population." (https://www.fmcsa.dot.gov/mrb).

80.     "The MRB independently reviews evidence reports and if an MEP was convened, also reviews the MEP opinion. The MRB deliberates and proposes recommendations for consideration by FMCSA."   (https://www.fmcsa.dot.gov/mrb; Exh. B5 at Dr. Holland Expert

22

Report-Ex I-000000415).

81.     The FMCSA then considers the evidence reports, as well as opinions of the MEP and the MRB, in periodically updating its medical standards and guidelines.  The FMCSA Medical Handbook, which is used by FMCSA medical examiners who perform the medical examination for CMV drivers, is updated to reflect any changes in standards and guidelines. (Exh. B5 at Dr. Holland Expert Report-Ex I-00370 and 415).

### FMCSA Guidelines on Seizure Disorders

82.     In 2007, the FMCSA formed an MEP to examine "FMCSA's current guidelines for medical examiners pertaining to seizure disorders" and recommend "changes to the existing FMCSA guidelines … based on scientific evidence whenever possible" (the "Seizures MEP"). The Seizures MEP identified any recommendations within its report that had no supporting evidence but were "based on expert opinion alone."   (MEP Recommendations on Seizure Disorders, attached as Exh. B6, at Dr. Holland Expert Report-Ex I-00338 and 340).

83.     The Seizures MEP's recommendations were based in part on an evidence report created through a "comprehensive systematic review of available literature" that included evidence "accessible from seven electronic databases," as well as "[a]dditional hand searches of the published literature" and web searches.  (*Id.*)

84.     One of the recommendations made by the Seizures MEP to the FMCSA was to change the existing guidelines for epilepsy to require that individuals with that diagnosis be "seizure free for a minimum of 8 years on or off anti-seizure medication."  (*Id.* at Ex I-00340). Concluding "an annual seizure risk of 2% to be an acceptable threshold," the Seizures MEP "calculated that the 2% annual seizure risk level would be attained approximately 8 years after AED [anti-epilepsy drugs] and the 1% risk level would be attained approximately 10 years

23

following withdrawal." (*Id*. at Ex I-00341). Yet, it conceded that it had not identified "any studies that provide direct evidence pertaining to the risk of seizure recurrence among individuals who are seizure free while being treated long-term with AEDs." (*Id*.)

85.     The MRB had a different conclusion on the appropriate guideline for seizure disorders. It relied on "previously published data sets for determining expected incidents rates of seizure disorders in employed populations," from which it determined that the Seizures MEP's recommended "2% seizure risk seems to accept an approximately 40-fold increased risk over incident epilepsy which is a further increased risk compared to an incident seizure." (FMCSA's Medical Review Board Article, attached as Exh. B7, at Dr. Holland Expert Report-Ex I-00167–68).

86.     The MRB found "the approach used by the [Seizures] MEP was flawed" and instead recommended "maintaining the current guidance for seizure disorders, which for most drivers is a period of 10 years both off medications and seizure-free" and 5 years off medication and seizure-free for individuals experiencing a single unprovoked seizure. (Exh B7 at Ex I-00168; Deposition of Matt Rizzo, attached at Exh. A63, at 20:13–23, 46:24–47:25, 95:10–96:4 (indicating he was an MRB member from 2006 to 2009 and a co-author of Exh. B7 and describing the article as a "summary of many, many articles and years of work" that "speaks for itself").

87.     The FMCSA Handbook reflects the MRB's recommendation, keeping the guidance for seizure disorders at "10 years off anticonvulsant medication and seizure free" for those with an epilepsy diagnosis and "5 years seizure free and off anticonvulsant medication" for a single unprovoked seizure. (Exh. B5 at Ex I-00509 and 511).

88.     Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in

24

its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions. (Holland Decl. at ¶ 30).

89.    HMS, in collaboration with representatives from Union Pacific's Operations and Safety Departments, developed three sets of standard work restrictions for safety sensitive employees determined to have an unacceptable risk for sudden incapacitation—one for the Transportation, Supply, and Telecom Departments; one for the Mechanical Department, and one for the Engineering Services Department. (Doc # 248-28; Holland Decl. at ¶ 31). These work restrictions for sudden incapacitation risk do not automatically disqualify an employee from a job but instead are functional work restrictions that may or may not prevent an employee from performing his or her job with or without reasonable accommodation. (*Id*.).

### FMCSA Guidelines on Cardiovascular Disease

90.    Also in 2007, the FMCSA formed a separate MEP to examine FMCSA's "current cardiovascular disease (CVD)-related guidelines with the aim of determining whether they require updating" (the "CVD MEP"). (Exh. B8, MEP Recommendations on Cardiovascular Disease and Commercial Motor Vehicle Driver Safety at Dr. Holland Expert Report-Ex I-01171).

91.    The CVD MEP reviewed and relied on an evidence report prepared in the same manner as the one for the Seizures MEP and also recommended changes "based on scientific evidence whenever possible." (Exh. B8 at Ex I-01171–73).

92.    The CVD MEP made a number of recommendations for changes to the FMCSA guidelines. One such recommendation was changing one of the guidelines for cardiomyopathy,

25

which then stated that individuals who presented "an LVEF [left ventricular ejection fraction] [4] <50% be precluded from certification," to "LVEF ≤40." (Exh. B8 at Ex I-01186–88).

93.    Ultimately, the FMCSA updated its Medical Examiner Handbook to prohibit certification for individuals with idiopathic dilated cardiomyopathy who had an "LVEF < 40%" and allow certification for those with an "LVEF 40% to 50%." (Exh. B5 at Ex I-00598).

94.    At the same time that Union Pacific began relying on the FMCSA's guidelines on seizure risk, Union Pacific also began relying on the FMCSA's guidelines for determining whether employees with CVD who work in safety-sensitive positions have an unacceptably high risk of sudden incapacitation in assessing when it is appropriate to impose sudden incapacitation work restrictions. (Holland Decl. at ¶ 33).

**Union Pacific's Reliance on FMCSA Guidelines**

95.    Union Pacific believes it is reasonable to consider FMCSA guidelines in determining if and for how long an employee holding a safety-sensitive position should be subject to functional work restrictions because the guidance: (1) is evidence-based; (2) has "been developed through consensus medical advisors" and are "periodically updated through expert consensus" (Exh. B1 at UP_Harris_036471–72); and (3) is unquestionably relevant to railroad workers in safety-sensitive positions, as recognized by the NTSB in its recommendations in multiple railroad accident reports that the railroad industry should look to FMCSA guidelines in developing fitness for duty requirements for safety-sensitive positions. (Holland Decl. at ¶ 34).

96.    Union Pacific has not adopted FMCSA guidelines in their entirety and does not restrict an employee from performing a job simply because he or she is at a greater than 1% risk of sudden incapacitation. Rather, Union Pacific uses the FMCSA as guidance, along with other

---

[4] The ejection fraction is a measure of the heart's efficiency. (Deposition of Charles Cannan, MD ("Cannan Dep.") at 16:24-17:4). A healthy individual has an ejection fraction between 55% and 75%. (*Id.* at 17:6-8). A lower ejection fraction correlates with a less efficient heart. (*Id.* at 17:11-17).

relevant evidence from the scientific literature, to inform its FFD decisions in conducting an individualized analysis of safety risks for work that may be posed by an employee's specific health conditions and functional limitations. Moreover, Union Pacific deviates from the FMCSA guidelines when a contrary conclusion is warranted. For example, the FMCSA prohibits employees with diabetes treated with insulin from driving CMVs, whereas Union Pacific has determined, based on more recent medical evidence, that allowing an employee with diabetes treated with insulin to work as a locomotive engineer may be safe and appropriate if, after an individualized assessment, Union Pacific determines the employee's condition is adequately controlled and the employee is periodically monitored. (Holland Decl. at ¶ 35).

97. In addition, the FMCSA is silent on how to handle other medical issues that may carry a risk of sudden incapacitation. For example, the FMCSA guidelines have no particular recommended waiting period after which an employee may be certified after having unexplained syncope. In such situations, Union Pacific's CMO and AMDs must use their best medical judgment in determining whether any functional work restrictions should apply and for how long. (Holland Decl. at ¶ 36).

## I. Union Pacific Accident In Arden

98. On August 7, 2014, in Arden, Nevada, a Union Pacific locomotive ran through the end-of-track bumping post and collided with the inside wall of a warehouse. (NTSB Report on Arden, NV accident, attached as Exh. B9, at Dr. Holland Expert Report-Ex I-02190).

99. Although no one was injured, there were three employees in the warehouse at the time of the accident, and the estimated damage caused by the accident was $188,000. (*Id*.).

100. The NTSB determined the probable cause of the accident was the locomotive engineer's failure to stop the train after becoming incapacitated by a seizure and that "[c]ontributing to the accident was the Federal Railroad Administration's failure to establish

27

medical certification standards, other than hearing and vision criteria, for railroad employees in safety-sensitive positions." (*Id*. at Ex I-02200).

101. The NTSB noted that in September 2003, when Union Pacific hired the engineer, he reported having a history of seizures and prior use of seizure medication, but he was not then taking any prescription medication. Because of his medical history, Union Pacific requested an evaluation of the engineer by his personal physician who "checked 'No' to the question, 'Any job modifications or restrictions advisable?' and wrote, 'Doing well. Last sz [seizure] > 7 years prior and off meds x3 yrs.'" Union Pacific chose to hire the engineer based on the recommendation of his treating physician. (*Id*. at Ex I-2193–94).

102. On November 13, 2008, the engineer was removed from service after his co-workers witnessed him having what was later determined to be a "tonic-clonic" seizure in the crew area of the yard" and was evaluated by two neurologists of his choosing. (*Id*.).

103. The medical records of the first neurologist included a recommendation to impose restrictions on the engineer, including no driving, no working at heights, no working with dangerous machinery, and "no driving trains!" However, the employee did not provide this report to Union Pacific. (*Id*.).

104. Union Pacific did receive a letter from the second neurologist who stated:

> It was my clinical impression that his seizure episode was due to a combination of severe sleep deprivation and associated hypoglycemia . . . I discussed in detail with patient ways to adjust his lifestyle . . to avoid a recurrent spell . . . When the patient was seen in follow up on March 10, 2009, he had already made significant changes in his daily activities as previously recommended . . . At the present time, [the engineer] is able to return to work full duties, with no restrictions, in a safety-sensitive position.

(*Id*. at Ex I-2195).

105. Union Pacific returned the engineer to work by April 3, 2009, based on this second treating physician's report. (*Id*.).

28

106.    All of these events occurred before Union Pacific modified its Medical Rules in 2011 and 2014 and adopted the FMCSA's seizure guidelines for determining sudden incapacitation risk.  (*Supra*, ¶¶ 54–58 and 71–95).

107.    After the Arden accident, Union Pacific applied the recently adopted FFD process and seizure guidelines to the engineer and imposed sudden incapacitation restrictions (which could not be accommodated in his locomotive engineer position) until he was seizure free and off anti-seizure medications for 10 years.  (Exh. B9 at Ex I-02196; Holland Decl. at ¶ 39).

108.    The NTSB noted the following:

> UP performed a postaccident fitness-for-duty evaluation of the engineer which included a record review by an outside neurologist.  UP determined that the engineer cannot be cleared to return to work as a locomotive engineer until he has been seizure free and off antiseizure medications for a minimum of 10 years.  The UP medical director stated that, previously, the standard practice was to wait 6 months without a seizure and require clearance by a neurologist before a return to work.  **Between 2009 and 2014, this standard practice was changed to 10 years off medication and without a seizure.  This practice is consistent with the [FMCSA] recommendations for commercial drivers.**  The NTSB concludes that there may be UP employees in safety-sensitive position with epilepsy who were hired before 2014 using the less-stringent standard for seizures.  **Therefore, the NTSB recommends that UP identify and review the records of all employees in safety-sensitive positions who have any history of seizures and ensure that the current UP standard of fitness for duty is met by each employee.**

(Exh. B9 at Ex I-02196 (emphasis added); *see also id.* at 2201 (reiterating recommendation)).

109.    The NTSB again concluded "that FRA medical standards for employees in safety-critical positions are not as robust as those required by other Department of Transportation modal agencies and are inadequate to ensure the fitness for duty of railroad employees in safety-sensitive positions."  (*Id*. at Ex I-2197).

110.    The NTSB also made recommendations to the FRA, including that it "enhance [its] medical standards by identifying a list of medical conditions that disqualify employees for safety-sensitive positions because of the potential for negatively affecting rail safety" and

"develop specific criteria (such as standards for medical test results) that may allow employees who have been disqualified but have been determined by a subsequent, individualized assessment to pose no increased danger to rail safety to obtain medical certification."  (*Id*. at Ex I-02201).

**J.      Union Pacific's FFD Evaluations and Determinations of the Named Plaintiffs**

**        Quinton Harris**

111.     Quinton Harris began working for Union Pacific in 2011 as a mechanical service operator ("MSO").  (Excerpts from the Deposition of Quinton Harris, attached hereto as Exh. A11, ("Harris Dep.") at 28:1-9).  As part of his application, Harris disclosed that he suffered from epilepsy but had been seizure-free since 2005 and was taking anti-seizure medications. (Harris Dep. at 86:21-24; 87:4-11; 88:11-15; Harris Dep. Ex. 262, attached at Exh. A13, at UP004530, UP004538).  At that time, Union Pacific had not yet implemented the 2011 medical rules and was not yet relying on the FMCSA's seizure guidelines.  (Excerpts from the Deposition of John Holland, attached hereto as Exh. A61, ("Holland Dep.") at 297:22-298:9).

112.     As an MSO, Harris generally performed hostler duties that involved moving and servicing inbound locomotives in the service area.  (Harris Dep. at 28:18-25; 29:14-30:3; 64:2-13; 71:6-20; Harris Dep. Ex. 260, attached as Exh. A12, at UP004560-61).  He sometimes drove the locomotive while other times he served as a ground operator, relaying communications to the driver.  (Harris Dep. at 32:11-14; 64:5-12; 71:25-72:3).  Harris also drove a forklift. (Harris Dep. at 72:13-16).  Harris testified that the position is "safety sensitive" and sudden incapacitation could cause an accident or train derailment.  (Harris Dep. at 76:3-77:24).  He described the job as "very dangerous" if not taken seriously.  (Harris Dep. at 76:8-13).

113.     Between December 2013 and February 2014, Harris applied for a train crew position and received a conditional offer pending a medical evaluation. (Harris Dep.  at 94:16-

30

19; 104:7-14; 98:3-19; 100:25-101:10; Harris Dep. Exs. 265–270, attached as Exhs. A14–A19). As part of that medical evaluation, Harris again disclosed that he was taking epilepsy medication and had been seizure-free for nine years. (Harris Dep. Ex. 273, attached as Exh. A20, at UP004454). By this time, Union Pacific had implemented its revised medial rules and was relying on the FMCSA's seizure guidelines in making decisions regarding functional work restrictions. (Holland Dep. at 298:2-299:18; Holland Rebuttal Report, part II, attached as Exh. B10, at p. 4; Harris Dep. Ex. 276, attached as Exh. A21, at UP004083-84).

114.   As a result, Union Pacific issued restrictions that prohibited Harris from: (1) operating company vehicles or on-track mobile equipment; (2) working on or near moving trains, freight cars, or locomotives, unless protected by barriers; (3) operating cranes, hoists, or other machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee; and (4) working at unprotected heights of more than four feet. (Harris Dep. at 119:13-20; Harris Dep. Ex. 279, attached as Exh. A22, at UP004112). These restrictions applied until Harris was seizure-free and off all seizure medications for ten years. (Holland Dep. at 298:2-299:18; Exh. B10 at p. 4). Dr. Holland informed Harris that Union Pacific would reevaluate the restrictions if his medical condition changed. (Harris Dep. at 119:1-8; Exh. A21 at UP004085).

115.   Robin Hiatt, a Union Pacific Assistant Director of Operations, evaluated the restrictions and job duties and advised that Union Pacific could not accommodate these restrictions, and no MSO position was available that did not require operating a locomotive, forklift, or car mover. (Exh. A21 at UP004081-82). Hiatt also noted that Harris had only worked for the Railroad for two years, so he lacked the required seniority under his collective bargaining agreement to secure a general duties job without those requirements. (Exh. A21 at

31

UP004081-82).  Harris subsequently received a referral to DPM.  (Harris Dep. at 108:24-109:3; 111:11-16; Exh. A21 at UP004081-82).

116.    Dr. Trangle testified that Union Pacific should have permitted Harris to return to work after being seizure-free, even while on medication, for five years.  (Excerpts from Deposition of Dr. Kevin Trangle, attached as Exh. A55, ("Trangle Dep.") at 158:7-22). Dr. Trangle admitted that it is appropriate for a railroad to rely on seizure protocol guidelines promulgated by governmental entities, but he disagrees with the specific guideline in this case, believing the ten-year FMCSA guideline to be too restrictive.  (Trangle Dep. at 159:24-160:15; 161:3-12; 159:1-4).  He conceded, however, that work restrictions applicable for more than five years might be appropriate in some seizure cases.  (Trangle Dep. at 161:22-24).  Dr. Devereaux testified that while he did not know the precise risks, he thought Harris should have been "very careful" around "dangerous [moving] equipment."  (Excerpts from Deposition of Dr. Michael Devereaux, attached as Exh. A62, ("Devereaux Dep.") at 76:3-7).  He stated: "we all know that individuals with epilepsy on anti-convulsant medications are going to have some job limitations" and that "long-term running a locomotive across the country, that would not be a good job for" Harris.  (*Id.* at 73:17-74:8).

### Thomas Taylor

117.    Thomas Taylor worked as a signalman, which generally involves the installation, repair, and maintenance of railroad signals and crossing warning devices.  (Excerpts from the Deposition of Thomas Taylor, attached hereto as Exh. A43, ("Taylor Dep.") at 32:23-33:2; Taylor Dep. Ex. 105, attached as Exh. A45, at HARRIS0003364).  Taylor was expected to operate large tools and equipment, as well as drive company vehicles.  (Taylor Dep. at 32:1-4; 41:24-42:9; Taylor Dep. Ex. 104, attached as Exh. A44, at UP008260-61).  Taylor admitted the position is "safety sensitive" and losing consciousness on the job could endanger other

employees and the public.  (Taylor Dep. at 41:11-20).

