# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1514
_____

Quinton Harris; Geoffrey Miller; Norman Mount; Thomas Taylor; John Baker; Scott Zinn

*Plaintiffs - Appellees*

v.

Union Pacific Railroad Company

*Defendant - Appellant*

------------------------------

AARP; American Diabetes Association; Disability Rights Advocates; Disability Rights Arkansas, Inc.; Disability Rights Education & Defense Fund; Disability Rights Iowa; Disability Rights Legal Center; Disability Rights Nebraska; Disability Rights Texas; Impact Fund; Legal Aid at Work; Mid-Minnesota Legal Aid; Missouri Protection & Advocacy Services; Public Justice; The Protection & Advocacy Project

*Amici on Behalf of Appellee(s)*

Chamber of Commerce of the United States of America; The National Association of Manufacturers; National Retail Federation; Association of American Railroads; Center for Workplace Compliance

*Amici on Behalf of Appellant(s)*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: November 13, 2019
Filed: March 24, 2020
_____

Before GRUENDER, KELLY, and ERICKSON, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Union Pacific Railroad Company appeals the district court's order certifying a class under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Because we conclude that the district court abused its discretion in finding that the plaintiffs met the Rule 23(b)(2) and (b)(3) requirements, we reverse the class certification order.

Union Pacific follows a fitness-for-duty policy to evaluate its employees, and its Health and Medical Services department ("HMS") is responsible for completing fitness-for-duty evaluations. The railroad defines "'Fitness for Duty' as the medical and functional . . . ability to: [s]afely perform a job, with or without reasonable accommodations, and [m]eet medical standards established by regulatory agencies in accordance with federal and state laws."

Employees in some positions must report certain events, called "reportable health events," to HMS so it can evaluate the employee's fitness for duty. Such events include heart attack, cardiac arrest, stroke, seizure, significant vision change, and eye surgery. According to Union Pacific, an employee who has a reportable health event is evaluated to "determine if the employee presents an unacceptably high risk of sudden incapacitation." To perform this evaluation, HMS reviews the employee's "appropriate medical records." HMS also considers guidelines from at least one federal agency and "other relevant evidence from the scientific literature[] to inform its [fitness-for-duty] decisions in conducting an individualized analysis of safety risks for work that may be posed by an employee's specific health conditions and functional limitations." Sometimes, HMS "may refer the matter to an outside

-2-

physician specialist (such as a neurologist or cardiologist) for a clinical evaluation or a medical file review."

Based on Union Pacific's assessment of the employee's risk for sudden incapacitation, the railroad may require "functional work restrictions," meaning "restrictions that focus on particular work functions or tasks rather than whether a person is qualified or disqualified for a particular job." Union Pacific uses "a level of acceptable risk for sudden incapacitation of no greater than a 1% annual occurrence rate." After assessing functional work restrictions, HMS "relies on the employee's supervisors, who are intimately familiar with the particulars of the employee's job, to determine whether the employee can perform the job with or without reasonable accommodation despite the restrictions." While the employee is being evaluated by HMS, the employee is removed from work.

Former Union Pacific employee Quinton Harris filed a complaint against the railroad in 2015, claiming that Union Pacific violated the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12101 *et seq.*, when he was disqualified from work because of his epilepsy. In 2018, Harris and other current and former employees of Union Pacific moved to certify a class action for a claim under the ADA. *See* 42 U.S.C. § 12112(a), (b)(6). They argued that Union Pacific's fitness-for-duty policy "has led to the systematic removal of workers with disabilities."

The district court granted the motion, certifying a hybrid class under Rule 23(b)(2) and (b)(3). It defined the class to include all employees who have been or will be subject to a fitness-for-duty evaluation because of a reportable health event from September 18, 2014 until the end of the case. We granted Union Pacific permission to appeal the order granting class certification. *See* Fed. R. Civ. P. 23(f). On appeal, Union Pacific argues that the class does not meet the Rule 23(b)(2) and (b)(3) requirements.