118.    In December 2014, Taylor was diagnosed with epilepsy.  (Taylor Dep. at 45:19-25).  Taylor's medical records reveal that he experienced at least ten seizures over a two-month period before his diagnosis.  (Sucholeiki Dep. Ex. 2, attached as Exh. A42, at HARRIS0003428).  Taylor's neurologist, Dr. Roy Sucholeiki, testified that Taylor was at a higher risk for future seizures given the number of episodes during this timeframe.  (Excerpts from the Deposition of Dr. Roy Sucholeiki, attached as Exh. A41, ("Sucholeiki Dep.") at Sucholeiki Dep., 41:20-24).

119.    Dr. Matthew Hughes, a Union Pacific AMD, reviewed Taylor's medical records and determined, consistent with FMCSA guidance, that Taylor was at an unacceptably high risk for sudden incapacitation.  (Taylor Dep. Ex. 114, attached as Exh. A47, at HARRIS0009634-35).  Dr. Hughes issued functional work restrictions that prohibited Taylor from: (1) operating company vehicles, on-track or mobile equipment, fork-lifts, golf carts, or ATVs; (2) working on or near moving trains, freight cars, or locomotives, unless protected by barriers (but allowing work on stationary locomotives outside of the blue flag zone, if working with another employee and following normal safety rules); (3) operating cranes, hoists, or other machinery if such activities might create a risk of harm to others or a risk of catastrophic injury to the employee; and (4) working at unprotected heights of more than four feet (but allowing ascending stairs and ladders on locomotives in shops, following normal safety rules).  (Exh. A47 at HARRIS0009634-35).  These restrictions applied until Taylor was seizure-free and off anti-seizure medications for ten years.  (Exh. A47 at HARRIS0009635; Taylor Dep. Ex. 115, attached as Exh. A48, at UP 003686).  HMS conferred with Taylor's supervisor, Thomas Moran, who advised that accommodating these restrictions would require the railroad to eliminate an essential function of the signalman position and there were no reasonable accommodations that

33

would allow Taylor to perform the essential functions of his job. (Taylor Dep. at 76:7-16; Taylor Dep. Ex. 113, attached as Exh. A46, at 001906-07). Union Pacific referred Taylor to DPM, and Taylor spoke with Union Pacific about working in other positions within the company. (Taylor Dep. at 95:9-96:25; Taylor Dep. Ex. 122, attached as Exh. A49, at UP001929-31).

120. Dr. Devereaux testified that he did not have a "precise answer" for how long he would have restricted Taylor from driving dangerous equipment, but it was "fair for Union Pacific to have concerns about him driving heavy equipment seizure-free certainly for six months . . . [a]nd probably longer." (Devereaux Dep. at 86:11-16). Dr. Devereaux stated that Taylor could have performed "any job away from heavy equipment." (Devereaux Dep. at 86:91:19-22). Dr. Trangle agreed that it was appropriate for Union Pacific to conduct a fitness-for-duty evaluation on Taylor, but opined that the railroad should have returned him to work about four months after his diagnosis. (Trangle Dep. at 477:16-17; 324:2-10). Dr. Trangle believes Taylor could have performed all duties of a signalman without an accommodation in spite of the restrictions. (Trangle Dep. at 325:1-18).

### John Baker

121. Union Pacific employed John Baker as a switchman, which required him to perform traffic control, hostler operations, and other general train services in the train yard. (Baker Dep. Ex. 133, attached as Exh. A2, at UP001076-77; Baker Dep. Ex. 134, attached as Exh. A3, at UP008269-71; Excerpts from the Deposition of John Baker, attached hereto as Exh. A1, ("Baker Dep.") at 28:23-29:4; 29:19-30:5). Baker admitted his position is "safety sensitive" and that working on and around trains and heavy equipment presents unique safety risks. (Baker Dep. at 35:1-5; 35:21-36:13).

122. Baker claims no disability, but alleges that Union Pacific "regarded" him as disabled. (Baker Dep. at 46:13-47:1). In or around October 2014, Baker experienced a "staring

spell with delirium." (Baker Dep. Ex. 145, attached as Exh. A6, at UP000707). Baker had experienced two other similar episodes during the preceding year, one of which included a trip to the hospital for garbled speech and confusion, and another involving dizziness. (*Id*.).

123. Following the October 2014 episode, Baker's neurologist, Dr. Robert Silzer, recommended that Baker avoid driving and operating heavy machinery during a period of neurological testing. (Baker Dep. Ex. 135, attached as Exh. A4, at UP001084; Baker Dep. at 70:13-16). Union Pacific subsequently placed Baker on a medical leave of absence. (Baker Dep. at 74:23-75:1). On January 6, 2015, Dr. Silzer drafted a note stating that Baker would be able to return to work in about two weeks and should then perform 30 days of "light duty," refraining from driving or operating heavy equipment. (Baker Dep. Ex. 140, attached as Exh. A5, at UP000761). Dr. Silzer referred to Baker's episodes as "spells" but could not determine any underlying neurological explanation. (Excerpts from the Deposition of Robert Silzer, MD, attached as Exh. A70, ("Silzer Dep.") at 19:6-14; 47:4-7). Although Baker's medical records suggest he had "syncope," Dr. Silzer explained this as a catchall term describing Baker's episodes but was not a definitive diagnosis. (*Id*. at 16:10-20) ("[S]yncope is just passing out and loss of consciousness…."). "[W]hat Mr. Baker had was not necessarily syncope, but just a spell that could not be diagnosed as a black-and-white condition." (*Id*. at 20:6-14).

124. Union Pacific reviewed medical records related to Baker's unexplained syncope episodes. Based on that review, Union Pacific concluded Baker was at risk of sudden incapacitation and should have the following functional work restrictions for one year from his last episode: (1) working on or near moving trains, freight cars, or locomotives (but permitting walking on paths in rail yards following normal safety rules); (2) operating company vehicles, on-track  or mobile equipment, or forklifts; (3) operating cranes, hoists, or other machinery if

such activities might create a risk of harm to others or a risk of catastrophic injury to the employee; and (4) working at unprotected heights of over four feet. (Baker Dep. Ex. 146, attached as Exh. A7, at UP000690). Baker's superintendent, Jay Everett, evaluated the restrictions and job duties and determined Baker could not be accommodated in his job with the restrictions. (*Id.*). Union Pacific advised Baker, however, that if he was episode-free for one year, he would be able to return to his position. (Baker Dep. at 94:16-20). Union Pacific referred Baker to DPM and provided him with assistance to find other jobs within the company. (Baker Dep. at 96:13-97:21; Baker Dep. Ex. 147, attached as Exh. A8, at UP000686–89).

125. In October 2015, Baker provided medical records from a recent visit to Dr. Silzer that showed his condition had resolved. (Baker Dep. Ex. 157, attached as Exh. A9, at UP000757). Union Pacific immediately reinstated Baker to a job with similar responsibilities but more pay. (Baker Dep. at 120:3-121:1; Baker Dep. Ex. 158, attached as Exh. A10, at UP000685). In total, Baker was out of work about one year. (Doc # 249-5 at 20; Baker Dep. at 93:9-14).

126. Dr. Trangle believes that Union Pacific held Baker out of service too long—that he could have gone back to work January 2015. (Trangle Dep. at 421:8-9). Dr. Devereaux opined that Union Pacific was appropriately concerned about Baker performing safety sensitive work but also feels Union Pacific should have returned Baker to work sooner; he also testified that Baker had no actual impairment that limited him in any way. (Devereaux Dep. at 49:6-21; 61:17-25). In fact, he testified that at least one of Baker's episodes likely resulted from merely dehydration. (*Id*. at 44:8-45:5).

**Geoffrey Miller**

127. Geoffrey Miller worked as a signalman and performed most of his work on or around railroad tracks. (Excerpts of the Deposition of Geoffrey Miller, attached as Exh. A23,

36

("Miller Dep.") at 49:23-24). Miller agreed that he and his crew needed to take precautions to protect themselves and the public. (*Id*. at 50:5-51:10). Miller worked on an "autonomous gang," and if a medical emergency occurred, the only available assistance would come from within the gang. (*Id*. at 90:1-10). Much of Miller's job involved operating large trucks that required a commercial driver's license ("CDL") from the FMCSA. (*Id*. at 39:5-7; 44:14-45:11).

128. Miller was diagnosed in 1995 with cardiomyopathy, a condition that reduces the heart's ability to pump blood. (*Id*. at 98:14-17; Excerpts from Deposition of Charles Cannan, MD, attached as Exh. A66, ("Cannan Dep.") at 14:23-16:3). Miller's condition does not limit him in any capacity. (Miller Dep. at 98:23-25). When Miller began working at Union Pacific in 2006, his heart's LVEF was 56.5 percent. (Cannan Dep. at 16:24-17:10; Miller Dep. at 102:4-9).

129. In or around March 2014, Union Pacific received the results of Miller's Commercial Driver Fitness Determination through the State of Washington, which revealed Miller's left ventricular cardiomyopathy. (Miller Dep. at 114:10-14; Miller Dep. Ex. 54, attached as Exh. A24, at UP000145; Miller Dep. Ex. 56, attached as Exh. A26, at UP000136; Miller Dep. Ex. 55, attached as Exh. A25, at p. 14-15). Union Pacific later received the results of a December 2014 echocardiogram, which showed that Miller's LVEF was 40 percent. (Exh. A25 at 12-13; Miller Dep. Ex 58, attached as Exh. A27, at UP000170). Miller's treating physician interpreting the test results, however, noted that Miller's actual LVEF was "subjectively lower" than 40 percent. (Exh. A27 at UP000170). He also opined that Miller suffered from "moderately severe dilated cardiomyopathy, probably ischemic." (*Id*. at UP000170).

130. Based on this information and other records provided by Miller, Union Pacific concluded that he faced increased risk for sudden cardiac incapacitation. (Miller Dep. Ex. 65,

attached as Exh. A32, at UP 000235-37).  Of particular importance was the record showing his LVEF was "subjectively lower" than 40 percent because FMCSA guidance states that persons with an LVEF less than 40 percent should not be certified to drive a commercial vehicle.  (*Supra*, ¶ 93; Exh. A32 at UP000237).[5]

131.   Union Pacific therefore issued functional work restrictions prohibiting Miller from: (1) operating company vehicles, on-track mobile equipment, and fork-lifts; (2) working on or near moving trains, freight cars, or locomotives without barriers; (3) operating cranes, hoists, or other machinery; (4) working at unprotected heights of four feet; (5) working on one or two-man gangs; (6) performing work involving more than light physical exertion; and (7) prolonged work in high heat and humidity or excessive cold.  (Miller Dep. at 149:23-150:6; Miller Ex. 60, attached as Exh. A29, at UP000165).  Miller's supervisor, Jason Coveau, advised that Union Pacific could not accommodate these restrictions without eliminating an essential function of the job.  (Miller Dep. at 135:20-136:5; Miller Dep. Ex. 59, attached as Exh. A28, at UP005376-77; Miller Dep. Ex. 60, attached as Exh. A29, at UP000165).  Union Pacific informed Miller that if updated medical information became available, however, it would review the information and issue another fitness-for-duty decision.  (Exh. A29 at UP000165).

132.   Miller and his union asked Union Pacific to review and reconsider the restrictions. (Miller Dep. at 158:10-12; Miller Dep. Ex. 62, attached as Exh. A30, at UP000216-18).  Union Pacific obliged and sent two separate letters in March and May 2015 to one of Miller's cardiologists, Dr. Joshua Remick, requesting that Dr. Remick participate in a conference call to discuss Miller's medical condition and the restrictions.  (Miller Dep. Ex. 63, attached as Exh. A31, at HARRIS0000382-85; Miller Dep. Ex. 65, attached as Exh. A32, at UP000232-34).  At

---

[5] Notably, in January 2015, Miller's LVEF tested at 31, but he did not provide records of this test to Union Pacific. (Remick Dep. at 30:11–31:5; Remick Dep. Exh. 1, attached as Exh. A40, at page 18; Gengler Decl. at ¶ 22)

Miller's instruction, however, Dr. Remick did not respond to Union Pacific's inquiries. (Miller Dep. at 189:4-7). When Miller took an echocardiogram test in June 2015, which showed his LVEF to be 45%, neither he nor Dr. Remick provided those results to Union Pacific. (Miller Dep. at 205:20-206:9).

133. Dr. Remick later testified that Miller was "asymptomatic" and the only result of his cardiomyopathy was a lower LVEF. (Excerpts from the Deposition of Joshua Remick, MD, attached as Exh. A39, ("Remick Dep.") at 14:3-10). Dr. Remick also stated that Miller's cardiomyopathy did not cause shortness of breath, fatigue, exertional issues, or any other limitations of a bodily function. (*Id*. at 14:22-15:5; 37:25-38:8).

134. Dr. Trangle believes Miller should have been returned to his job but routinely monitored "to make sure he's continually be [*sic*] fit for duty." (Trangle Dep. at 477: 18–24). Dr. Goldstein agrees with Union Pacific's determination that Miller had "objective evidence of significantly diminished ejection fraction," but opines that because Miller was asymptomatic, he had low risk of sudden cardiac arrest and should not have been kept out of work. (Goldstein Dep. at 87:24–89:5. Both Dr. Trangle and Goldstein testified that Union Pacific was reasonable in evaluating Miller to begin with. (Trangle Dep. at 477:4–24; Goldstein Dep. at 88:4–6).

### **Norman Mount**

135. Norman Mount worked as a signal maintainer. (Excerpts of the Deposition of Norman Mount, attached as Exh. A33, ("Mount Dep.") at 30:13-20). He was generally responsible for the upkeep and maintenance on light signals, crossing gates, switches, and other equipment on and around the railroad tracks. (*Id*. at 33:6-11, 20-24; 34:8-12; 35:7-16; 36:17-24). Mount admitted that his position was safety-sensitive and required precautions to protect both him and the public. (*Id*. at 42:15-43:12).

136. Mount claims that he is disabled because he had a pacemaker implanted in 1992.

39

(*Id*. at 47:8-14; 50:14-15). Mount testified that before the pacemaker he was "sluggish" but now has "no limitations" and is in "excellent shape." (*Id*. at 47:15-48:22). The pacemaker is rarely necessary, however. Mount's cardiologist, Dr. Katholi, opined that Mount needs the pacemaker less than 1% of the time and it otherwise sits dormant. (Excerpts from Deposition of Richard Katholi, MD, attached as Exh. A67, ("Katholi Dep.") at 20:4-21:6). Plaintiffs' expert Dr. Goldstein agreed that Mount is not pacemaker-dependent and rarely needs to rely on the pacemaker to dictate his heart rhythm. (Goldstein Dep. at 48:12-15; 49:7-50:17).

137.    In 2013, Union Pacific undertook an initiative to assess the health risks of electromagnetic force ("EMF") exposures on pacemakers for workers in specific railroad positions. (Mount Dep. Ex. 182, attached as Exh. A36, at UP005994; Holland Dep. at 31:18-32:16; Exh. B10 at p. 15). If a pacemaker is exposed to EMF levels above the manufacturer's recommended limits, the device can malfunction and create an imminent safety risk for an individual with a cardiac condition. (Exh. A36 at UP005993).

138.    As part of its efforts, Union Pacific contracted with health physicists to measure the electromagnetic exposures in particular jobs, including the signal maintainer. (Holland Dep. at 32:11-16; 361:11-362:13). The health physicists performed complex evaluations of the EMF in equipment and locations that a signal maintainer would reasonably expect to encounter. (*Id*. at 360:24-362:13). Union Pacific used this exposure study to determine appropriate restrictions for employees who often worked with equipment that emitted electromagnetic forces. (Exh. A36 at UP005995). For example, the study concluded that a person with a pacemaker could not safely work within 24 inches of certain electric motors (such as rail crossing motors or lift gate motors) and could not enter "signal sheds," which contain electrical relay and control equipment. (Exh. A36 at UP005995).

40

139.    In June 2014, Union Pacific issued Mount work restrictions that required him to avoid certain work activities with dangerous levels of EMF exposure and maintain a minimum distance from certain equipment, such as maintain 24 inches of separation from vehicle lift motors, track switching motors, and rail crossing arm motors. (Mount Dep. Ex. 178, attached as Exh. A34, at UP001348; Mount Dep. at 68:21-69:5). Notably, EMF exposure limits are determined by the device's manufacturer, not Union Pacific. (Holland Dep. at 365:2-17; Exh. A36 at UP005995-96). Dr. Holland testified that Union Pacific could not simply disregard the manufacturer's recommendations and knowingly permit Mount to be exposed to EMF levels above the limit. (Holland Dep. at 365:2-17). Mount conceded that the only reason Union Pacific placed restrictions on him was because of EMF exposure. (Mount Dep. at 78:23-79:9). Mount's supervisor advised that Union Pacific could not accommodate these restrictions within Mount's signal maintainer position. (Exh. A36 at UP005996).

140.    Union Pacific subsequently referred Mount to DPM, which offered assistance in finding another job within the Railroad. (Mount Dep. at 89:18-90:22; Mount Dep. Ex. 180, attached as Exh. A35, at UP001341-45). Mount was referred to an available "bid job" with Union Pacific in Omaha at the Harriman Dispatch Center ("HDC") but refused to bid for the job, stating he was not interested in a different position. (Mount Dep. at 89:22–95:21).

141.    Instead, Mount applied for disability benefits from the Railroad Retirement Board ("RRB"). The RRB concluded Mount was unable to perform any job and thus was entitled to disability benefits, which he continues to receive. (Mount Dep. at 123:1-124:18; Mount Dep. Ex. 196, attached as Exh. A37). In applying for and receiving benefits, Mount claimed that he was "disabled from all work." (Mount Dep. at 124:21-127:12; Mount Dep. Ex. 197, attached as Exh. A38). Mount understood that in order to receive disability benefits from the RRB, that [he]

41

had to be disabled and unable to work." (Mount Dep. at 128:5-8).

142.     Though Dr. Trangle agrees that Union Pacific cannot ignore the manufacturer's exposure limits for Mount's pacemaker, Dr. Trangle disputes that the exposure study was appropriately conducted because it did not study Mount's job specifically or consider evidence from Mount's pacemaker of actual exposure. (Trangle Dep. at 395:11–23). He further believes that the best evidence that Mount was not at danger of EMF exposure in his signal maintainer position was his history in the position with no evidence of any unsafe exposures. (*Id*. at 388:1–24, 391:24–392:5). In addition, Trangle opines that even if Mount were exposed to an EMF, because he used his pacemaker less than 1% of the time, the consequences would be slight. (*Id*. at 394:16–395:4). Goldstein also opines that Mount should not have been removed from service because he was not pacemaker-dependent, there was a simple way to determine whether Mount's pacemaker had actually been exposed to EMF, and there was no alert recorded within Mount's pacemaker indicating any EMF exposure. (Goldstein Dep. at 42:14–44:3).