District courts have "broad discretion to determine whether certification is appropriate." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375 (8th Cir.

2018) (internal quotation marks omitted). In reviewing the district court's certification decision, "[t]he district court's rulings on questions of law are reviewed de novo and its application of the law is reviewed for an abuse of discretion." *Id.*

Before a class may be certified, Rule 23 requires that plaintiffs meet all of Rule 23(a)'s requirements and "satisfy one of the three subsections of Rule 23(b)." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016). The touchstone of a 23(b)(2) class is that the class claims must be cohesive. *Id.* at 480. Said another way, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Rule 23(b)(3), meanwhile, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at 362. The predominance requirement "is not satisfied if individual questions . . . overwhelm the questions common to the class." *Ebert*, 823 F.3d at 478-79 (alteration in original and internal quotation marks omitted).

Union Pacific argues that the district court misapplied the Rule 23 standards because plaintiffs satisfied neither 23(b)(2)'s cohesiveness nor 23(b)(3)'s predominance and superiority requirements. We begin by considering the nature of plaintiffs' claim to determine whether it is suitable for class certification. *See Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) (explaining that the class certification question "necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims"); *Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001) ("To determine whether the claims alleged by the putative class meet the requirements for class certification, we must first examine the underlying cause of action . . . .").

The ADA generally provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement . . . and other terms, conditions, and privileges

-4-

of employment." 42 U.S.C. § 12112(a). As relevant here, the statute defines "discriminate against a qualified individual on the basis of disability" to include:

> using qualification standards, employment tests or other selection critera that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

§ 12112(b)(6).

Plaintiffs claim that Union Pacific's "reportable health events" policy violates this provision of the ADA because it is "designed to target employees with disabilities." According to plaintiffs, the claim could be certified under Rule 23(b)(2) and (b)(3) because the claim involves a "common predominant question," whether the policy is unlawfully discriminatory, which "entails a number of common subsidiary questions."

Persuaded by the plaintiffs' arguments, the district court adopted a two-stage trial plan, certifying the first stage under Rule 23(b)(2), and certifying the second stage under Rule 23(b)(3). During the first stage of litigation, the jury would determine whether Union Pacific "engaged in a pattern or practice of disability discrimination" and the district court would decide whether to grant injunctive relief. *See* Fed. R. Civ. P. 23(b)(2). During the second stage, the district court would hold "Individual Hearings on reinstatement, back pay and compensatory damages, ADA 'qualification,' and individual defenses." *See* Fed. R. Civ. P. 23(b)(3).

The district court noted that its hybrid certification was "consistent with litigating class discrimination cases as set forth" in *International Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). In *Teamsters*, the Supreme Court adopted a similar two-step framework for analyzing certain Title VII, 42 U.S.C. § 2000e *et seq.*, claims that seek to show a pattern or practice of discrimination. *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 177-79 (3d Cir. 2009); *Serrano v. Cintas*

*Corp.*, 699 F.3d 884, 898 (6th Cir. 2012) ("*Teamsters* provides an evidentiary framework pursuant to which the EEOC may seek to prove its allegations of intentional discrimination, not an independent cause of action.").

The parties disagree about whether the district court could use the *Teamsters* framework for an ADA claim. We assume, without deciding, that the district court properly applied the *Teamsters* framework here. *See Hohider*, 574 F.3d at 182 ("This dispute comprises two inquiries: whether the *Teamsters* framework, as a general matter, can be imported from the Title VII context . . . and applied to pattern-or-practice claims raised under the ADA; and if so, whether plaintiffs' claims, when analyzed with this framework in mind, can be certified for class treatment."). We consider only whether the district court abused its discretion by finding that the plaintiffs, using the *Teamsters* framework, have satisfied the Rule 23(b)(2) and (b)(3) requirements.

We thus turn to the Rule 23(b)(2) and (b)(3) requirements with the *Teamsters* framework in mind. If the elements of plaintiffs' ADA claim "include individualized inquiries that cannot be addressed in a manner consistent with Rule 23, then the class cannot be certified." *Hohider*, 574 F.3d at 184.