### Scott Zinn

143.     Before working for Union Pacific, Scott Zinn served four years in the United States Marine Corps and deployed to Iraq and Japan. (Excerpts of the Deposition of Scott Zinn, attached as Exh. A50, ("Zinn Dep.") at 16:1-6; 17:8-18:2). In October 2012, he became a ballast tamper operator for Union Pacific. (*Id*. at 29:8-11). In this role, Zinn operated the ballast tamper machine, which picks up rail ties and tamps the rock beneath the track to ensure sturdiness. (*Id*. at 29:12-18). Zinn agreed that the position is "safety sensitive" and presents a risk of injury to both the operator of the machine and other people. (*Id*. at 36:2-10).

144.     In February 2014, Zinn took a mandated drug test after he was involved in a workplace accident in which he derailed a ballast tamper machine. (*Id*. at 37:22-38:4; 58:21-59:7). Zinn tested positive for Benzodiazepine (Xanax), an anti-anxiety medication for which he

42

had no prescription, and was subsequently removed from service and referred to Union Pacific's Employee Assistance Program ("EAP") for treatment. (*Id*. at 60:15-19; 61:19-62:2). In mid-March 2014, while still on leave, Zinn was hospitalized for a combination of excessive alcohol and oxycodone. (*Id*. at 72:3-73:9). While in the hospital, Zinn suffered a myocardial infarction. (*Id*. at 73:16-21). After his release, Zinn completed a voluntary, 30-day inpatient treatment program for substance abuse. (*Id*. at 73:25-74:20). During this treatment program, Zinn was diagnosed with post-traumatic stress disorder ("PTSD"). (*Id*. at 124:2-5).

145. Upon completion of the substance abuse program, Zinn returned to work and informed HMS that he had suffered a cardiac event during his absence. (*Id*. at 87:9-88:5; Zinn Dep. Ex. 222, attached as Exh. A51, at UP006421-22). Union Pacific thus initiated an FFD evaluation, during which it cleared Zinn for the cardiac issue relatively quickly. (Exh. A51 at UP006419-20). However, medical records obtained during the FFD evaluation revealed other troubling diagnoses, including recurrent substance abuse problems, mental health issues, and PTSD. (Holland Dep. at 385:5-20; Exh. A51 at UP006421-22).

146. Union Pacific placed Zinn on a medical leave of absence pending a psychological evaluation and chemical dependency report. (Zinn Dep. at 117:4-19; Exh. A51 at UP006420; Zinn Dep. Ex. 241, attached as Exh. A54, at UP001651). In August 2014, a licensed psychologist, Fred Wiggins, Ph.D., examined Zinn. (Zinn Dep. at 118:14-22). Dr. Wiggins' records show that Zinn suffers from "frequently occurring nightmares related to combat" and that he is often "angry, depressed, and anxious." (Zinn Dep. Ex. 230, attached as Exh. A52, at UP001702). Zinn also reported to Dr. Wiggins frequent panic attacks and intense anger without warning. (*Id*. at UP001702). Zinn acknowledged using alcohol and prescription drugs to self-medicate for his conditions. (*Id*. at UP001703; Zinn Dep. 119:22-120:2). Dr. Wiggins's records

also state that Zinn reported "visual hallucinations of demons on a regular basis." (*Id*. at UP001703).[6]

147.   In April 2015, Union Pacific issued Zinn a "General Medical Disqualification." (Holland Dep. at 385:5-387:20; Zinn Dep. Ex. 241, attached as Exh. A54, at UP001652; Zinn Dep. Ex. 240, attached as Exh. A53, at UP001732).  The disqualification was based on recurring substance abuse and chronic mental health issues, which included anger control, impulsive behavior, reported visual hallucinations of demons, and symptoms of untreated PTSD.  (Exh. A54 at UP001652; Holland Dep. at 385:5-387:20).   Union Pacific determined that these conditions were not only incompatible with safety-sensitive work but also precluded Zinn from working safely for the Railroad in any capacity.  (Holland Dep. at 385:5-387:20; Exh. A54 at UP001652).

148.   Zinn testified that his only disability is PTSD.[7]  (Zinn Dep. at 189:8-13).  Zinn claims that his PTSD limited him by making his home life challenging, caused him difficulty in leaving the house, and left him angry.  (*Id*. at 192:6-194:15).  Zinn testified that he did not need nor did he request accommodations to perform his job.  (*Id*. at 210:25-211:7).

149.   Dr. Trangle believes it was appropriate for Union Pacific to evaluate Zinn for his PTSD and chemical addition.  (Trangle Dep. at 438:5–10).  Dr. Trangle disagrees, however, with Union Pacific's ultimate decision to medically disqualify Zinn because: (1) Zinn successfully completed the EAP drug-related treatment, (2) Union Pacific was unreasonable in relying on Dr. Wiggins' report[8] because no other medical professional reported that Zinn was having

---

[6] Zinn denied in his deposition that he had ever had, or ever reported to Dr. Wiggins that he had, visual hallucinations.  (Zinn Dep. at 120:9–21).
[7] That diagnosis was removed as of August 6, 2015. (Zinn Dep. at 192:25-193:5).
[8] Though Dr. Wiggins' report was produced in discovery and used as an exhibit at Zinn's deposition (Zinn Dep. Ex. 230), Dr. Trangle never reviewed Dr. Wiggins' report—only "comments by Dr. Holland saying he used Dr. Wiggins."  (Trangle Dep. at 439:8–12; Doc # 249-5 at 143 (Dr. Wiggins' "consultation was not available for review.")).

44

hallucinations, and (3) the Railroad should have ordered "more formal psychiatric evaluation." (*Id*. at 442:16–446:22).

### K.        Plaintiffs' Proposed Class List from the "eHealthSafe Datasets"

150.     Plaintiffs assert that "over 7,000 Union Pacific employees have been subjected to a fitness-for-duty evaluation due to a 'reportable health event' during the applicable statutory period." (Doc. # 249 at 15).  This is inaccurate.  In support, they rely on reports (which they call the "eHealthSafe datasets," a term Union Pacific will adopt for purposes of this Motion),[9] which contain information on 7,700 current and former Union Pacific employees.  (Declaration of Kyle Haynes, attached as Exh. F, ("Haynes Decl.") at ¶ 3).  These eHealthSafe datasets were provided by Union Pacific in response to two of Plaintiffs' interrogatories that sought the identification of and information related to individuals subject to Union Pacific's fitness for duty since January 1, 2014.  (Declaration of Allison D. Balus, attached as Exh. A, ("Balus Decl.") at ¶ 3 and Exh. A71, Defendant's responses and supplemental responses to Plaintiffs' Interrogatory Nos. 6 and 8).  The original dataset, provided by Union Pacific on April 20, 2017, contained "1,279 current or former Union pacific employees who were subject to an FFD evaluation related to a Reportable Health Event."  (Doc. # 248-29 at 6).  Union Pacific later supplemented its eHealthSafe datasets several times in response to inquiries from Plaintiffs about specific former Union Pacific employees that Plaintiffs believed should be but had not been included in the original dataset. (Doc. # 248-29 at 6-7; Balus Decl. at ¶ 3)  Union Pacific was clear that it provided these updated datasets without waiving any arguments against class certification or admitting that any

---

[9] The eHealthSafe datasets were generated from queries that pulled data primarily from Union Pacific's eHealthSafe system.  (Haynes Decl. at ¶ 4).  eHealthSafe is a system maintained within SAP that is used principally by Union Pacific's Health and Medical Services Department to, among other things, store data, documents, information, and communications related to fitness-for-duty evaluations.  (*Id*. at ¶ at 39:16–40:8; Holland Dep. at 56:18–59:4).

45

particular individual was appropriately included within Plaintiffs' class definition[10] (which, as Plaintiffs admit, has narrowed since their Amended Complaint (Doc. # 249 at 22 n.5)). (Doc. # 248-29 at 6-7). For this reason, as Union Pacific has made clear to Plaintiffs, the eHealthSafe datasets are significantly broader than the proposed class definition. (Balus Decl. at ¶ 4).

151.    To be included in the final eHealthSafe datasets, the employee had to meet one of the following conditions:

- individuals identified as having a Reportable Health Condition Service or a critical diagnosis;

- individuals who had a service outcome entry of "NOTMC" (not medically cleared to return to work) or CLPERMR (cleared to return to work with permanent work restrictions);

- individuals who had a workability entry of "Temporary – Not Fit for Duty or "Permanent – Not Fit for Duty";

- individuals who had a workability entry of "Sudden Incapacitation."

(Doc. # 248-29). Employees who had a Reportable Health Condition Service (which appears in the data under the column "Service Type" as "Health Condition – Reportable") were those whose FFD evaluations were triggered by an RHE. (Aguilera Dep. at 26:6–22). Only 1,837 of the individuals listed in the final eHealthSafe datasets have this type of service type. (Haynes Decl. at ¶ 5).

152.    Other employees within the eHealthSafe datasets had FFD evaluations that were not triggered by an RHE but have a health condition that may fall within one of the RHE categories that was later identified during the FFD evaluation. One such example is Miller, whose FFD evaluation is coded in the eHealthSafe datasets under a Service Type[11] of "Deferred

---

[10] *See* Doc. # 248-29 at 6-7 n.1-3 (noting the production of the eHealthSafe datasets were "not an admission that the employees disclosed were or could be part of the 'ADA Class' … as alleged in Plaintiffs' First Amended Complaint or any other class on whose behalf Plaintiffs are seeking relief.")

[11] The "Service Type" denotes the type of process being performed by HMS. (Aguilera Decl. at ¶ 6). Relevant examples include "Deferred Exam Regulatory/Company" (where an employee has taken a regulatory or company

Exam Regulatory/Company," (Haynes Decl. at ¶ 6), meaning that the trigger for his FFD evaluation was his CDL renewal. (Declaration of Heather Aguilera, attached as Exh. G, ("Aguilera Decl.") at ¶ 7). Nonetheless, through that CDL renewal, Union Pacific identified his cardiovascular myopathy, which ultimately led to his sudden incapacitation restrictions that could not be accommodated. (*Supra*, ¶ 129). This category of employees (those with an RHE that affected but did not trigger their FFD evaluation) is more difficult to identify within Union Pacific's eHealthSafe system because their FFD evaluations are not typically coded as related to an RHE in eHealthSafe. (Aguilera Decl. at ¶ 8). Some, like Miller, could be otherwise identified by their Diagnosis Description within the eHealthSafe datasets (which in Miller's case is "Cardiomyopathy/Dilated"—clearly an RHE). (Haynes Decl. at ¶ 6) But, as Plaintiffs point out, only 5,855 of the individuals have a diagnosis identified within the eHealthSafe datasets. (Doc. # 249 at 248-34 at ¶ 7).

153.    Still other employees within the eHealthSafe datasets clearly had no discernable RHE. Even had Union Pacific not been clear in its communications about that fact, Plaintiffs were aware through other discovery. Indeed, Plaintiffs' own Rule 1006 summary of the "eHealthSafe datasets" demonstrates that the list of 7,000+ individuals does not match their class definition. For example, Plaintiffs indicate that 1940 unique individuals have a "Diagnosis Key Category" of "MSK," which stands for "musculoskeletal." (Doc. # 248-34 at ¶ 8; Doc. # 248-49 at 85:10-11). Musculoskeletal conditions—which include diagnoses such as carpal tunnel syndrome, hand pain, rotator cuff tear, etc.—are not reportable health events. (Aguilera Decl. at ¶ 9; Doc. # 248-11, App. B). Moreover, three of the individuals who submitted declarations in

exam during which a health issue requiring an FFD has been identified), "FRA Appeal" (a regulatory process available to the employee through FRA regulations), "Manager Referral" (where an employee is referred for an FFD evaluation by their manager), "Monitoring" (where the employee was required to be periodically monitored because of a previously identified medical condition), and "Return to Work Over One Year" (where an employee is requesting to return from a medical leave that was more than a year).

support of Plaintiffs' motion for certification claims describe medical issues that are not RHEs. (Doc. # 248-33 at 76 ("arthroscopic surgery on my shoulder to prevent dislocations"); *id*. at 94 ("arthroscopic labrum repair surgery on my shoulder"); *id.* at 118 ("injuries to my head, which required surgery"). Thus, the individuals in the eHealthSafe datasets do not all even have identifiable RHEs—let alone were subjected to an FFD evaluation *due to* an RHE.

154. The putative class is widely divergent. The putative class members worked in over 650 different positions. (Haynes Decl. at ¶ 7). Though many do not have recognized diagnoses within the eHealthSafe databases, those who do have a total of 10,789 different diagnoses. (*Id*. at ¶ 8). 534 were salaried, exempt employees at some point during their employment with Union Pacific, while 7,185 had been paid by the hour, trip, or other measurement. (*Id*. at ¶ 9). 542 held a non-agreement position at one point, while 7,366 held an agreement position; a total of 393 individuals held both agreement and non-agreement positions. (*Id*. at ¶ 10). Those who are union members are potentially covered by 33 different collective bargaining agreements. (Doerr Decl. at ¶ 9). Some employees who are salaried, exempt and are held from service for a FFD evaluation continue to be paid during that evaluation period. (Gengler Decl. at ¶ 7). In addition, many agreement employees who are held from service for an FFD evaluation but ultimately returned to their position have the opportunity to submit what is called a "time claim" under their collective bargaining agreement to try to recover compensation. (*Id*.). The only common factor applicable to all 7,700 individuals in the eHealthSafe datasets appears to be the fact that they had an FFD evaluation, but the FFD evaluations themselves varied greatly. The FFD evaluations had varying triggers, such as manager referrals, regulatory examinations, or returns from a leave of absence that was longer than one year. (Aguilera Decl. at ¶ 10). Plaintiffs concede that only 5,783 individuals were given restrictions as a result of their

48

FFD evaluation and that some of those restrictions were temporary (e.g., 1,589 had restrictions for 90 days or less), while others' restrictions were to last much longer (e.g., 1,961 had restrictions lasting more than 730 days).[12]  (Doc. # 248-34).  Of those who had restrictions, only 543 individuals had Sudden Incapacitation Restrictions—the restrictions based on the so-called "1% Rule."  (Haynes Decl. at ¶ 11; Doc. # 248-36 at 179:13–23; Doc. # 248-3).  Others had restrictions such as lifting, carrying, bending, grasping/gripping, kneeling, pushing/pulling, reaching, sitting, standing, squatting, twisting, walking, and uneven surface restrictions— restrictions that are not typically indicative of an RHE.  (Haynes Decl. at ¶ 11; Holland Decl. at ¶ 15).  In fact, all but one of the 543 individuals with Sudden Incapacitation Restrictions also had one or more other restrictions.  (Haynes Decl. at ¶ 12).  There are also 192 individuals with hearing restrictions and 969 individuals with vision restrictions, many of which are regulated by FRA regulations on hearing and vision requirements for engineers and conductors.  (Haynes Decl. at ¶ 14; Holland Decl. at ¶ 16).  Only 378 putative class members have restrictions that prohibit them from working "in positions requiring accurate color signal recognition."  (Haynes Decl. at ¶ 15).    Notably, of the 5,783 individuals with restrictions, 4,347 have a Service Closure Reason of "Full Duty Release," 217 have a Service Closure Reason of "Manager Agrees to Accommodate," and 473 have a Service Closure Reason of "Medical Monitoring Required – Referred to Monitoring Service," indicating that these employees were eventually returned to their position despite their restrictions.  (Haynes Decl. at ¶ 20; Aguilera Dep. at 103:16-104:21; Aguilera Decl. at ¶ 11).  Even out of the 543 individuals with Sudden Incapacitation Restrictions, 252 have a Service Closure Reason of "Full Duty Release," 44 have a Service Closure Reason of "Manager Agrees to Accommodate," and 32 have a Service Closure Reason of "Medical

---

[12] According to Kyle Haynes, the eHealthSafe datasets actually show that 4,945 individuals were given restrictions as a result of their FFD evaluation, 1,642 had restrictions for 90 days or less, and 1,923 had restrictions lasting more than 730 days.  (Haynes Decl. at ¶¶ 18–19)

49

Monitoring Required – Referred to Monitoring Service.  (Haynes Decl. at ¶ 13).

155.    Harris and Taylor were 2 of 29 employees in the eHealthSafe datasets with a Diagnosis Description of epilepsy, and the outcomes for these individuals varied. (Expert Report of Ali Saad, PhD, in Rebuttal to Dr. Trangle, attached as Exh. A69, at p. 16-17 and Ex. 5). About 59 percent of these employees had restrictions that Union Pacific could not accommodate. (*Id.*). Two individuals, however, were cleared to work without restriction, and one employee's restrictions were accommodated. (*Id.*).[13]

156.    Miller was 1 of 18 employees in the eHealthSafe datasets with a Diagnosis Description of "Cardiomyopathy, Dilated."  (Exh. A69 at p. 20 and Ex. 11).  While five of these employees, including Miller, were given permanent restrictions that their managers could not accommodate, two were returned to work full duty without restrictions and four were cleared to work with medical monitoring.  (*Id*.).

157.    Mount was the only employee in the eHealthSafe datasets with a pacemaker whose restrictions were not accommodated. (Exh. A69 at p. 22 and Ex. 17). In fact, 18 employees in the database had pacemakers, and six of these individuals returned to full duty without restrictions. (*Id.*). Other employees had various outcomes, including three with restrictions that Union Pacific agreed to accommodate. (*Id*.).

158.    Baker was one of 59 employees in the eHealthSafe datasets with a diagnosis of "Syncope, Neurogenic."  (Exh. A69 at p. 23 and Ex. 18).  27 of those individuals received a "Full Duty Release" and were "Cleared to Work – No Restrictions."  (*Id*.).

---

[13] Ali Saad, Ph.D., is Union Pacific's expert in economics and statistics who was provided access to and relied on the eHealthSafe datasets reflecting Diagnosis Descriptions, Service Closure Reasons, and Service Outcomes. (Exh. A69 at 1–2 and Excerpts from Deposition of Ali Saad, PhD, attached as Exh. A68, ("Saad Dep.") at 18:1–5, 19:9–21:4; *also compare* Saad Dep. at 55:4–23 (identifying the reports he reviewed as UP_Harris_202506 and UP_Harris_238006) *with* Doc. # 248 at 10 ¶ 15 (identifying those same spreadsheets as two of the three reports summarized on behalf of Plaintiffs by Alexander Wise)).

50

159.   Zinn did not have a diagnosis listed in the eHealthSafe datasets; however, there were 40 other individuals listed in the eHealthSafe datasets who had a Diagnosis Description of "Anxiety Disorder-PTSD," over half of whom received "Full Duty Release" and were "Cleared to Work – No Restrictions."  (Exh. A69 at p. 24 and Ex. 19). Only one individual with this diagnosis had restrictions that Union Pacific could not accommodate, and two received general medical disqualifications. (*Id.*). Three employees required medical monitoring before being cleared to work without restrictions. (*Id.*).