We agree with Union Pacific that the individualized inquiries in this case cannot be addressed in a manner consistent with Rule 23. As outlined above, the ADA defines "discriminate against a qualified individual on the basis of disability" to include "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." § 12112(b)(6). But if the qualification standard, employment test, or other selection criteria "is shown to be job-related for the position in question and is consistent with business necessity," it is not unlawfully discriminatory under the ADA. *Id.*

Plaintiffs argue that the policy is facially discriminatory—they say they are challenging the lawfulness of the "policy itself," rather than the way the policy was

applied. But under the plain language of the ADA, the district court cannot determine whether the "policy itself" constituted a pattern or practice of unlawful discrimination without considering whether the policy is job-related for each of over 650 positions in question and whether the policy is consistent with business necessity in each situation.[1] *See* 42 U.S.C. § 12112(b)(6); *cf. Cripe v. City of San Jose*, 261 F.3d 877, 889 (9th Cir. 2001) (citing 42 U.S.C. § 12112(b)(6)) ("If [a] standard serves to 'screen out . . . a class of individuals with disabilities,' it is lawful only if it is 'shown to be job-related for the position in question' and 'consistent with business necessity.'").

"An employer urging a business necessity defense must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position." *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999). "To show 'job-relatedness,' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007); *see also Atkins v. Salazar*, 677 F.3d 667, 682 (5th Cir. 2011) (per curiam) ("For a qualification to be job-related, the employer must demonstrate that the qualification standard is necessary and related to the specific skills and physical requirements of the sought-after position." (internal quotation marks omitted)).

---

[1] The plaintiffs claim that Union Pacific did not argue before the district court that class certification was improper based on its affirmative defenses. But given that the plaintiffs devoted five pages in their reply brief in the district court to argue that "contrary to Union Pacific's contention . . . the success of [its] defenses . . . can be decided for the class in a single proceeding," and given that the district court found that the "defenses are typical of the class," we conclude the issue was properly before the district court and thus preserved for our review. *See Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1172 n.8 (10th Cir. 2009) (concluding that an issue was preserved for appellate review where "both the opposing party and the district court understood" the party "to be asserting argument on point").

"For a safety-based qualification standard, '[i]n evaluating whether the risks addressed by . . . [the] qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence.'" *Bates*, 511 F.3d at 996 (alteration in original). This means the district court would have to consider whether Union Pacific's policy is job-related and consistent with business necessity in light of the medical conditions to which it applies.[2] The named plaintiffs alone have varying conditions: one has a cardiomyopathy, one has a pacemaker that may malfunction if near electromagnetic forces, one has post-traumatic stress disorder ("PTSD") and substance abuse problems, and one has syncope "episodically," including an incident where he "had garbled speech and confusion."

As the foregoing shows, determining whether the policy is job related and consistent with business necessity requires answering many individual questions. Indeed, the analysis for an accountant with a cardiomyopathy is not the same as the analysis for an engineer with a cardiomyopathy, nor is the analysis for an engineer with a cardiomyopathy the same as the analysis for an engineer with PTSD.

Plaintiffs nevertheless argue the evidence shows that Union Pacific does not make "individualized," job-related assessments because it uniformly applies its policy. They rely on a report by Dr. John Holland, Union Pacific's Chief Medical

---

[2]The parties disagree about if "adjudicating [plaintiffs'] claims will require individualized assessments of whether each class member has a 'disability'" so that they can recover under the ADA, defeating Rule 23(b)(2) and (b)(3)'s cohesiveness and predominance requirements. We do not address that argument. Rather, we observe that the plaintiffs' medical conditions and reportable health events are relevant to the business necessity and job-related analysis. *See E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000) ("The acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example. . . . [T]he court should thus consider the magnitude of a failure in assessing whether the rate of recidivism among recovering substance abusers constitutes a safety risk sufficient for business necessity.").

Officer, stating that Union Pacific uses a "single set of medical standards" to evaluate its employees during the fitness-for-duty evaluation. They thus conclude that Union Pacific can present "classwide defenses" at stage one of the trial plan.