## III.
## ARGUMENT AND AUTHORITIES

### A.   Standard of Review

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotations omitted).  "Plaintiffs must meet all requirements of Rule 23(a) and fall within one of the categories of Rule 23(b) to certify their … claims as a class action." *Blades v. Monsanto Co.*, 400 F.3d 562, 568 (8th Cir. 2005) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).[14]  A plaintiff bears the initial burden of showing that the class should be certified under Rule 23.  *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994).  Courts should not suppress "doubt" as to whether a Rule 23 requirement is met—no matter the area of substantive law.  *Henke v. Arco Midcon, L.L.C.*, No. 4:10CV86 HEA, 2014 WL 982777, at *3 (E.D. Mo. Mar. 12, 2014) (citing *In re Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 321 (3d Cir.2009)); *see also Dukes*, 564 U.S. at 351 ("[A]ctual, not presumed, conformance with Rule 23(a) remains … indispensable.").  For all of the reasons discussed below, Plaintiffs have not

---

[14] Plaintiffs cite a number of pattern or practice cases filed by the Equal Employment Opportunity Commission (EEOC) against employers.  These cases are largely irrelevant to Plaintiffs' motion for class certification because the EEOC is not subject to Rule 23's requirements.  *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 324, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *E.E.O.C. v. Northwest Airlines, Inc.*, 216 F.Supp.2d 935, 937–38 (D. Minn. 2002).

51

met their burden under Rule 23, and their motion to certify an ADA disparate treatment class claim should be denied.

**B.      Plaintiffs' Disparate Treatment Pattern or Practice Claim Requires Proof of Discriminatory Intent**

Though Plaintiffs asserted several class claims in their Amended Complaint, including a disparate impact claim under the ADA, they have moved to certify only one claim: "Count I, ADA disparate treatment."  (Doc. # 249 at 22).  In determining whether to certify Plaintiffs' proposed class on this single claim, any "rigorous analysis" under Rule 23 will inevitably touch on the factual and legal issues that comprise the claim that Plaintiffs seek to certify.  *Comcast Corp.*, 569 U.S. at 33 (The Rule 23 "analysis will frequently entail overlap with the merits of the plaintiffs' underlying claim" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal citations and quotations omitted); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (allowing consideration of the merits where "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied").

"Liability in a disparate-treatment case depends on whether the protected trait ... actually motivated the employer's decision."  *Raytheon Co. v. Hernandez,* 540 U.S. 44, 52 (2003) (internal quotations and citations omitted) ("By contrast, disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."). Even in cases where plaintiffs attempt to prove a disparate treatment claim through a pattern or practice framework, "proof of discriminatory motive is critical,' however 'statistical evidence often is used to establish the existence of a pattern or practice.'"  *Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1287 (11th Cir. 2000) (quoting *Lujan v. Franklin Cnty. Bd. of Educ.,* 766 F.2d 917,

52

929 (6th Cir.1985)); *see also Monaco v. City of Jacksonville*, 51 F. Supp. 3d 1251, 1261–62 (M.D. Fla. 2014), *aff'd,* 671 F. App'x 737 (11th Cir. 2016) (pattern or practice disparate treatment cases require proof of discriminatory intent).   Underlying the analysis of whether Plaintiffs' proposed class satisfies each requirement of Rule 23 is the question of whether Plaintiffs can prove discriminatory intent on a classwide basis.

**C.      Plaintiffs' ADA Disparate Treatment Claim Does Not Satisfy Rule 23(a)**

The Court may certify a class action only if it "is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Bishop v. Comm. on Prof'l Ethics & Conduct of Iowa State Bar Ass'n*, 686 F.2d 1278, 1287-88 (8th Cir. 1982) (quoting *General Telephone Co. v. Falcon*, 457 U.S. 147 (1982)).   These prerequisites include numerosity, commonality, typicality, and adequate representation. Fed. R. Civ. P. 23(a).  The typicality and commonality requirements "tend to merge" because "[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *See Falcon*, 457 U.S. at 157 n.13.

To establish commonality, Plaintiffs must show "that a classwide proceeding will 'generate common answers apt to drive the resolution of the litigation.'" *Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011) (quoting *Dukes*, 564 U.S. at 350).  "Any competently crafted class complaint literally raises common 'questions.'" *Dukes*, 564 U.S. at 349.  Rather, Plaintiffs must show that their claim "depend[s] upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." *Id*. at 350.  "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  Rule 23(a)'s requirements "effectively limit the class claims to

53

those fairly encompassed by the named plaintiff's claims." *Id*. at 349. Plaintiffs cannot satisfy the commonality requirement by merely "demonstrating that class members have all suffered a violation of the same provision of law." *Bennett*, 656 F.3d at 814. "Plaintiffs cannot 'simply leap from the premise that they were the victims of discrimination to the position that others must also have been.'" *Gonzalez v. Brady*, 136 F.R.D. 329, 331 (D.D.C. 1991) (quoting *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985)). When, as here, a class claim challenges thousands of decisions, there must be "some glue holding the alleged *reasons* for all those decisions together;" otherwise, it would be "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" *Dukes*, 564 U.S. at 352 (emphasis in original).

The typicality element requires there to be "other members of the class who have the same or similar grievance as the plaintiff." *Alpern v. UtiliCorp United, Inc*., 84 F.3d 1525, 1540 (8th Cir.1996) (quoting *Donaldson v. Pillsbury Co*., 554 F.2d 825, 830 (8th Cir.1977) cert. denied, 434 U.S. 856 (1977)). This requirement is "intended to assure the claims of the class representatives are similar enough to those of the class, so that the representatives will adequately represent the class." *In re Baycol Products Litigation*, 218 F.R.D. 197, 205 (D. Minn. 2003) (internal quotations omitted). "In other words, the Court must consider whether the representative's interests will be aligned with those of the proposed class, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Bradford v. Union Pacific R.R. Co*., 2007 WL 2893650, *7 (W.D. Ark. 2007); *In re: American Medical Systems, Inc*., 75 F.3d 1069, 1082 (6th Cir. 1996)). "The premise of the typicality requirement is simply stated: as goes the claim of the naked Plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). "If proof of the representatives'

54

claims could not necessarily prove all of the proposed class members' claims, the representatives are not typical of the proposed members' claims." *Liberty Lincoln Mercury v. Ford Mktg. Corp.*, 149 F.R.D. 65, 77 (D. N.J. 1993); *see also Bradford*, 2007 WL 2893650 at \*7 (finding named plaintiff was not typical because "[h]er claims, as well as those of the class, are highly individualized and will require individual-based evidence" and "[i]n pursuing her own unique claims, [she] will not advance the claims of the class"). "The requirement ensures that no claim of a class member, or significant aspects of such claim, will go unrepresented by representative plaintiffs." *McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 878 (D.C.S.D. 1982) (citing *Sommers v. Abraham Lincoln Federal Savings & Loan Assoc.*, 66 F.R.D. 581 (E.D. Pa.1975). "In short, in the course of proving her own claim, plaintiff must also prove the claims of the other members of the class. The claims and defenses of the class representative 'would not be typical if it would require substantially more or less proof than required for the other members of the class.'" *McElhaney*, 93 F.R.D. at 878 (quoting *Amswiss Int. Corp. v. Heublein, Inc*., 69 F.R.D. 663, 667 (N.D. Ga. 1975)).

"Adequacy of representation entails the concern over whether the class representatives and their counsel will competently and vigorously pursue the lawsuit and the concern that differences exist between the interests of the class representatives and the class." *Hervey v. City of Little Rock*, 787 F.2d 1223, 1230 (8th Cir. 1986) (internal quotations omitted). "In many ways, the inquiry as to the adequacy of the class representation under Rule 23(a)(4) is similar to the inquiry on typicality. The Court must ask 'whether the representative parties will fairly and adequately protect the interests of the class.'" *Murphy v. Gospel for Asia, Inc.*, No. 5:17-CV-5035, 2018 WL 4323938, at \*6 (W.D. Ark. Sept. 10, 2018) (quoting Fed. R. Civ. P. 23(a)(4)).

Union Pacific does not dispute that the putative class meets the numerosity requirement,

55

nor the competency of their counsel.  As explained below, however, Plaintiffs cannot satisfy the commonality and typicality requirements.  In addition, though Union Pacific does not separately address the reasons the Named Plaintiffs are not adequate representatives, they fail to satisfy the adequacy requirements for largely the same reasons their claims are not typical of the putative class members' claims.

1.    As in *Hohider*, Plaintiffs' Disparate Treatment Claim Lacks Commonality Because of the ADA's "Qualified" Standard

After a year and a half of discovery, Plaintiffs' disparate treatment claim suffers from the same deficiencies under the commonality prerequisite as outlined in Union Pacific's motion to dismiss—namely, those that prevented certification in *Hohider v. United Parcel Service, Inc.*[15] In *Hohider*, the plaintiffs sought to certify a disparate treatment claim based on UPS' alleged 100% healed policies, which they had asserted were "*per se* unlawful under the ADA because they inherently deny employees individualized consideration and reasonable accommodation." 574 F.3d 169, 194 (3d Cir. 2009).  Just as in this case, the *Hohider* plaintiffs alleged a pattern or practice of unlawful discrimination under Title I of the ADA and argued that if they could establish the existence of a policy that violated the ADA, "no further proof would be needed to establish liability under the ADA." *Id.* at 195.

As the Third Circuit held, the proposed class in *Hohider* lacked commonality because "in light of the substantive requirements of the ADA, … [the plaintiffs'] claims cannot be adjudicated within the parameters of Rule 23 such that a determination of classwide liability and relief can be reached." *Id.* at 185.  Instead, "establishing the unlawful discrimination alleged by

---

[15] Plaintiffs assert that in denying Defendant's Motion to Dismiss this Court rejected the analysis in *Hohider*.  (Doc # 249 at 33 ("As it did at the motion to dismiss stage, the Court should reject Union Pacific's contention that the Third Circuit's decision in *Hohider* … prevents certification of ADA disparate treatment claims."))  The Court made no such ruling.  Rather, the Court found that "dismissal of the class action allegations would be premature at this stage of the litigation" because there "appear to be issues capable of class-wide resolution presented in the Amended Complaint."  (Doc. # 111 at 8).  Nonetheless, the Court stated that Union Pacific could "renew its arguments in response to any motion for class certification."  (*Id.* at 9).

plaintiffs would require determining whether class members are 'qualified' under the ADA, an assessment that encompasses inquiries acknowledged by the district court to be too individualized and divergent with respect to this class to warrant certification under Rule 23(a) and (b)(2)." *Id*. at 186. This is true because ADA claims are distinguishable from Title VII claims in that the ADA "does not prohibit discrimination against *any individual* on the basis of disability, but, as a general rule, only protects from discrimination those disabled individuals who are able to perform, with or without reasonable accommodation, the essential functions of the job they hold or desire." *Id*. at 191 (emphasis in original).[16]

As in *Hohider*, Plaintiffs' claims "require inquiry into whether class members are 'qualified'—which includes whether they can or need to be reasonably accommodated—before a classwide determination of unlawful discrimination, as contemplated at the first *Teamsters* stage, can be reached." *Id.* at 192. Also as in *Hohider*, but even more pronounced in this case, Plaintiffs' putative class "contains no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation of whether each member of the class is 'qualified' and thus can perform the essential functions of a given job with or without reasonable accommodation." *Id*. at 189. As the Third Circuit aptly explained:

> [A]ssessment of whether class members are "qualified" is necessary to determine whether UPS has engaged in a pattern or practice of unlawful discrimination and

---

[16] For this reason, the Title VII race and gender class cases cited by Plaintiffs are easily distinguished. Indeed, those cases certified classes based on definitions that included only persons within the protected class. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*, 672 F.3d 482, 488 (7th Cir. 2012) (class of "700 black brokers currently or formerly employed by it"); *United States v. City of New York*, 276 F.R.D. 22, 27 (E.D.N.Y. 2011) (class of "black firefighters or firefighter applicants"); *Easterling*, 278 F.R.D. at 51 (class of "female applicants for the position of Correction officer"); *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 433 (D.D.C. 2002) (class of "African-Americans who are or were salaried employees"); *Rollins v. Traylor Bros.*, Inc., Case No. C14-1414 JCC, 2016 WL 258523, at 4 (W.D. Wash. Jan. 21, 2016) (class of African American laborers), *class decertified at* 2016 WL 594943, at *1–2 ("given all of the individual issues that must be litigated in this matter, trial administration would be overwhelming").

57

thus can be held liable for violating the ADA with respect to the class. As discussed, in this case the ADA's "qualified" standard cannot be evaluated on a classwide basis in a manner consistent with Rule 23(a) and (b)(2); applying the *Teamsters* evidentiary framework to plaintiffs' claims does not remove this impediment to certification, even if all that is considered is the first, "liability" stage of that framework." … Because the statutorily required inquiry into qualification is incompatible with the requirements of Rule 23 in this case, and because plaintiffs cannot adjudicate their claims and requested relief without it, the class cannot be certified.

*Id.* at 196.

The Third Circuit thus explicitly rejected Plaintiffs' assertion that a determination of "ADA 'qualification'" can be relegated to the "Second Stage – *Teamsters* Hearings." (Doc. # 249 at 33 and 38). The Third Circuit's analysis is consistent with the Eighth Circuit's recognition that "the plaintiff bears the burden of ultimately proving that he is 'qualified'" and, if he needs an accommodation, that "reasonable accommodation is possible." *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568–69 (8th Cir. 2007). Even if the *Teamsters* framework could be used in ADA pattern-or-practice class actions,[17] which has not explicitly been decided within this Circuit, the framework "would not, by its own force, affect what patterns or practices constitute discrimination prohibited by statute" nor "independently dictate what substantive elements must meet the requirements of Rule 23 in order to reach a classwide finding of unlawful discrimination under that statute." *Hohider*, 574 F.3d at 183–85; *cf. In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *48 (N.D. Ill. Mar. 31, 2017) ("Plaintiffs vaguely assert that there is a 'single, significant common issue of liability," … but 'liability,' of course, depends on the elements of a cause of action.").

The Third Circuit's view of the *Teamsters* framework is consistent with courts around the

---

[17] Union Pacific takes no position on whether the *Teamsters* framework, in general, is applicable in private-plaintiff ADA class actions—only that it is not an effective mechanism for managing *this* class action.

58

country that have evaluated the appropriateness of the framework for a particular claim. The *Teamsters* framework, as compared to *McDonnell Douglas*, "charges the plaintiff with the *higher* initial burden of establishing 'that *unlawful discrimination* has been a regular procedure or policy followed by an employer….'" *Serrano v. Cintas Corp.*, 699 F.3d 884, 893 (6th Cir. 2012)(emphasis added); *see also Monaco v. City of Jacksonville*, 51 F.Supp.3d 1251, 1262 (M.D. Fla. 2014) ("Plaintiffs must show not merely a discriminatory practice, but one that is *unlawful* under the ADA," and "to prevail on a class-wide disparate treatment theory, Plaintiffs must show that the City intentionally denied those employees entry into the System on the basis of disability, that is, Plaintiffs must establish that *discrimination* was the City's standard operating procedure.") (emphasis in original); *EEOC v. JBS USA, LLC*, 940 F.Supp.2d 949, 968 (D. Neb. 2013)("To make out a *prima facie case,* 'a plaintiff must prove that the employer 'regularly and purposefully,' treated members *of the protected group* less favorably and that unlawful discrimination was the employer's 'regular procedure or policy.'") (quoting *EEOC v. McDonnell Douglas Corp,* 191 F.3d 948, 951 (8th Cir. 1999)) (emphasis added). Thus, without a showing that each member of the putative class (the ones allegedly injured by Union Pacific's "FFD policy") are protected from intentional discrimination under the ADA (i.e., they are qualified individuals with disabilities), the Plaintiffs cannot demonstrate that Union Pacific's "FFD policy" is discriminatory under the ADA. *See, e.g.*, *Chedwick v. UPMC*, Civil Action No. 07-806, 2011 WL 1559792, at *12 (W.D. Pa. April 21, 2011)("[A]n individual must show that he or she is 'qualified' for the relevant position in order to establish that the results of a medical examination were improperly 'used' to facilitate discrimination."); *Burdette v. Federal Express Corp.*, No. 1:97-cv-2935, 1998 WL 190275, at *1 (N.D. Ga. Feb. 18, 1998) (dismissing class action allegations because the class definition—"those who are affected by the Defendant's 'no

light duty' policy"—was not limited to individuals entitled to protection under the ADA, i.e. qualified individuals with a disability) (citing *Chandler v. City of Dallas*, 2 F.3d 1385, 1396 (5th Cir. 1993)).[18]

That Plaintiffs must establish that putative class members are qualified persons with disabilities as part of their *prima facie* case is true even if Plaintiffs are arguing that Union Pacific's "FFD policy" is a *per se* violation of the ADA.[19] *See Hohider*, 574 F.3d at 195 ("[W]e do not believe plaintiffs can reach a determination of unlawfulness under the ADA by proving only the existence of '100% healed' policy, without any inquiry into whether that policy has been used to discriminate against individuals protected by the ADA from such discrimination."); *see also Gardenhire v. Manville*, 722 Fed.Appx 835, 840 (10th Cir. 2018) (reasoning that because plaintiff had not shown he could perform the essential functions of his job with or without accommodation, "whether or not [the employer] had a 100%-healed policy has no bearing on [plaintiff's] ADA claim"); *Bates v. UPS, Inc.*, 511 F.3d 974, 988-89 (9th Cir. 2007) (finding that "[b]efore an employee can challenge an employer's qualification standard, however, an employee must first prove that he is a 'qualified individual' within the meaning of the ADA," vacating denial of defendant's decertification motion, and remanding for a finding on

---

[18] Throughout this brief, Union Pacific cites a handful of pre-ADA Amendments Act (ADAAA) cases. It does so only where the proposition for which Union Pacific cites the case relied on an aspect of the ADA that did not change under the ADAAA, such as the requirement that to have standing to bring a disparate treatment claim, the plaintiff must be a qualified individual with a disability. *Taylor v. Specialty Rests. Corp.*, No. 2:12-CV-44, 2014 WL 4922942, at *5 (S.D. Ohio Sept. 30, 2014) ("As other district courts have noted, the ADAAA left untouched the plaintiff's burden of proof; he still has to prove he has a disability.") (internal citations and quotations omitted).