But Holland's report went on to explain that Union Pacific could use a single set of medical standards because the employee is then given "functional work restrictions," which are "evaluated by each individual employee's manager as to whether the employee can meet the standards and still perform the essential functions of the job with or without an accommodation." Holland submitted a declaration to the district court, explaining that after HMS identifies functional work restrictions, it "relies on the employee's supervisors, who are intimately familiar with the particulars of the employee's job, to determine whether the employee can perform the job with or without reasonable accommodation despite the restrictions."

Debra Gengler, Director of Clinical Services for Union Pacific, also submitted a declaration to the district court, detailing the fitness-for-duty evaluation. Like Holland, she explained that HMS asks an employee's supervisor and, in some cases, other high-ranking managers, whether the employee can perform the essential functions of the job despite functional work restrictions. She said the supervisor "evaluates the restrictions" with the employee's job duties in mind "and makes an independent determination" as to whether the restrictions affect the employee's ability to perform the job and, if so, whether the restrictions can be accommodated.

This process leads to varying—and individualized—outcomes. For example, of eighteen employees with a cardiac pacemaker who underwent a fitness-for-duty evaluation, six received a "full duty release" and were cleared to work with no restrictions, three received "full duty release" and were cleared to work with permanent restrictions, and two received accommodations from their manager and were cleared to work with permanent restrictions, among other outcomes. Only one person received the outcome "cleared to work with permanent restrictions" and "manager does not agree to accommodate—refer to accomm[odation] committee."

Thus, employees with the same disability do not automatically receive the same outcome under Union Pacific's policy.

Additionally, Holland's declaration demonstrates another way Union Pacific's procedure requires individualized assessments. He explained that Union Pacific uses medical guidelines to inform its fitness-for-duty decisions "in conducting an individualized analysis of safety risks for work that may be posed by an employee's specific health conditions and functional limitations." But he also noted that although the Federal Motor Carrier Safety Administration's Medical Examiner Handbook prohibits diabetic employees treated with insulin from driving commercial motor vehicles, Union Pacific allows diabetic employees treated with insulin to work as locomotive engineers "if, after an individualized assessment, Union Pacific determines the employee's condition is adequately controlled and the employee is periodically monitored." Dr. Matthew Rizzo also stated in a report that Union Pacific performs an "[i]ndividual assessment" under its policy. He explained that the assessment allows Union Pacific to "make individual allowances for particular individuals who may be at greater or lesser risk than the general population of at risk individuals with the same condition."

Both the text of the ADA and the record evidence demonstrate that the district court would be required to consider the unique circumstances of each position in question to determine whether the policy is unlawfully discriminatory. *See Hohider*, 574 F.3d at 184 ("That the existence of the polic[y] alleged by plaintiffs can be adjudicated on a classwide basis . . . does not mean that th[is] polic[y], if proven to exist, would amount to a classwide showing of unlawful discrimination under the ADA."). Even the plaintiffs acknowledge that their "common predominant question"—whether Union Pacific's policy is unlawfully discriminatory—requires asking a subsidiary question, whether the policy is consistent with business necessity.[3]

---

[3]Plaintiffs say that "setting aside subsection 12112(b)(6)," they can prove that Union Pacific's policy "constitutes a practice of unlawful discrimination against otherwise qualified individuals with disabilities, without a valid justification," under

-10-

This is inherently an individualized question, defeating both predominance and cohesiveness. With regard to Rule 23(b)(3)'s predominance requirement, the district court failed to conduct the required "rigorous analysis." *See Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2018). After outlining the relevant law and the parties' arguments, the district court's predominance analysis consisted of one short paragraph, which concluded that the plaintiffs "as a whole do in fact allege and have injury" and that "[t]he same evidence will be used to establish class-wide proof." But "[t]he requirements of the Rule 23(b)(3) analysis readily demonstrate why the district court must perform a rigorous analysis before determining that issues common to the class predominate over issues that differ among the individual class members." *Ebert*, 823 F.3d at 478.