[19] Union Pacific disputes that any of its policies or practices challenged by Plaintiffs in this case are "per se" violations of the ADA because they apply to all employees, not just those with disabilities. *See, e.g.,* Patterson v. *Illinois Dep't of Corr.*, 37 Fed.Appx. 801, 804 (7th Cir. 2002) (unpublished) (holding that a testing requirement was not a "per se" violation because it applied to all employees, not only disabled employees); *Hustvet v. Allina Health Sys.*, 283 F. Supp. 3d 734, 743–44 (D. Minn. 2017) (plaintiff's case "concerns a policy that applied to all similarly situated employees. As such, the existence of the policy was not a per se violation of the ADA or MHRA akin to a 100% healed policy.") For example, Union Pacific's use of the so-called 1% Rule applies to all employees in safety-sensitive positions in determining whether sudden incapacitation work restrictions are appropriate, regardless of the employees' medical condition or status.

60

whether one named plaintiff and one class member were "qualified");[20] *EEOC v. Prestige Care, Inc.*, Case No. 1:17-cv-1299, 2018 WL 3473964, at *3 (E.D. Cal. July 17, 2018) (if an individual is not a qualified individual with a disability, "then the ADA offers no protection … even if an individual is subject to a policy that is alleged to be a *per se* violation of the ADA"); *Hutchinson v. UPS, Inc.*, 883 F.Supp. 379, 398 (N.D. Iowa 1995) (plaintiff was not a person with a disability under ADA and therefore was "not a person who can assert a claim under 42 U.S.C. § 12112(a), nor one who can be wronged by violation of its provisions").  Thus, the use of the *Teamsters* framework does not absolve Plaintiffs of their burden to prove that each putative class member is a qualified individual with a disability during the initial phase.

As in *Hohider,* Plaintiffs' proposed class lacks the "high level of homogeny" required by Rule 23's commonality strictures that would potentially allow for a classwide determination of whether the class members are "qualified" under the ADA.  *Cf. EEOC v. FedEx Ground Package Sys., Inc.*, No. 2:15-cv-256, 2016 WL 299045, at *5 (W.D. Pa. Jan. 25, 2016).  As explained above, the putative class members work in a wide array of jobs[21] and have all manner

---

[20] In support of their motion, Plaintiffs cite the district court opinion in *Bates* (which certified the plaintiffs' proposed class), (Doc. # 249 at 27 and 33, citing *Bates v. United Parcel Serv.*, 204 F.R.D. 440 (N.D. Cal. 2001)), but they fail to mention that the Ninth Circuit later found that *Teamsters* was inapplicable because the case involved a facially discriminatory qualification standard and remanded for these further findings mentioned above.  *Bates,* 511 F.3d at 988-89.  In contrast, Plaintiffs' claim does not involve a facially discriminatory qualification standard because none of Union Pacific's practices being challenged, including the 1% Rule, disqualifies employees outright nor "focus[es] directly on an individual's disabling or potentially disabling condition."  *Id*. at 988; *see also Monaco v. City of Jacksonville*, 51 F. Supp. 3d 1251, 1261–62 (M.D. Fla. 2014), *aff'd,* 671 F. App'x 737 (11th Cir. 2016) (distinctions that apply to the "treatment of a multitude of dissimilar conditions and which constrain individuals both with and without disabilities, are not distinctions based on disability.  Consequently, although such distinctions may have a greater impact on individuals with disabilities do not intentionally discriminate on the basis of disability.")

[21] This is another way in which this case is distinguishable from the cases relied on by Plaintiffs.  *Bates*, 511 F.3d at 981 (class included only "package-car drivers"); *Ellis*, 285 F.R.D. 492, 509 ("[T]he class covers only two closely-related, management level positions (AGM and GM) that share a uniform job description across the class…."); *Sodexho*, 208 F.R.D. 428 ("Plaintiffs have defined their claims and class narrowly to include only discrimination in promotions, and only those individuals who sought either an above-the-unit position or a job that would lead to an above-the-unit position."); *Easterling*, 278 F.R.D. at 51 (class included only applicants for Correction Officer position); *City of New York*, 276 F.R.D. at 31 (class included only applicants for entry-level firefighter position).

of medical conditions[22] with the only discernable commonality among them being that they were evaluated by Union Pacific for their fitness for duty. *Id.* ("In *Hohider*, there was no such unity because the plaintiffs, in a wide array of jobs, suffered from all manner of disabilities and the only thing bringing them together was UPS's alleged policy of not accommodating them upon returning from their medical leave of absence.") Simply put, it is even more clear now, after more than 18 months of discovery specific to the viability of class certification, that the putative class lacks *any* unifying or limiting criteria that could potentially permit classwide evaluation of whether each member of the class has a disability and is "qualified" to perform the essential functions of a given job with or without reasonable accommodation. "With the extreme diversity of job positions, claimed disabilities, and return-to-work decisions of [the] potential class plaintiffs, … it would be super difficult, if not impossible, to satisfy Rule 23's commonality and typicality requirements." *Id*.

2.    Discovery Has Confirmed That Plaintiffs Cannot Satisfy the Commonality and Typicality Requirements

Some of the Named Plaintiffs' own claims prove the lack of commonality and typicality because there are individual questions of fact that will have to be decided to determine whether even they themselves are persons with actual disabilities. "Though the ADAAA makes it easier to prove a disability, it does not absolve a party from proving one." *Tramp v. Assoc. Underwriters, Inc.*, 768 F.3d 793, 804 (8th Cir. 2014) (quoting *Neely v. PSEG Tex. Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013)). For example, Miller has cardiomyopathy, but the condition does not limit him in any capacity. (Sec. II at ¶ 128)[23] In fact, his physicians called him "asymptomatic." (*Id*. at ¶ 133). At best, determining whether he has an actual disability under

---

[22] This makes Plaintiffs' putative class different from the class in *Bates*, which included only one medical condition (hearing impairment), which the defendant did not dispute was a disability. *Bates*, 511 F.3d at 988.
[23] All citations to "Sec. II" are to Section II, Factual Background, of this brief.

62

the ADA will require an inquiry as to how the condition would affect him in an unmitigated state or whether it substantially impairs a major bodily function. Similarly, Mount is not pacemaker-dependent, relying on the device less than one percent of the time, has "no limitations," and is in "excellent shape." (*Id.* at ¶136)  Baker, on the other hand, admits he has no actual disability, having been diagnosed with either unexplained syncope or dehydration, both of which are symptoms rather than impairments. (*Id.* at ¶¶ 122, 126); *see  Collier v. Utah Transit Auth.*, No. 1:11-CV-00163, 2012 WL 3686002, at *2 (D. Utah Apr. 20, 2012), *report and recommendation adopted,* No. 1:22-CV-163, 2012 WL 3685999 (D. Utah Aug. 27, 2012) (dismissing amended complaint where plaintiff alleged that he "received heat exhaustion and dehydration" but did not identify "any specific physical or mental impairment"). Zinn had mental impairments at the time of his termination from Union Pacific, but whether a mental impairment is a disability still depends on evidence presented of how it limits one's major life activities. *See Lange v. Bon Appetit Mgmt. Co.,* No. CV 14-784 (MJD/JSM), 2015 WL 6445134, at *6 (D. Minn. Oct. 21, 2015) (finding plaintiff failed to establish his alleged PTSD constituted a disability). Similarly, while Harris and Taylor both suffer from seizure disorders, determining whether their seizure disorders constitute a disability still depends on a fact-specific inquiry as to how their seizures limit their ability to perform major life activities when the seizures are not controlled. *Hustvet v. Allina Health Sys.*, 283 F. Supp. 3d 734, 739 (D. Minn. 2017) ("The record does not otherwise reveal the extent, frequency, or severity of her seizures. Given this lack of evidence, Hustvet fails to meet her burden of showing she is disabled due to conditions that substantially limit her performance of major life activities.").

More importantly, proof that the Named Plaintiffs have disabilities will not prove that other class members—even those with the same medical condition—have a disability. *Cf. Wade*

63

*v. Montgomery Cty., Texas,* No. 4:17-CV-1040, 2017 WL 7058237, at *4 (S.D. Tex. Dec. 6, 2017), *report and recommendation adopted sub nom. Wade v. Montgomery Cty.,* No. 4:17-CV-1040, 2018 WL 580642 (S.D. Tex. Jan. 25, 2018) ("Neither the Supreme Court nor [the Fifth Circuit] has recognized the concept of a per se disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies.") (quoting *Waldrip v. General Electric Co.,* 325 F.3d 652 (5th Cir. 2003)); *see also, e.g., Gard v. Dooley*, No. 4:14-CV-04023-LLP, 2017 WL 782279, at *4 (D.S.D. Feb. 28, 2017) ("Thus, even under the EEOC regulations, one who has diabetes is not *per se* disabled. Instead, one with diabetes has a physical or mental impairment. One would still need to show that impairment substantially limits a major life activity."); *Barron v. Decare Dental, LLC,* No. CIV. 12-699 RHK/SER, 2013 WL 3989786, at *4 (D. Minn. Aug. 2, 2013) ("Although the ADAAA broadened the definition of what constitutes a disability, ... courts have repeatedly recognized that alcoholism is not a disability under the ADA per se.") (internal citations and quotations omitted).  Because proof of their own alleged disability would not advance the claims of the class, the Named Plaintiffs are not typical.  *Cf. Pennell v. Corizon Health, Inc.,* No. 18-06034-CV-SJ-ODS, 2018 WL 4088084, at *2 (W.D. Mo. Aug. 27, 2018)(typicality lacking because "[h]ealthcare needs of a particular inmate are individualized and will vary from inmate to inmate.").

The declarations filed by some of the putative class members also demonstrate the individualized inquiries required to determine whether any of them have disabilities.  For example, many of the declarants indicate that they have seizure disorders, similar to Harris and Taylor, but offer no information about the extent, frequency, or severity of the seizures when they are not controlled.  (Doc. # 248-33 at 23, 32, 52, 108, and 123).  The ten declarants with

64

alleged color vision deficiencies (*id*. at 5, 20, 44, 49, 55, 63, 79, 85, 91, and 121) also fail to describe any ways in which they are limited by the condition. *See Vannattan v. VendTech-SGI, LLC*, No. 16-CV-2147-JWL, 2017 WL 2021475, at *3 (D. Kan. May 12, 2017) ("The court cannot locate one case under the ADA in which a court determined that a plaintiff's color-vision deficiency substantially limited the major life activity of seeing."); *Ferguson v. Whirlpool Corp.*, No. 99-2112, 2000 WL 1013309, at *3 (Apr. 5, 2000 W.D. Ark.) (finding inability to distinguish colors did not substantially limit ability to see). In fact, none of the declarations contain any allegations regarding how the declarant is substantially limited in any major life activity or major bodily function. (Doc. # 248-33). "Various factors would have to be considered in determining whether each named Plaintiff and each member of the putative class has or will have a 'disability' for the purposes of an ADA claim." *Davoll v. Webb*, 160 F.R.D. 142 (D. Colo. 1995) (denying class certification motion supported by affidavits from named plaintiffs alleging merely that they sustained work-related injuries which required them to be placed in a light duty position). "Such 'necessarily individualized inquiries' are best suited to a case-by-case determination." *Id*; 29 C.F.R. § 1630.2(j) ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.")[24]

Plaintiffs may argue that even if some Named Plaintiffs or putative class members do not have an actual disability under § 12102(1)(A), Union Pacific regarded them as disabled under § 12102(1)(C) by (a) requiring them to undergo an FFD evaluation and/or (b) ultimately determining they could not be returned to their job. Again, such a determination cannot be made on a classwide basis. Plaintiffs cannot rely solely on the fact that Union Pacific evaluated each putative class member for fitness for duty to establish a classwide "regarded as" claim. *See Pena*

---

[24] Because establishing a "record" of disability also requires a showing that the alleged record of impairment substantially limits a major life activity, 29 C.F.R. § 1630.2(k), this same analysis precludes a classwide finding that each putative class member has a disability under 42 U.S.C. § 12102(1)(B).

*v. City of Flushing*, 651 Fed.Appx. 415 (6th Cir. 2016) (referring an individual to a fitness for duty examination when the employer knows the employee has medical problems is not a *per se* "regarded as" violation). This is particularly true here because Union Pacific requires FFD evaluations for reasons unrelated to an employee's medical condition, such as if the employee is returning from a leave of absence that lasted longer than one year or because of required regulatory examinations. (Sec. II at ¶ 59).

Even in cases where Union Pacific required an FFD evaluation because of a putative class member's medical condition (whether real or perceived), the Court would have to make an individualized inquiry as to whether Union Pacific regarded each putative class member as having an "impairment." *Cf. Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1113 (8th Cir. 2016) (to establish that BNSF regarded him as disabled, "as a threshold matter, Morris was required to show that BNSF perceived his obesity to be a condition that met the definition of 'physical impairment'"). This may require an examination of the reason(s) Union Pacific required an FFD evaluation and, where applicable,[25] why it ultimately determined that the employee was not fit to return to work. *Cf. Fischer v. Minneapolis Pub. Sch.*, 792 F.3d 985, 989 (8th Cir. 2015) (reasoning that defendant's belief that plaintiff did not have the level of physical strength in his back needed for the job "is not equivalent to a belief that [plaintiff] suffered a physical impairment such as a physiological disorder, cosmetic disfigurement, anatomical loss, or disease."); *Johnson v. Univ. Hosp. Physician Serv.*, 617 Fed.Appx. 487, 489 (6th Cir. 2015) (rejecting "regarded as" claim predicated upon referral for fitness for duty evaluation resulting

---

[25] As already noted, the eHealthSafe datasets reveal that of the 5,783 individuals with restrictions, 4,347 have a Service Closure Reason of "Full Duty Release," 217 have a Service Closure Reason of "Manager Agrees to Accommodate," and 473 have a Service Closure Reason of "Medical Monitoring Required – Referred to Monitoring Service," indicating that these employees were eventually returned to their position despite their restrictions. (Sec. II at ¶ 154). All of these Service Closure Reasons indicate that the employee was returned to work following the FFD evaluation. (*Id.*)

from the plaintiff's deteriorating performance, such as "falling asleep at work").

In addition, the "regarded as" basis for establishing disability is inapplicable "to impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B) ("A transitory impairment is an impairment with an actual or expected duration of 6 months or less."). This may disqualify the 2,138 individuals Plaintiffs identify as having restrictions of 180 days or less. (Doc. # 248-34 at ¶ 12). Finally, "a person must show, for both coverage under the 'regarded as' prong and for ultimate liability, that he or she was subjected to a prohibited action because of an actual or perceived impairment…." 29 C.F.R. § Pt. 1630, App.'x § 1630.2(l); *see also* 29 C.F.R. § 1630.2(l)(3) ("Establishing that an individual is 'regarded as having such an impairment' does not, by itself, establish liability. Liability is established under title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability within the meaning of section 102 of the ADA, 42 U.S.C. 12112."). Again, this cannot be determined without an individual inquiry as to the basis for any allegedly prohibited action taken by Union Pacific against each putative class member.

Even were Plaintiffs to provide evidence that each putative class member is disabled under the ADA, they would also have to establish that each putative class member was otherwise qualified for the job from which he/she was removed. *Cf. Prestige Care, Inc.*, 2018 WL 3473964 at *13 (dismissing charging party who sufficiently alleged a disability but not that she was "qualified"). "In order to be a qualified individual for the purposes of the ADAAA, the plaintiff must '(1) possess the requisite skill, education, experience, and training for [the] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 810 (8th Cir. 2015). The essential functions of a job can include, for example, operating safely. *See, e.g., Hohn v.*

67

*BNSF Railway Co.*, 707 F.3d 995, 1003 (8th Cir. 2013) ("The position's essential functions include the safe and frequent use of machinery…") (internal quotations omitted); *Nall v. BNSF Railway Company*, No. 4:14-cv-02819, 2017 WL 607126, at \*16 (S.D. Tex., Feb. 14, 2017) (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 628 (1989)) ("railroad employees 'discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.'"); *Equal Employment Opportunity Comm'n v. Amsted Rail Co.*, 280 F. Supp. 3d 1141, 1151 (S.D. Ill. 2017), *motion to certify appeal denied,* No. 14-CV-1292-JPG-SCW, 2018 WL 488715 (S.D. Ill. Jan. 19, 2018) ("Whether the applicant was actually a safety risk is a separate inquiry to be determined in the context of the qualification inquiry …."). But this is a determination that must be made for each individual, for his/her specific job.

In addition, if a plaintiff's claim is based on a perceived disability, the qualification inquiry "does not consider the effect of any possible accommodations." *Hanson v. N. Pines Mental Health Ctr., Inc.*, No. CV 16-2932, 2018 WL 1440333, at \*8 (D. Minn. Mar. 22, 2018); 42 U.S.C. § 12201(h) (reasonable accommodations are not available for an employee who is merely regarded as disabled). Yet, class members claiming an actual or record of disability must demonstrate that they were qualified with or without a reasonable accommodation. *Hohider,* 574 F.3d at 192 ("inquiry into whether class members are 'qualified'… includes whether they can or need to be reasonably accommodated"). And whether an employee could be accommodated depends on a variety of factors, including the specifics of their particular collective bargaining agreement, *Harrell v. Donahue*, 638 F.3d 975, 979 (8th Cir. 2011) (noting that an accommodation that violates a collective bargaining agreement imposes an undue hardship), whether the employee was qualified for reassignment to a vacant position, *Cravens v. Blue Cross*

68

*and Blue Shield of Kansas City*, 214 F.3d 1011, 1018-19 (8th Cir. 2000), or whether an employee reasonably refused DPM's offer of assistance to find an alternative position. *Minnihan v. Mediacom Communications Corp.*, 779 F.3d 803, 814 (8th Cir. 2015). Moreover, the determination of whether an employee was qualified may require an explanation of why the individual's claim for disability benefits (such as Mount's)[26] does not conflict with the element of qualification. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 796 (1999) ("An ADA plaintiff's sworn assertion in an application for disability benefits that she is unable to work appears to negate the essential element of her ADA claim that she can perform the essential functions of her job" and requires an explanation as to why "the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation.").