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 479 (internal quotation marks omitted). Because the ADA requires the district court to consider whether Union Pacific's policy is job related and consistent with business necessity as to each of the over 650 jobs at issue to determine whether the policy is unlawfully discriminatory, common questions do not predominate. *See Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1241 (11th Cir. 2016) ("Individual affirmative defenses can defeat predominance in some circumstances. For example, the affirmative defenses could apply to the vast majority of class members and raise complex, individual questions.").[4]

---

§ 12112(a). But even if plaintiffs brought suit under § 12112(a) only, they acknowledge that Union Pacific could still assert defenses, and such defenses would include the argument that its policy is "job-related and consistent with business necessity," *see* § 12113(a). As with § 12112(b)(6), this means the district court could not determine whether the "company had a practice of repeated individual violations" without considering how the policy applies to each position and medical condition or reportable health event in question.

[4]We need not decide whether plaintiffs have satisfied Rule 23(b)(3)'s additional requirement "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).

With regard to Rule 23(b)(2), "the cohesiveness requirement . . . is more stringent than the predominance" requirement of Rule 23(b)(3). *Ebert*, 823 F.3d at 480. We have previously explained that a class is not suitable for 23(b)(2) certification when the defendant's "conduct cannot be evaluated without reference to the individual circumstances of each plaintiff." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1036 (8th Cir. 2010); *see also Ebert*, 823 F.3d at 480-81 (explaining that certification under Rule 23(b)(2) was an abuse of discretion because "[t]he resolution of [the] single question" during the first stage of the hybrid class action "does not apply uniformly to the entire class, as in reality, the issue of liability and the relief sought by these homeowners is, at bottom, highly individualized"). That is precisely the case here, where the district court cannot determine whether the policy is unlawfully discriminatory under the ADA without considering whether it is job related and consistent with business necessity in each situation. For these reasons, we conclude that the district court abused its discretion by certifying the class under Rule 23(b)(2) and (b)(3).

We emphasize that we need not decide whether Union Pacific's policy is consistent with business necessity and whether it does, in fact, properly "validate" its policy "for job-relatedness to the specific skills and physical requirements of the sought-after position[s]." *See Belk*, 194 F.3d at 951; *cf. Cripe*, 261 F.3d at 890 (noting a Ninth Circuit case holding that the business necessity defense rendered a medical examination nondiscriminatory "when an employee's health problems . . .

---

Nevertheless, we question whether they have. Plaintiffs say that if Union Pacific "prevails on the class claim, it will get the benefit of res judicata on that particular claim." But they clarify that even if the class claim fails, the class members "can also bring separate individual actions . . . albeit ones that would challenge the application of the policy to their specific circumstances." It is thus less than clear to us why a class action would be a superior method for fairly and efficiently adjudicating the controversy in this case. *See Ebert*, 823 F.3d at 479 ("The district court's narrowing and separating of the issues ultimately unravels and undoes any efficiencies gained by the class proceeding because many individual issues will require trial.").

-12-

had a substantial and injurious impact on an employee's job performance" (internal quotation marks omitted)). Rather, we need only conclude, as we do, that in this case this is a highly individualized question that does not allow class certification under Rule 23(b)(2) and (b)(3).

We also do not reject the possibility that a class bringing an ADA claim through the *Teamsters* framework could be certified under Rule 23. For example, had some number of employees from the same or similar positions with the same or similar disabilities sought to challenge Union Pacific's policy, class certification may have been appropriate. *See Hohider*, 574 F.3d at 189 ("The class, as defined, contains no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation . . . ."). And were it the case, as the plaintiffs argue, that Union Pacific's policy applied in the same way to every Union Pacific employee no matter their position and medical circumstance, the district court may have been able to properly consider whether the policy was facially discriminatory without individual circumstances overwhelming the inquiry.[5] But neither of these circumstances is the case here, and "the *Teamsters* framework cannot, by its own force, cure [the] flaw in the class." *Hohider*, 574 F.3d at 186; *see also Kittel v. City of Oxnard*, No. CV-17-6709-MWF(GJSx), 2018 WL 6004524, at *8 (C.D. Cal. Feb. 20, 2018) ("[T]he many necessary individualized inquiries . . . render Plaintiff's citation to the *Teamsters* framework inadequate to render these [ADA] claims amenable to class treatment.").