These are all individualized inquiries regarding the essential functions of the job at issue and whether the particular class member can satisfy those essential functions. *Cf. Quaintance v. City of Columbia, COMO Connect*, No. 2:17-CV-04007-NKL, 2018 WL 264177, at *4 (W.D. Mo. Jan. 2, 2018) (Plaintiff "has not established a prima facie case because she has not shown that she was qualified to perform the 'essential functions' of the job of temporary bus driver; namely, the ability to drive the bus safely.") And these are just the individualized inquiries related to Plaintiffs' *prima facie* case, let alone Defendant's various defenses, including "direct threat" and "business necessity." *See*, *e.g.*, *Wal-Mart Stores*, 477 F.3d at 571 (direct threat is an individualized analysis that looks at the best current medical or other objective evidence); *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999) ("An employer urging a business necessity defense must validate the test or exam in question for job-relatedness to the specific skills and

---

[26] Mount is also, therefore, not typical or an adequate representative because he is subject to this unique defense. *Golan v. Veritas Entm't, LLC*, 788 F.3d 814 (8th Cir. 2015) ("A class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation.") (internal quotations omitted).

physical requirements of the sought-after position.").

One need look no farther than Plaintiffs' own expert witnesses' opinions to corroborate the individualized nature of the issues central to Plaintiffs' class claim. For example, as Plaintiffs point out, Dr. Trangle opines that the 1% Rule is "arbitrary and lacks scientific justification." (Doc. # 249 at 13). Nonetheless, he testified that, while he still felt the FFD evaluations themselves were not handled appropriately, Union Pacific was justified in removing two employees with seizures from their safety-sensitive positions: Stefan Ybara and Joey Burns. (Trangle Dep. at 249:20–250:3, 293:21–295:7, 297:15–298:16, 299:9–14). In addition, Dr. Trangle testified that for his expert report, he was asked to look at 26 individuals, but for 7 of them, he did not have "enough information to offer an opinion one way or the other."[27] (*Id*. at 14:14–15:8, 16:20–22, 17:25–18:14). He further testified that to form an opinion on whether Union Pacific made "an appropriate determination" for "an employee who was at Union Pacific in a safety-sensitive position and was accommodated for seizure disorder," he would need to look at the same things he relied on for the individuals discussed in his report:

> Medical records. Personnel records. Medical department records. Results of any tests or studies. What other outside doctors write in their reports. How he's accommodated, how long. What he did. Was it temporary, permanent? Was it for one day? Was it for a lifetime? I mean, I don't really know, because I don't have any of that information. I can't really comment without information.

(*Id*. at 163:21–164:11). In fact, the opinions of Drs. Trangle, Goldstein, and Devereaux as to why the Named Plaintiffs were inappropriately removed from service by Union Pacific are all intricately dependent on the individual facts of each case. (Sec. II at ¶¶ 116, 120, 126, 134, 142, and 149).

Again, these necessary individualized inquiries undermine the commonality and

---

[27] Dr. Trangle's testimony on the precise number of individuals for whom he did not have sufficient information to form an opinion vacillated between seven and eight. (Trangle Dep. 94:21–95:1 (eight).

typicality required to certify a class action under Rule 23. *See Semenko v. Wendy's Int'l, Inc.*, No. 2:12-cv-0836, 2013 WL1568407, at \*11 (W.D. Pa. April 12, 2013) (commonality and typicality were lacking because, "to determine whether each claimant was subjected to prohibited discrimination, the Court must probe into factual details and then conduct a multi-step legal analysis," involving determinations of ADA "qualification," essential functions, accommodations, undue hardship, and discrimination). *Id*. at \*7; *cf. Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 374 (8th Cir. 2013) ("This court has previously rejected certification of classes where trial would require considering varied circumstances.").

3.   Plaintiffs' Motion Further Fails Under Rule 23(a) For Lack of Commonality and Typicality in the Policies and Practices They Challenge

Certification under Rule 23 is even less supportable here than in *Hohider* because Plaintiffs' class claim is based not on *one* allegedly unlawful policy but a smorgasbord of allegedly unlawful policies and practices, such as the RHE policy, the so-called 1% Rule, the use of FMCSA guidelines, requests for medical records, the use of standard work restrictions, and the Color Vision Field Test ("CVFT").[28]   In *Dukes*, the Supreme Court noted that "proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a *pattern or practice* of discrimination" because "in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision." *Dukes*, 564 U.S. at 352. As already explained above, Plaintiffs' claim requires "some glue holding the alleged *reasons*" for all the decisions they challenge together," without which " it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* at 352 (emphasis in original); *Postawko v. Missouri Dep't of Corrections*, No. 2:16-cv-04219, 2017 WL 3185155, at \*7 (W.D. Mo. July 26, 2017)

---

[28] Union Pacific maintains its position that Magistrate Judge Bazis correctly ruled that the validity/methodology of the CVFT is not relevant to Plaintiffs' claims.  (Doc. # 238).

("[E]ither these policies are unlawful as to all [class members] or they are not."); *Hartman v. Duffey*, 19 F.3d 1459, 1472 (D.C. Cir. 1994) ("While in a case alleging intentional discrimination, such as this one, a plaintiff need not isolate the particular practice and prove that such practice *caused* the discrimination, plaintiffs must make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the employer's challenged employment decisions.").

Although not addressing a discrimination case, the typicality analysis in *In re Fluidmaster, Inc.* explains the importance of this requirement. In that case, the named plaintiffs alleged a product defect claim based on a faulty coupling nut, but the court found their claim was not typical of potential claims of putative class members' claims based instead on a hose failure. 2017 WL 1196990, at *48. The court noted that "[i]f the factfinder concludes that the coupling nut was not defective, [the named plaintiffs] cannot merely swap out their defective design claims for an entirely unrelated alleged defect." *Id.* ("These are not minor factual differences. These claims lack the same essence, and do not stand or fall together.") (internal quotations omitted); *compare Walls v. Sagamore Ins. Co.*, No. 07-cv-1020, 2009 WL 890528, at *6-7 (W.D.Ark. Mar. 31, 2009) (finding typicality lacking where named plaintiff's pursuit of her own breach of contract claims would not advance the claims of class members having claims based on a different contract) *with Postawko*, 2017 WL 3185155 at *11 (typicality satisfied because named plaintiffs claims were "identical to the claims that could be raised by any member of the class").

Plaintiffs' proposed class lacks this necessary "glue," this "same essence," that would cause the claims to "stand or fall together." Indeed, there is a conceptual gap between (a) the Named Plaintiffs' claims that Union Pacific refused to reinstate them on discriminatory grounds

72

and their otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as they, such that their claims and the class claim "will share common questions of law or fact and that the [Named Plaintiffs'] claim[s] will be typical of the class claims." *See Falcon*, 457 U.S. at 157. To bridge that gap, the Named Plaintiffs must prove much more than the validity of their own claims. *Id*. Even if the Named Plaintiffs could prove that they were removed from service because of their disability, "such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of [Union Pacific's] practices, (2) that [Union Pacific's] practices are motivated by a policy of [disability] discrimination that pervades [the entire company], or (3) that this policy of [disability] discrimination is reflected in" Union Pacific's practices that the Named Plaintiffs were not affected by, such as the CVFT. *Id*. "These additional inferences demonstrate the tenuous character of any presumption that the class claims are 'fairly encompassed' within [the Named Plaintiffs'] claim." *Id*.

Frankly, it is unclear what common answer(s) the Plaintiffs are asserting will drive the resolution of the litigation. They claim to be challenging a "single policy—promulgated at the highest level of the company and carried out uniformly by a small team of decision-makers," (Doc. # 249 at 2), but discovery and even their own description of the facts have made clear that there is no "single policy" at issue. In several places, they assert that they are "challeng[ing] Union Pacific's policy of removing employees from their jobs based on an arbitrary and scientifically-unsound '1% Rule.'" (Doc. # 249 at 1, 23, 25). Yet, even if they could prove that the 1% Rule is arbitrary and scientifically unsound, such an "answer" would not resolve the litigation—even for the individual Named Plaintiffs, let alone the class.

First, only four of the Named Plaintiffs (Taylor, Harris, Baker, and Miller) and 543

73

putative class members (in other words, about seven percent of the class) had Sudden Incapacitation Restrictions—the restrictions based on the so-called "1% Rule." (Sec. II. at ¶¶ 114, 119, 124, 131, and 154). Second, even if Plaintiffs could prove that the 1% Rule is scientifically unsound, such a conclusion alone would not prove a disparate treatment claim. This is true in part because even if Plaintiffs could establish that Union Pacific removes an employee from his/her job based on a test that does not accurately measure an employee's risk of sudden incapacitation, absent a showing of discriminatory intent, it would not be enough to satisfy a *prima facie* case of disability discrimination. *Fischer*, 792 F.3d at 989 (absent some showing of discriminatory intent, employer's honest belief that the plaintiff could not meet the essential functions of the job, even if that belief was based on a flawed test, did not support plaintiff's prima facie case of disability discrimination). Moreover, whether the 1% Rule is scientifically sound also does not answer the question of whether each putative class member was nonetheless qualified to perform the job, either with or without a reasonable accommodation. Indeed, some putative class members who were at greater than a 1% risk of sudden incapacitation were accommodated and returned to work.

A case in point is ███████████████, who is a Yardmaster in Nampa, Idaho. The eHealthSafe datasets indicate that he was diagnosed with a seizure disorder and on January 16, 2016, was given Sudden Incapacitation Restrictions for the Mechanical and TE&Y departments, which his manager agreed to accommodate. (Aguilera Decl. at ¶ 12). His internal Union Pacific records show that on December 1, 2015, after being "in the therapeutic range for his long term seizure medication" and being "about 8-years seizure free," ██████ had a grand mal seizure while at work. (███ Medical Comments History, attached as Exh. D4, at UP_Harris_409932-34). After reviewing his medical records, the AMD placed sudden

74

incapacitation restrictions on him based on the 1% Rule. (*Id.* at UP_Harris_409932; Seizures Memo). HMS and DPM then engaged in discussions with ▮▮▮▮▮▮▮ manager, asking "what would happen should a yard master became [*sic*] incapacitated." (*Id.* at UP_Harris_409929). His manager discussed some of the individual aspects of the Yardmaster job in the Nampa location, such as the fact that the Nampa yard "does not have any remote control zones," and suggested that they could accommodate ▮▮▮▮▮▮ with "a standardized work practice of a recommended HDC contact at least every 1/2 hour, and if no contact HDC would contact local management." (*Id.* at UP_Harris_409928). With this accommodation, ▮▮▮▮▮▮ remains in his Yardmaster position, which is a safety sensitive position, despite the fact that he had another seizure in January 2018. (*Id.* at UP_Harris_409924).

Plaintiffs' anticipated argument that ▮▮▮▮▮▮ case has been cherry-picked by Union Pacific is beside the point. His case demonstrates not only that Plaintiffs' putative class includes individuals who were returned to work under the so-called 1% Rule, but also that a determination of the scientific validity of the 1% Rule would not answer the question of whether ▮▮▮▮▮▮ was discriminated against because of a disability.

On the flip side is ▮▮▮▮▮▮,[29] ▮▮▮▮▮▮▮▮▮, who is the Locomotive Engineer who caused the Arden accident on August 7, 2014. (Holland Decl. at ¶ 38; ▮▮▮▮ Medical Comments History, attached as Exh. D5, at UP_Harris_213206 (describing an "[i]ncident today at work where Engineer drove train through cement wall")). The eHealthSafe datasets indicate that he was given Sudden Incapacitation Restrictions associated with the Mechanical and TE&Y departments on September 30, 2014, which Union Pacific did not agree to accommodate. (Aguilera Decl. at ¶ 13). The NTSB not only supported Union Pacific's

---

[29] Plaintiffs have identified ▮▮▮▮▮▮ as a "putative class member[] – who Plaintiffs' counsel represents – and whose documents or testimony Plaintiffs anticipate, at this time, possibly using to support their claims." (Plaintiffs' January 24, 2018 Amended Answers to Second Set of Interrogatories, attached as Exh. A72).

75

determination that this "engineer cannot be cleared to return to work as a locomotive engineer until he has been seizure free and off antiseizure medications for a minimum of 10 years," but also recommended that Union Pacific "review the records of all employees in safety-sensitive positions who have any history of seizures and ensure that the current [Union Pacific] standard of fitness for duty is met by each employee." (Sec. II at ¶ 108). To prove that his removal from his Locomotive Engineer position was unlawful under the ADA, ███████ would have to prove, among other things, that Union Pacific was unreasonable despite the NTSB's approval. Thus, again, a determination as to the scientific validity of the 1% Rule would not answer the question of whether ███████ was discriminated against because of a disability.

The same is true of all of the other "common questions" Plaintiffs allege to exist. The use of "standard work restrictions" is not common to all of the class members. The ones misquoted[30] by Plaintiffs in their brief are the Sudden Incapacitation Restrictions, which, again, were applied only to 543 putative class members. (Sec. II at ¶ 154). There are also 192 individuals with hearing restrictions and 969 individuals with vision restrictions, many of whom are regulated by FRA regulations on hearing and vision requirements for engineers and conductors. (*Id* ). Others had restrictions such as lifting, carrying, bending, grasping/gripping, kneeling, pushing/pulling, reaching, sitting, standing, squatting, twisting, walking, and uneven surface restrictions. (*Id*.). Some of the restrictions come directly from the employee's treating physician, while others are assigned because of the results of an FCE. (*Id*. at ¶¶ 17, 19). Thus,

---

[30] Plaintiffs intentionally leave off important qualifying language on the restrictions, such as "work on or near moving trains, freight cars or locomotives, unless protected by barriers." (*Compare* Doc. # 249 at 12 *with* Doc # 248-28). Dr. Holland explained in his deposition why this particular qualifying language is important. ("[I]t's not meant to mean everybody that's working in the train yards, or everybody that works … on railroad property. It's meant to be really specific to people that need to be right next to the track, or riding on the train, on the side of the car, or in the train." The restriction is not meant to apply to "people that work on the track." It is not "intended to include people that are working in mechanical shops, because there, when they move the locomotives in and out of the shop, they put up these little, temporary barriers, and you need the proper safety practices, you stay off the track.") (Holland Dep. at 74:6–77:13.)

Union Pacific's use of standard work restrictions does not provide a common question sufficient to certify the putative class under Rule 23.

Nor does the RHE policy. First, not all putative class members have been affected by the RHE policy. (Sec. II at ¶ 153). Second, as Plaintiffs' own expert witness conceded, that policy is nothing more than a list of conditions that employees are required to report. It is merely one mechanism that would trigger an FFD—it does not dictate who will or will not ultimately be found unfit to return to their job. (Trangle Dep. at 119:9-122:3 ("[The RHE policy] only purports to identify those conditions that need to be addressed … without any preconceived notion of the outcome.") Indeed, Dr. Trangle testified that he did not "take issue" with anything about the RHE policy. (*Id.*; *see also id.* at 185:9–13 ("I don't have a problem setting up a medical program, and I do frequently do this, where you have the portable [*sic*] health events and conditions, and like they say here, that merit an evaluation.") Thus, Plaintiffs have failed to even identify common evidence that the RHE policy is inappropriate, let alone unlawful under the ADA.

Union Pacific's reliance on various FMCSA guidelines is equally problematic as a common question. First, Union Pacific references FMCSA guidelines only in FFD evaluations involving the potential risk of sudden incapacitation. (Sec. II at ¶ 76). As already discussed, only about seven percent of the putative class was determined to have an unacceptable risk of sudden incapacitation that resulted in restrictions. (*Id.* at ¶ 154). Second, the FMCSA guidelines vary by and are based on evidence-based medical evaluation of many different medical conditions. (*Id.* at ¶¶ 82–93). For example, the guidelines for cardiomyopathy are different, and supported by different medical studies, from the guidelines for seizure disorders or even other CVD conditions. (*Id.*; Exh. B5 at Dr. Holland Expert Report-Ex I-00436–480 (section on

77

"Cardiovascular") and at Ex I-500–513 (section on "Neurological")).  The appropriateness of Union Pacific's reliance on these guidelines would need to be evaluated for each medical condition.  Indeed, Dr. Trangle admitted that reliance on the FMCSA guidelines is appropriate in some cases.  (Trangle Dep. at 385:25–387:4 (the FMCSA's one-year waiting period for cerebral vascular stroke was appropriate for Mr. Tramontini)).  Third, according to Dr. Trangle, "[i]n some cases, the company appears to have arbitrarily established its own standards with even more prohibitive restrictions than those of the FMCSA," (Doc. # 249-5 at 2), though Plaintiffs fail to identify these alleged arbitrary standards or establish that they are applied across the putative class.  Union Pacific disputes Dr. Trangle's conclusion but admits that there are medical conditions for which the Railroad does not adhere to the FMCSA's guidelines, such as diabetes treated with insulin.  (Sec. II at ¶ 96).  Finally, some Union Pacific positions, such as Miller's, require a CDL.  (*Id*. at ¶ 127).  The analysis with respect to employees in those positions would focus not on the validity of the FMCSA guidelines but on whether having a CDL is an essential function of the job.  If it is an essential function, Union Pacific is justified in abiding by the FMCSA regulations.  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999) (employer was justified in applying FMCSA visual acuity standard in determining employee was not qualified for job driving trucks in interstate commerce, even where employee obtained a waiver from the DOT); *see also* Trangle Dep. at 132:22-24 ("If they need to have a CDL and that's actually part of their job, and then we'll have to follow [the FMCSA's] guidelines for that particular thing.")).  Thus, evaluating Union Pacific's reliance on the FMCSA guidelines requires a number of individualized inquiries that are counter to the requirements of Rule 23.

The appropriateness of Union Pacific's medical requests to employees as part of their FFD evaluations is also not an issue that can be evaluated classwide.  Union Pacific tailors its

requests for medical information to the individual's medical condition or other reason he/she was required to undergo an FFD evaluation in the first place. Indeed, the requests Union Pacific made of some of the Named Plaintiffs demonstrates the individually tailored nature of the requests:

> Taylor: "medical information related to your seizure," specifically: "Copy of medical documentation including date of diagnosis, last date of seizure, current medication and treatment plan" (Trangle Dep. Exh. 524, attached as Exh. A56).

> Baker: "medical information related to your reportable health condition (headaches and dizziness)," specifically: "Copy of diagnostic study reports including lab work (medication levels), EEG (awake and/or sleep deprived), Tilt table test, CT scan, MRI, etc.," "Copy of physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition," "Return to work release from your treating provider," "List of any limitations/restrictions and their duration," and "List of current medications." Baker also received a follow-up request for "medical information related to your absence," specifically "Copy of the October 14, 2014 initial Neurology clinic note" (Trangle Dep. Exhs 527–528, attached as Exh. A57–A58).

> Zinn: "Mental Health Records only" and "Cardio Doctor Notes; No MH; Copy of Hospital Summary; Copy of Outpatient Treatment Notes; All Medical Records 3-18-14 – 6-16-14" (Trangle Dep. Exhs 535 and 537, attached as Exh. A59–A60).