For the foregoing reasons, we reverse the district court's class certification.

---

[5]Again, we do not decide whether the district court properly applied the *Teamsters* framework to the plaintiffs' ADA claims. But we agree with the Third Circuit in *Hohider* that "it is necessary to look to the ADA, the statutory basis for plaintiffs' claims, to assess what elements must be demonstrated for the court to reach, at the first *Teamsters* stage, a determination of unlawful discrimination and a finding of classwide liability and relief." 574 F.3d at 184.

KELLY, Circuit Judge, concurring.

I agree with the court that this class was improperly certified, but I write separately because I disagree with the court's reliance on the number and types of disabilities within the class. In my view, the error was in certifying a class containing 650 different jobs, not in certifying a class of individuals who have different disabilities.

As relevant here, the ADA proscribes

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6). To decide whether Union Pacific's policy violates this provision of the ADA, we must determine whether the policy is "job-related for the position in question and is consistent with business necessity." We can make that determination on a class-wide basis, but only if the class contains individuals with the "same or similar positions." See ante at 13. The class certified here contains 650 different jobs, which means the answer to the question, "Was this policy job-related for the position in question?" cannot be answered as to the entire class. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) ("What matters to class certification is not the raising of common questions—even in droves—but rather, the capacity of the class-wide proceedings to generate common *answers* apt to drive the resolution of the litigation." (cleaned up)).

But this does not mean that only a class of employees with the "same or similar disabilities" can bring a class action. See ante at 13. Union Pacific imposes functional work restrictions on employees based on "a level of acceptable risk for sudden incapacitation of no greater than a 1% annual occurrence rate," and it uses a

-14-

"single set of medical standards" to determine whether an employee crosses that threshold. At the point that restrictions are imposed, the employee has been treated differently based on a 1% annual risk of sudden incapacitation. Plaintiffs argue this "tend[s] to screen out . . . a class of individuals with disabilities" in violation of the ADA. See 42 U.S.C. § 12112(b)(6). To rebut that claim, Union Pacific must show that decision—which is made without reference to the employee's particular disability—is job-related and business justified. See id. I see no reason why the district court could not determine, on a class-wide basis, whether imposing these restrictions is job-related and business justified for a particular position.

The particular type of disability that results in an unacceptably high risk of sudden incapacitation is not relevant for protection under the statute. A plaintiff can demonstrate a "disability" if she has been "regarded as having such an impairment." See 42 U.S.C. § 12102(1). This, in turn, can be shown by establishing that she "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment." See id. at § 12102(1)(3). And Congress has instructed that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(5), 122 Stat. 3553.

It is true that some of the employees who were deemed to have functional work restrictions under Union Pacific's policy may not have suffered damages. Cf. Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1051 (2016) (Roberts, C.J., concurring) (concluding the class may consist of individuals who suffered no damages so long as any damages award goes only to the individuals who did). After Union Pacific decides that an employee "presents an unacceptably high risk of sudden incapacitation," it conducts a further inquiry into whether the employee can nonetheless "perform the job with or without reasonable accommodation despite the restrictions." Depending on the outcome of that assessment and the accommodations given, Union Pacific may have an individualized defense as to a particular employee. But those individualized inquiries would not prevent the district court from answering the class-wide question of whether imposing functional

-15-

-16-

work restrictions based on a 1% annual risk of sudden incapacitation is job-related for a specific position and consistent with business necessity, see 42 U.S.C. § 12112(b)(6), nor would they "undercut" the propriety of class resolution, see Barfield v. Sho-Me Power Elec. Coop., 852 F.3d 795, 806 (8th Cir. 2017).

_____