Moreover, Dr. Trangle testified that these requests were appropriate. (Trangle Dep. at 326:8–18; 428:6–11; 447:5-448:15). Thus, the appropriateness of Union Pacific's requests for medical information related to its FFD evaluations does not provide a common issue that can support certification of Plaintiffs' class disparate treatment claim.

Setting aside Magistrate Judge Bazis's order that the validity/methodology of the CVFT is irrelevant to Plaintiffs' claims, even if it were relevant, it would not provide a common question to support class certification. First, as noted by Judge Bazis, "none of the named Plaintiffs suffer from vision issues or have been removed from service based on a failed CVFT." (Doc. # 238 at 3). The Named Plaintiffs have never been subjected to the CVFT and therefore lack typicality as to that issue. *See, e.g.*, *McReynolds v. Sodexho Marriott Servs., Inc.*, 208

79

F.R.D. 428, 441 (D.D.C. 2002) (finding the class representatives' claims were not typical of members of the class whose claims predated the merger of two companies, since none of the representatives had worked at the predecessor company).[31]  Second, only 378 putative class members have restrictions that prohibit them from working "in positions requiring accurate color signal recognition."  (Haynes Decl. at ¶ 15).  Finally, and most importantly, the validity of the CVFT fails as a common question for the same reason as the soundness of the 1% Rule—a conclusion as to its validity would not prove a disparate treatment claim.  Plaintiffs would still need to prove discriminatory intent and that each individual removed from their position based on their failure of the CVFT was, in fact, qualified, with or without reasonable accommodations.[32]  *Supra*, p. 74.

Plaintiffs occasionally cite Union Pacific's FFD "policy."  (Doc. # 249 at 4, 7, 14).  It is not surprising that they try to imply that there is a cohesive FFD policy since, as already indicated, the fact that they underwent FFD evaluations appears to be the only factor common to the putative class members.  But there simply is no single FFD "policy" at issue in the Plaintiffs' proposed class claim.  Even the Named Plaintiffs' FFD evaluations demonstrate the myriad of

---

[31] Union Pacific stated in a footnote in its recent Brief in Opposition to Plaintiff's Objections to Magistrate Judge's Order (Doc. # 254 at 14 n.8) that the "Named Plaintiffs arguably do not even have standing to bring a claim that the Light Cannon violates the ADA" and promised to "fully address this issue" herein.  This argument is more appropriately framed as a lack of typicality.

[32] In addition, whether the CVFT is "valid" under FRA regulations is an issue more appropriately taken up with the FRA itself.  Employees who believe their CVFT did not comply with FRA regulations could appeal to the FRA's Locomotive Review Board or Operating Crew Review Board through the FRA's Dispute Resolution Procedures.  49 C.F.R. §§240.401 *et seq.* and 242.501 *et seq.*  Thus, any claims based on the CVFT should be dismissed until Plaintiffs can show that they have exhausted their administrative remedies.  *Harris v. P.A.M. Transp., Inc.,* 339 F.3d 635, 638 (8th Cir. 2003)(observing that "[u]ntil a plaintiff has pursued available administrative relief, [the] suit is premature and must be dismissed. . .[and] 'exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone")(internal citations omitted).  Alternatively, the FRA has primary jurisdiction.  *See, e.g.*, *Access Telecommunications v. Sw. Bell Tel. Co.,* 137 F.3d 605, 608 (8th Cir. 1998) ("One reason courts apply the doctrine of primary jurisdiction is to obtain the benefit of an agency's expertise and experience . . . Another reason is to promote uniformity and consistency within the particular field of regulation.");  *see also City of Osceola, Ark. v. Entergy Arkansas, Inc*., 791 F.3d 904, 909 (8th Cir. 2015) (holding Federal Energy Regulation Commission should decide the appropriate treatment of bandwidth payments).  These additional issues further complicate classwide treatment of claims involving the CVFT.

considerations, requests for information, diagnoses, expert consultants, job descriptions, and discussions with managers that go into each FFD evaluation. In short, Plaintiffs have failed to identify a companywide policy the examination of which would produce "a common answer to the crucial question *why was I disfavored.*" *Dukes*, 564 U.S. at 352 (emphasis in original); *see also United States v. City of New York*, 276 F.R.D. 22, 34 (E.D.N.Y. 2011) ("[A] plaintiff class seeking to establish a defendant's liability for discrimination under … a pattern-or-practice disparate treatment theory … must introduce evidence of discrimination against the protected group as a whole.")(citing *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147, 158 (2d Cir. 2001)). Without a common policy or practice that was applied with demonstrable discriminatory intent to the class as a whole, Plaintiffs' proposed class lacks sufficient commonality and typicality to be certified under Rule 23(a).

4.    Plaintiffs' Putative Class Also Lacks Commonality in the Absence of Statistical Evidence of Disparities Between Disabled and Non-Disabled Individuals

Despite Plaintiffs' heavy reliance on *Ellis v. Costco Wholesale Corp.*, they make no attempt to provide the same statistical evidence demonstrating disparities (in this case, based on disability) that the *Ellis* court relied on in certifying a disparate treatment claim. 285 F.R.D. 492, 521-531 (N.D Cal. 2012) ("Plaintiffs provide persuasive statistical evidence of gender disparities throughout Costco sufficient to refute the notion that '[d]issimilarities within the proposed class … [might] impede the generation of common answers.'") (quoting *Dukes*, 131 S.Ct. at 2551). The court noted the Ninth Circuit's concern that a key dispute between the parties was "whether there is a nationwide gender disparity … or whether any purported gender disparity is merely confined to certain regions and therefore not common *to the class as a whole*." *Id.* at 521 (emphasis added); *see also Sodexho*, 208 F.R.D. at 441 (finding plaintiffs' commonality showing was "buttressed" with statistical evidence showing that African Americans were

81

underrepresented in the jobs at issue and that "this pattern of discrimination was company-wide and did not vary significantly by division"). [33]

Plaintiffs, on the other hand, offer no statistical evidence (let alone classwide statistical evidence) of disparities between disabled and non-disabled Union Pacific employees. Plaintiffs attempt to analogize their evidence to that presented by the plaintiffs in *Ellis*, arguing that "the available data demonstrat[es] the effects on the workforce." (Doc. # 249 at 26). Yet, Plaintiffs do not make clear what "effects" the data allegedly demonstrates—certainly no disparities based on disability. Their Rule 1006 summary shows, for example, how many employees had restrictions and how long those restrictions lasted, but provides no information on how many of those restricted employees had disabilities or whether any of them were provided accommodations. (Doc. # 248-34). Thus, unlike the statistics presented in *Ellis,* Plaintiffs' "data" demonstrates nothing that would refute the notion that dissimilarities within the proposed class might impede the generation of common answers. This lack of statistical evidence demonstrating classwide disparities on the basis of disability provides yet another reason that commonality does not exist in Plaintiffs' putative class, and Rule 23(a) is not satisfied.

**D.** **Plaintiffs' ADA Disparate Treatment Claim Does Not Satisfy Rule 23(b)(2) With Respect to Liability/Injunctive Relief**

Plaintiffs have asked the Court to "employ 'hybrid' certification of liability/injunctive relief under Rule 23(b)(2) and damages under Rule 23(b)(3)…." (Doc. # 249 at 3). This approach was rejected by the Eighth Circuit in *Ebert v. Gen. Mills, Inc.* based on a finding that "the cohesiveness necessary to proceed as a class under (b)(2) [was] lacking." 823 F.3d at 480.[34]

---

[33] Plaintiffs also rely on *Sodexho*. (Doc. # 249 at 31 n. 8).

[34] Curiously, Plaintiffs continue to cite *Ebert* in support of their assertion that "hybrid certification" is gaining ground but ignore the case's holding: that such hybrid certification is inappropriate where, as Plaintiffs advocate for here, the primary determination to be made in the liability phase is "artificially narrowed … to achieve class status" and therefore "does not advance the efficiencies necessary for such treatment." *Ebert*, 823 F.3d at 481.

The same conclusion is appropriate here.

"Although a Rule 23(b)(2) class need not meet the additional predominance and superiority requirements of Rule 23(b)(3), 'it is well established that the class claims must be cohesive.'" *Id*. (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998)). Rule 23(b)(2)'s cohesiveness requirement is "more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3)." *Id.*; *see also Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121–22 (8th Cir. 2005). This is because a (b)(2) class is mandatory and does not include an opt-out provision. *See Ebert*, 823 F.3d at 480 ("Because a (b)(2) class is mandatory, the rule provides no opportunity for (b)(2) class members to opt out, and does not oblige the district court to afford them notice of the action, both of which are prescribed for (b)(3) classes.").

For reasons already addressed in the sections above, Plaintiffs cannot prove classwide liability and entitlement to injunctive relief because, "the individual proof necessary to resolve the issues abound and thus the matter founders for lack of cohesion" under Rule 23(b)(2). *Ebert*, 823 F.3d at 481. Although Plaintiffs seek to frame their claims as solely involving questions about the propriety of some of Union Pacific's practices, such as the 1% Rule and the FMCSA guidelines, this case is fundamentally about Plaintiffs' allegations of intentional disability discrimination, which cannot be established on a classwide basis. *See Avritt*, 615 F.3d at 1036 (certification under (b)(2) inappropriate where "[a]lthough [plaintiffs] seek to frame their claims as solely involving questions about the propriety of [defendant's] interest-crediting practices, this case is fundamentally about the plaintiffs' allegations of non-disclosure and deception," which "varied between plaintiffs.") "[T]he plaintiffs point to no authority suggesting that [Rule 23(b)(2)], in the [ADA] context, is relaxed enough to permit class actions when the only unifying

83

criteria for the members of the class are that they are somehow disabled, in need of accommodation, and [allegedly] mutually affected by the policy sought to be enjoined." *Perdue v. Murphy*, 915 N.E.2d 498, 507 (Ind. Ct. App. 2009).

In addition, Plaintiffs' Rule 23(b)(2) class fails because there is no single equitable relief that would provide relief to the entire class. In *Dukes* the Supreme Court clarified that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.'" *Dukes*, 564 U.S. at 360. "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id*. (internal quotations omitted).

Plaintiffs assert that a "single injunction will provide relief to the class members by stopping Union Pacific's use of its reportable health events policy and 1% Rule to remove workers with disabilities." (Doc. # 249 at 31). As already explained, this is incorrect because only a small percentage of the putative class members were affected by the 1% Rule and an undeterminable portion (though clearly less than 100 percent) of putative class members were affected by the RHE policy. *Supra*, pp. 74, 77. For example, stopping Union Pacific from engaging in these two practices would provide no relief to employees who were given restrictions to prevent EMF exposure or because they failed the CVFT. In addition, the putative class members who were not affected by these two practices, as well as those who are not current employees (which includes five out of six of the Named Plaintiffs), lack standing to seek the Plaintiffs' proposed injunctive relief. *See Dukes*, 564 U.S. at 365 ("[T]hose plaintiffs no longer employed by Wal-Mart lack standing to seek injunctive relief against its employment practices," the logical, though perhaps wasteful, solution being "excising plaintiffs from the class as they

84

leave their employment.")  Even if the Plaintiffs argue that former employees with an interest in returning to Union Pacific have standing to seek injunctive relief, 23(b)(2) would remain unsatisfied because Plaintiffs have offered no evidence on how many, if any, of the putative class members who no longer work at Union Pacific are interested in reinstatement.  *Haliye v. Celestica Corp.*, No. 06-CV-4769(PJS/JJG), 2009 WL 1653528, at *10 (D. Minn. June 10, 2009) (concluding, based on little to no showing of interest in reinstatement, that "the final relief in this case will relate predominantly to money damages" and Rule 23(b)(2) certification was therefore inappropriate).

Lastly, Plaintiffs proposed injunctive relief is inappropriate under Rule 23(b)(2) because it is not "final."  "An injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) ("Far from being final relief, a class-wide roof reinspection would only initiate thousands of individualized proceedings to determine breach and damages.")  For reasons already explained, an injunction precluding Union Pacific from using the 1% Rule would not determine liability for plaintiffs affected by the 1% Rule, such as Harris. *Supra*, p. 74.  Yet Plaintiffs' proposed trial plan addresses "ADA 'qualification' and individual defenses" in the "Second Stage – *Teamsters* Hearings," only after a determination has been made on liability in the First Stage.  (Doc. # 249 at 37).  "Seen in this light, the contemplated injunction would essentially have the effect of shifting the burden to [Union Pacific] to prove elements of the plaintiffs' claims." *Kartman*, 634 F.3d at 893.  Certification under Rule 23(b)(2), even with respect to liability and injunctive relief only, is thus inappropriate.

E.    **Plaintiffs' ADA Disparate Treatment Claim Cannot Be Certified Under Rule 23(b)(3)**

Plaintiffs' ADA disparate treatment claim similarly fails to satisfy the predominance and

85

superiority requirements of Rule 23(b)(3).[35]  "The predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member."  *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013).  "The requirement of predominance under Rule 23(b)(3) is not satisfied if individual questions … overwhelm the questions common to the class."  *Ebert*, 823 F.3d at 478-79.  "In contrast to Rule 23(a)(2), the issue of predominance under Rule 23(b)(3) is qualitative rather than quantitative."  *Id*.  Indeed, "the predominance criterion is far more demanding" than commonality.  *Amchem*, 521 U.S. at 624.  "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation … and goes to the efficiency of a class action as an alternative to individual suits."  *Ebert*, 823 F.3d at 479 (internal citations and quotations omitted).

For largely the same reasons addressed above as to why commonality and typicality are lacking, Plaintiffs cannot satisfy the predominance inquiry on questions of liability.[36]  Individual questions overwhelm any common ones.  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prime facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson Foods v. Bouaphakeo*, 577 U.S. __, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (quoting 2 W.

---

[35] As noted above, classes certified under Rule 23(b)(3) oblige the district court to afford class members notice of the action and allow them the opportunity to opt out.  Plaintiffs' proposed Rule 23 notice states that any individual who wishes to opt out of a Rule 23(b)(3) class must provide an "Exclusion Request" by written and signed letter. (Doc # 248-35, p. 6).  This is inappropriate, and Union Pacific reserves the right to object to Plaintiffs' proposed notice should the Court certify any portion of the class under Rule 23(b)(3).

[36] Plaintiffs arguments regarding why the class satisfies Rule 23(b)(3)'s predominance and superiority requirements are somewhat confusing.  They request certification under Rule 23(b)(3) on damages only (Doc. # 249 at 3), but their Rule 23(b)(3) arguments primarily address liability issues. (*See* Doc. # 249 at 32-36 (discussing, for example, "the common questions of whether Union Pacific engaged in a pattern of ADA violations, and whether the reportable health events policy is valid under the rubric of Union Pacific's direct threat and business necessity affirmative defenses" and the efficiencies to be achieved "by deciding in a single proceeding whether Union Pacific engaged in a pattern of discrimination").  Union Pacific thus responds to these arguments on the certifiability of liability questions under Rule 23(b)(3) out of an abundance of caution.

Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196-97 (5th ed. 2012)). "If to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Avritt*, 615 F.3d at 1035 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). As already explained above, because Plaintiffs' asserted "common issue"—that Union Pacific's practices are unlawful under the ADA— "breaks down into an unmanageable variety of individual legal and factual issues," the predominance requirement is not satisfied. *Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 10-04175-CV-C-NKL, 2013 WL 12153517, at *2 (W.D. Mo. June 5, 2013) (citing *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996)).

For this same reason, a class action is not a superior method of adjudication. In essence, "[t]his is not a case where the class action device 'saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.'" *Elkins v. American Showa, Inc.*, 219 F.R.D. 414, 426 (S.D. Ohio 2002) (quoting *Falcon*, 457 U.S. at 155). "[T]he economy to be achieved by class treatment of the stated issues is more than offset by the individualization of numerous issues relevant only to a particular plaintiff." *Id*. Plaintiffs have failed to identify "a sensible and practicable way for the court to resolve efficiently the individual factual issues that bear on liability … without conducting hundreds or thousands of mini-trials" and thus fail to explain "how bifurcation, creating even more subclasses, or appointing a special master would make classwide treatment *more* efficient." *In re Fluidmaster*, 2017 WL 1196990, at *48 (internal quotations and citations omitted)(emphasis in original).

Nor is certification under Rule (b)(3) appropriate with respect to damages. Because of the wide variety of jobs held by putative class members and the varying factors in determining

87

whether each putative class member was "qualified" for his/her job, there are no common questions with respect to the class's claims to relief that could be decided for the class as a whole to achieve economies of scale. Thus, the justification used for Rule 23(b)(3) certification of claims for monetary and individualized relief in *United States v. City of New York* and *Easterling v. Connecticut Dept. of Correction*, two cases cited by Plaintiffs, is inapplicable. *City of New York*, 276 F.R.D. 22, 47–48 (E.D.N.Y. 2011) (finding predominance satisfied where court could aggregate value of back pay and benefits and "[f]indings relating to the characteristics of a firefighter's employment will be essential to the determination of each of the putative subclass members' claims to compensatory damages"); *Easterling*, 278 F.R.D. 41, 49 (D. Conn. 2011) (finding predominance satisfied with respect to "the total amount of back pay that should be awarded to the class (a figure which itself depends on a number of common issues, including the number of additional [corrections officer] positions that would have been filled by women in the absence of a discriminatory test, the rate at which those women would have been paid, the value of the benefits they would have received in addition to salary, and time period for [which] they should receive back pay)").

Furthermore, Plaintiffs' attempt to certify the question of whether punitive damages should be awarded is inappropriate. The Fifth Circuit Court of Appeals rejected the idea that punitive damages can be assessed on a classwide basis at the conclusion of the liability phase:

> Punitive damages cannot be assessed merely upon a finding that the defendant engaged in a pattern or practice of discrimination. Such a finding establishes only that there has been general harm to the group and that injunctive relief is appropriate. Actual liability to individual class members, and their entitlement to monetary relief, are not determined until the second stage of the trial. And because punitive damages must be reasonably related to the reprehensibility of the defendant's conduct and to the compensatory damages awarded to the plaintiffs, recovery of punitive damages must necessarily turn on the recovery of compensatory damages. Thus, punitive damages must be determined after proof of liability to individual plaintiffs at the second stage of a pattern or practice case,

88

not upon the mere finding of general liability to the class at the first stage.

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 424 (5th Cir. 1998); *Equal Employment Opportunity Comm'n v. JBS USA, LLC*, No. 8:10CV318, 2011 WL 13137568, at \*2–3 (D. Neb. May 31, 2011) (quoting *Allison* and similarly concluding "that punitive damages should be part of the Phase II litigation"). For all these reasons, Plaintiffs' request to certify even parts of their putative class under Rule 23(b)(3) must be rejected.

**F.    Certification of Any Particular Issues Under Rule 23(c)(4) Would Be Inappropriate**

As their "Hail Mary," Plaintiffs assert that "the issues of injunctive relief and class-wide liability are appropriately certified under Rules [*sic*] 23(c)(4)." (Doc. # 249 at 37). "The Eighth Circuit has recognized that 'there is a conflict in authority on whether [an issue] may be certified under Rule 23.'" *In re Nat'l Hockey League Players' Concussion Injury Litig.*, No. MDL142551SRNBRT, 2018 WL 3421343, at \*8 (D. Minn. July 13, 2018) (quoting *In re St. Jude Medical, Inc.* ("*St. Jude II*"), 522 F.3d 836, 841 (8th Cir. 2008)). "Even courts that have approved 'issue certification' have declined to certify such classes when the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation." *St. Jude II*, 522 F.3d at 836;[37] *see also Ebert*, 823 F.3d at 479 (holding that the "deliberate limiting of issues" may be "problematic"). Without explicitly referencing Rule 23(c)(4), the Eighth Circuit explained the problem:

---

[37] Plaintiffs argue that the analysis in *St. Jude II* is no longer valid because it relied on the Fifth Circuit's decision in *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) and the Fifth Circuit has "since changed its approach" in *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014). (Doc. # 249 at 36 n.11). Even if the *Deepwater Horizon* opinion were as broad as Plaintiffs assert, however, the Eighth Circuit has not similarly eased its reluctance to use Rule 23(c)(4), as demonstrated by its recent citation to that same discussion from *St. Jude II*. *See Ebert*, 823 F.3d at 480 (citing *St. Jude II*, 522 F.3d at 841 on "whether a class may be certified as to specific issues and whether such a class may be effectively maintained under Rule 23"). This reluctance has recently been noted by several other district courts within the Eighth Circuit. *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 2018 WL 3421343, at \*8 (discussing analysis on (c)(4) in *St. Jude*); *In re Hardieplank Fiber Cement Siding Litig.*, *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-MD-2359, 2018 WL 262826, at \*20 (D. Minn. Jan. 2, 2018) (same); *Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at \*13 (E.D. Mo. Mar. 31, 2017) (same).

89

> While a determination regarding [the defendant's] liability, in the broad sense *could* impact the entire class as a whole, as the district court advances, that single determination, artificially narrowed by the district court to achieve class status, does not advance the efficiencies necessary for such treatment in this case. The resolution of that single question does not apply uniformly to the entire class, as in reality, the issue of liability and the relief sought by [the plaintiffs] is, at bottom, highly individualized.

*Id*. at 481. The Circuit Court therefore concluded that any limitations used to certify an initial phase of the case would be "artificial or merely preliminary to matters that *necessarily* must be adjudicated to resolve the heart of the matter." *Id*. at 479–80 (emphasis in original) (citing *In re St. Jude Med., Inc.*, 522 F.3d at 841); *see also In re Hardieplank Fiber Cement Siding Litig.*, No. 12-MD-2359, 2018 WL 262826, at *20 (D. Minn. Jan. 2, 2018) ("Issue certification should be denied when certification under (c)(4) will not make the case more manageable, and individual trials will still be required to determine issues of causation, damages, and applicable defenses.")(internal quotations omitted); *Morris v. Davita Healthcare Partners, Inc.*, 308 F.R.D. 360, 370 (D. Colo. 2015) ("[C]ourts should use Rule 23(c)(4) only where resolution of the particular common issues would materially advance the disposition of the litigation as a whole.")(internal quotations omitted).

Similarly, Plaintiffs can only pare down their class members' claims to discrete issues so much to shoehorn them into the Rule 23 requirements until the efficiencies that justify class treatment have completely dissolved. Resolution of any particular issues on which the plaintiffs may seek certification "would play only a limited role in the resolution of their claims as a whole." *Morris*, 308 F.R.D. at 379. "Unlike a situation in which a Rule 23(c)(4) class might be appropriate because liability is capable of classwide treatment but damages are not, Plaintiffs offer no theories of liability for which classwide treatment is apt." *Gonzalez v. Corning*, 885 F.3d 186, 202–03 (3d Cir. 2018), as amended (Apr. 4, 2018) (finding that a Rule 23(c)(4) class would not "materially advance resolution of the underlying claims"). Therefore, Plaintiffs'

90

suggestion of issue certification under Rule 23(c)(4) should be rejected.

**G.    Plaintiffs Have Failed to Identify an Ascertainable Class That Includes Only Class Members With Standing**

In addition to all of the other issues addressed above, Plaintiffs' class definition also makes class certification inappropriate. First, "[i]t is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (internal quotations omitted). As explained above, while the Plaintiffs define the class as including "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of [an RHE]," that definition does not match the 7,700 individuals in the eHealthSafe datasets. (Sec. II. at ¶¶ 150–153). Notably, many individuals within the eHealthSafe datasets are not identified as having had Reportable Health Condition Service or a particular diagnosis that may qualify as an RHE. (*Id.* at ¶¶ 151–152). For those individuals, to determine whether they even had an RHE, let alone an FFD that resulted from the RHE, would require a review of their individual medical files. "[I]f a court must undertake extensive individualized inquiries into whether a putative member falls within the class definition, certification is not appropriate." *Morris*, 308 F.R.D. at 370 ("[T]here must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."); *see also St. Louis Heart Ctr., Inc. v. Vein Centers for Excellence, Inc.,* No. 4:12 CV 174 CDP, 2017 WL 2861878, at *4 (E.D. Mo. July 5, 2017) ("Individual inquiries into the validity of each potential class member's claim … is something that could be accomplished at individual trials, but it [*sic*] there is no objective way to determine it on a class-wide basis. … the class is unascertainable.")

In addition, "for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision."

91

*Halvorson,* 718 F.3d at 778 (citing *Avritt*, 615 F.3d at 1034). "Although federal courts do not require that each member of a class submit evidence of personal standing, a class cannot be certified if it contains members who lack standing." *Avritt*, 615 F.3d at 1034. A class must therefore "be defined in such a way that anyone within it would have standing." *Halvorson,* 718 F.3d at 778 (reversing district court's certification where "[s]ome of the members [of the class] likely have standing, and some likely do not"). Yet Plaintiffs are attempting to certify a class that includes employees who were on paid leave during their FFD evaluation because they were salaried and were ultimately returned to work or because they made a successful time claim under their collective bargaining agreement. (Sec. II. at ¶ 154). These individuals lack standing because they have no injury in fact, and yet they are not only in the eHealthSafe datasets but would also be included in Plaintiffs' class definition.[38] For these reasons, a class cannot be certified either under Plaintiffs' class definition or based on the eHealthSafe dataset.

## IV.
## CONCLUSION

The rigorous analysis required under Rule 23 demonstrates only that Plaintiffs have failed to meet their burden to show that the putative class members have a disparate treatment claim that can be adjudicated on a classwide basis. Union Pacific therefore respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

---

[38] These individuals would also be unable to establish a *prima facie* case of discrimination because they have suffered no adverse action. "First and foremost, an essential factual element of [a disparate treatment claim] is a finding that the challenged employment practice caused each individual class member to suffer an adverse employment action." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 424 (5th Cir. 1998). Yet, placement on paid administrative leave without a demotion or transfer to a less desirable position is not an adverse action. *Singletary v. Missouri Dept. of Corrections*, 423 F.3d 886, 891-92 (8th Cir. 2005). Nor is an FFD evaluation in and of itself, without significant harm or materially significant disadvantage, an adverse action. *Schoffstall v. Henderson*, 223 F.3d 818 (8th Cir. 2000); *Davis v. Minneapolis Pub. Sch.*, Civ. No. 10-2638, 2011 WL 6122312, at *12 (D. Minn. Oct. 13, 2011). Plaintiffs implicitly acknowledged this in their response to Interrogatory No. 20 because they did not list either administrative leave or the FFD evaluation itself as an adverse action on which their claims are based. (Plfts' Response to Interrogatory No. 20, attached as Exh. A73).

92

Dated this 2nd day of October, 2018.

UNION PACIFIC RAILROAD COMPANY,
Defendant,


By:  s/Allison D. Balus
    Scott Parrish Moore (NE# 20752)
    Christopher R. Hedican (NE# 19744)
    Allison D. Balus (NE# 23270)
    Leigh Campbell (MA#682637)
of    BAIRD HOLM LLP
    1700 Farnam St. Ste. 1500
    Omaha, NE  68102-2068
    Phone: 402-344-0500


## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

James H. Kaster at kaster@nka.com
David E. Schlesinger at schlesinger@nka.com
Charles A. Delbridge at cdelbridge@nka.com
Robert L. Schug at schug@nka.com
Neil D. Pederson at npederson@nka.com
Laura A. Baures at lbaures@nka.com
Corey L. Stull at cstull@atwoodlawyers.com
Anthony S. Petru at petru@hmnlaw.com
Nicholas D. Thompson at nthompson@moodyrrlaw.com


and I hereby certify that I have mailed by United States Postal Service, postage prepaid, this document to the following non CM/ECF participants:

None.

/s/ Allison D. Balus

93

**Index of Evidence for Defendant's Brief in Opposition to Plaintiffs' Motion for Class Certification**

Exh. A:  Declaration of Allison D. Balus

Exh. A1.  Excerpts from the Deposition of John Baker

Exh. A2.  Baker Depo. Ex 133: Job functions for train crew

Exh. A3.  Baker Depo. Ex 134: Union Pacific trainman job description brief

Exh. A4.  Baker Depo. Ex 135: Little Rock Diagnostic Clinic memo dated 10.16.14

Exh. A5.  Baker Depo. Ex 140: Little Rock Diagnostic Clinic Neurology Department return to work slip dated 1-6-15

Exh. A6.  Baker Depo. Ex 145: Little Rock Diagnostic Clinic Medical Note dated 10-14-14

Exh. A7.  Baker Depo. Ex 146: Letter to Mr. Baker from Mr. Everett dated 3-2-15

Exh. A8.  Baker Depo. Ex 147: Letter to Mr. Baker from Ms. Owens dated 3-2-15

Exh. A9.  Baker Depo. Ex 157: Fax sent from Mr. Baker to Ms. Weatherford dated 10-20-15

Exh. A10. Baker Depo. Ex 158: Letter to Mr. Baker from Mr. Everett dated 10-30-15

Exh. A11. Excerpts from the Deposition of Quinton Harris

Exh. A12. Harris Depo. Ex 260: Job description, Mechanical Service Operator

Exh. A13. Harris Depo. Ex 262: LHI, Medical Consent Form

Exh. A14. Harris Depo. Ex 265: E-mail from HRSSMAIL@up.com to Harris, 12-19-13 re: Hiring Session-Training Crew

Exh. A15. Harris Depo. Ex 266: E-mail from CDHARRIS@up.com to Quinton Harris, re: Referral

Exh. A16. Harris Depo. Ex 267: E-mail from HRSSMAIL@up.com to Harris, re: Application Received

Exh. A17. Harris Depo. Ex 268: E-mail from HRSSMAIL@up.com to Harris, re: Update, Train Crew in North Little Rock

Exh. A18. Harris Depo. Ex 269: E-mail from HRSSMAIL@up.com to Harris, re: Update, Train Crew in North Little Rock

Exh. A19. Harris Depo. Ex 270: E-mail from HRSSMAIL@up.com to Harris, re: Job Offer Extended for Train Crew

Exh. A20. Harris Depo. Ex 273: Union Pacific Railroad – Health History Form, 2-7-14

Exh. A21. Harris Depo. Ex 276: Medical Comments History

Exh. A22. Harris Depo. Ex 279: Certified letter to Harris, 3-14-14, from Hiatt, re: Restrictions

Exh. A23. Excerpts from the Deposition of Geoffrey Miller

Exh. A24. Miller Depo. Ex 54: Medical Examination for Commercial Driver Fitness Determination, 2/1/14

Exh. A25. Miller Depo. Ex 55: Medical Comments History

Exh. A26. Miller Depo. Ex 56: Letter to Mr. Miller from UPRR Health and Medical Services, 3-19-14

Exh. A27. Miller Depo. Ex 58: Echo Report

Exh. A28. Miller Depo. Ex 59: Restriction Review Form

94

Exh. A29.  Miller Depo. Ex 60: Letter, 1-13-15, advising permanent restrictions cannot be accommodated

Exh. A30.  Miller Depo. Ex 62: Request for Reexamination

Exh. A31.  Miller Depo. Ex 63: Explanation of Medical Restrictions

Exh. A32.  Miller Depo. Ex 65: Fax from Theresa Rodino, RN, to Dr. Joshua Remick, 5-8-15

Exh. A33.  Excerpts from the Deposition of Norman Mount

Exh. A34.  Mount Depo. Ex 178: EMF Work Restrictions

Exh. A35.  Mount Depo. Ex 180: Letter, 9-3-14, Fitness-for-duty Decision

Exh. A36.  Mount Depo. Ex 182: CMO Memo on Fitness-for-Duty Evaluation

Exh. A37.  Mount Depo. Ex 196: Letter, 6-29-15, Determination regarding Disability Annuity

Exh. A38.  Mount Depo. Ex 197: Disability Decision Rationale

Exh. A39.  Excerpts from the Deposition of Joshua Remick, MD

Exh. A40.  Remick Depo. Ex 1: Progress Note, 1-28-15

Exh. A41.  Excerpts from the Deposition of Roy Sucholeiki, MD

Exh. A42.  Sucholeki Depo. Ex 2: Nurse's Note 12-1-14

Exh. A43.  Excerpts from the Deposition of Thomas Taylor

Exh. A44.  Taylor Depo. Ex 104: UPRR Signalman Job Description Brief

Exh. A45.  Taylor Depo. Ex 105: Signal Person Job Description

Exh. A46.  Taylor Depo. Ex 113: Letter, 6-17-15, re: Cleared to Work

Exh. A47.  Taylor Depo. Ex 114: E-mail, 6-16-15, between Taylor and Roberts re: AMD FFD Determination Memo

Exh. A48.  Taylor Depo. Ex 115: Work Restrictions for UPRR Workers with Seizures

Exh. A49.  Taylor Depo. Ex 122: Letter from Terry Owens to Taylor, 6-17-15

Exh. A50.  Excerpts from the Deposition of Scott Zinn

Exh. A51.  Zinn Depo. Ex 222: Medical Comments History

Exh. A52.  Zinn Depo. Ex 230: 8-1-14 Fax from Fred Wiggins, Ph.D. to William Ford

Exh. A53.  Zinn Depo. Ex 240: 3-31-15 letter to Zinn from Hardistry, re: Permanent Medical Disqualification

Exh. A54.  Zinn Depo. Ex 241: 4-9-15 Memo from Holland, re: Determination Memo

Exh. A55.  Excerpts from the Deposition of Kevin Trangle

Exh. A56.  Trangle Depo. Ex 524: Letter 6-4-15 by Jennifer Roberts

Exh. A57.  Trangle Depo.Ex 527:  Letter 11-6-14 by Pachaud

Exh. A58.  Trangle Depo.Ex 528: Letter 2-12-15 by Pachaud

Exh. A59.  Trangle Depo.Ex 535: Health Info, Scott Zinn

Exh. A60.  Trangle Depo.Ex 537: VA Fax 6-17-14

Exh. A61.  Excerpts from the Deposition of John Holland, MD

Exh. A62.  Excerpts from the Deposition of Michael Devereaux, MD

Exh. A63.  Excerpts from the Deposition of Matthew Rizzo, MD

Exh. A64.  Excerpts from the Deposition of Robert Goldstein, MD

Exh. A65.  Excerpts from the Deposition of Heather Aguilera

Exh. A66.  Excerpts from the Deposition of Charles Cannan, MD

Exh. A67.  Excerpts from the Deposition of Richard Katholi, MD

Exh. A68.  Excerpts from the Deposition of Ali Saad, PhD

95

Exh. A69.  Excerpts from the Expert Report of Ali Saad, PhD in response to Dr. Trangle's expert report (including exhibits 5, 11, 17, 18 and 19)

Exh. A70.  Excerpts from the Deposition of Robert Silzer,, MD

Exh. A71.  Defendant's responses and supplemental responses to Plaintiffs' Interrogatory Nos. 6 and 8

Exh. A72.  Plaintiffs' January 24, 2018 Amended Answers to Second Set of Interrogatories

Exh. A73.  Plaintiffs' February 26, 2018 Answers to Third Set of Interrogatories

Exh. A74.  Excerpts from the Deposition of Matthew Hughes, MD

Exh. A75.  Excerpts from the Deposition of John Charbonneau, MD


Exh. B:      Declaration of John Holland, MD

Exh. B1.   Excerpts from the 2005 FRA Medical Standards for Railroad Workers Report at UP_Harris_036441–036643

Exh. B2.   RSAC Physician's Task Force Recommendations, at Dr. Holland Expert Report-Ex I-00001

Exh. B3.   NTSB Goodwell, OK Report at Dr. Holland Expert Report-Ex I-02124–2187

Exh. B4.   1% Memo at at Dr. Holland Expert Report-Ex B-FFD_RRC-00247–249

Exh. B5.   Excerpts from the FMCSA Handbook at Dr. Holland Expert Report-Ex I-00364–623

Exh. B6.   Expert Panel Recommendations: Seizure Disorders and Commercial Motor Vehicle Driver Safety at Dr. Holland Expert Report-Ex I-00335–363

Exh. B7.   MRB article at Dr. Holland Expert Report-Ex I-00167–68

Exh. B8.   Expert Panel Recommendations: Cardiovascular Disease and Commercial Motor Vehicle Driver Safety at Dr. Holland Expert Report-Ex I-001168–1202

Exh. B9.   NTSB Arden, NV Report at Dr. Holland Expert Report-Ex I-02190–2202

Exh. B10.  Excerpts from Dr. Holland Rebuttal Report, part II


Exh. C:      Declaration of Rod Doerr

Exh. D:      Declaration of Debra Gengler

Exh. D1.    1997 Union Pacific Medical Rules at UP 004020–34

Exh. D2.    RSAC Medical Standards Working Group Draft

Exh. D3.    2011 Union Pacific Medical Rules at UP 004035-38, 4041–46, 4061-62

Exh. D4.    Medical Comments History for ▮▮▮▮▮ at UP_Harris_409922-44

Exh. D5.    Medical Comments History for ▮▮▮▮▮▮ at UP_Harris_213206-213224


Exh. E:      Declaration of Kristi Deardorff

Exh. F:      Declaration of Kyle Haynes

Exh. G:      Declaration of Heather Aguilera